# VOLUMEN

I

# INDEX

Exhibit 1    Letter of December 17, 2007 from Cardio Service, Inc

Exhibit 2    Letter of December 17, 2007 from Aguadilla Heart Center

Exhibit 3    Letter of December 17, 2007 from Diagnostic Nuclear Medicine

Exhibit 4    E-mail of March 31, 2009

Exhibit 5    E-mail of July 17, 2009

Exhibit 6    Letter of August 4, 2009 from Municipality of Mayaguez

Exhibit 7    Letter of August 10, 2009 from MEDHS

Exhibit 8    Letter of August 19, 2009 from Municipality of Mayaguez

Exhibit 9    Contract between Municipality of Mayaguez and MEDHS, where SISSO appears as guarantor

Exhibit 10   Photos of abandoned and/or ruined portions of the hospital

Exhibit 11   E-mail of September 11, 2009 from the Municipality of Mayaguez to MEDHS and MEDHS' answer dated September 12, 2009, included in reverse order, as kept by e-mail service

Exhibit 12   E-mail of September 27, 2009

Exhibit 13   E-mail of September 30, 2009

Exhibit 14   E-mail of October 7, 2009

Exhibit 15   E-mail of October 12, 2009

Exhibit 16   Agreement for Designation of Representation

Exhibit 17   Answer to "Request for Extension of Time to Submit Financial Reports"

Exhibit 18   Letter of October 16, 2009 from MEDHS

Exhibit 19   Letter of November 13, 2009 signed by SISSO's minority stockholders, addressed to Dr. Marini, in which the signatories confirm the transfer of their ownership interest

Exhibit 20    "Bounced" check and Municipality letter returning it

Exhibit 21    Letter of December 1st, 2009 from MEDHS

Exhibit 22    Letter of December 2, 2009 from SISSO

Exhibit 23    Letter of December 3, 2009

Exhibit 24    Letter of December 8, 2009 from the Municipality's legal counsel to MEDHS

Exhibit 25    Letter of December 8, 2009 from MEDHS to SISSO

Exhibit 26    Letter of December 30, 2009 from MEDHS to SISSO

Exhibit 27    Cancellation letter of January 8, 2010

Exhibit 28    SISSO's letter of January 29, 2010 accepting the cancellation

Exhibit 29    Contract between the Municipality of Mayaguez and MMC

Exhibit 30    MEDHS' letter of February 1st, 2010

Exhibit 31    Letter by Attorney Antonio Santos dated February 16, 2010, advising the Health Secretary of change of control and requesting transfer of licenses

Exhibit 32    Contract between MEDHS and SISSO

Exhibit 33    Contract between MMC and SISSO for Administration of Contract

Exhibit 34    Contract between MEDHS and MARC

Exhibit 35    Complaint MMC v MARC, filed April 15, 2010 before the Court of First Instance of the Commonwealth of Puerto Rico, Mayaguez Part, Case No. ISCI2010-00546

Exhibit 36    Contract Quiros/Marini for sale of stock, par XXIII

Exhibit 37    Letter of February 16, 2010 requesting cancellation and emission of new certificate of need and convenience

Exhibit 1



# CARDIO SERVICES, INC.

### Dr. Orlando Marini Román
P.O. Box 5218
Aguadilla, Puerto Rico 00605
Tel. (787) 819-1060 - Tel. & Fax (787) 819-1396

17 de diciembre de 2007

Dr. Orestes Castellanos
Presidente
Medical Education and Health Service, Inc

Estimado doctor Catellanos:

Saludos muy cordiales. Por la presente, quiero dejarle saber el interes y la disponibilidad de Cardio Services, Inc., en invertir en las facilidades del area cardiovascular no invasivo del Hospital Ramón Emeterio Betances de Mayaguez tan pronto surja el cambio de administración.

Quiero dejarle saber que estamos dispuestos hacer una inversión económica para adquirir el equipo necesario para el desarrollo de la misma.

Esperando poder reunirnos con usted prontamente.

Cordialmente,

Dr. Orlando Marini Román
Presidente

myr

Exhibit 2



# Aguadilla Heart Center

P.O. Box 3261
Aguadilla, PR 00605-3261
Tel. (787) 378-7910

17 de diciembre de 2007

Dr. Orestes Castellanos
Presidente
Medical Education and Health Service, Inc

Estimado doctor Catellanos:

Saludos muy cordiales. Por la presente, quiero dejarle saber el interes y la disponibilidad de Aguadilla Heart Center, Inc., en invertir en las facilidades del área cardiovascular del Hospital Ramón Emeterio Betances de Mayagüez tan pronto surja el cambio de administración.

Trabajariamos el mismo concepto en que en estos momentos tenemos en Aguadilla, uniendo todos los cardiólogos del área y asumiendo todos los gastos en los que se incurra tales como, permisologia, remodelación y la administración de la misma.

Estamos dispuestos hacer una inversión económica para adquirir el equipo necesario para el desarrollo de la misma.

Esperando poder reunirnos con usted prontamente.

Cordialmente,

Orlando Marini Román
Presidente

myr

Exhibit 3



**Diagnostic Nuclear Medicine**

17 de diciembre de 2007

Dr. Orestes Castellanos
Presidente
Medical Education and Health Service, Inc

Estimado doctor Catellanos:

Saludos muy cordiales. Por la presente, quiero dejarle saber el interés y la disponibilidad de Diagnostic Nuclear Medicine, en invertir en las facilidades del área cardiovascular no invasiva del Hospital Ramón Emeterio Betances de Mayagüez tan pronto surja el cambio de administración.

Estamos dispuestos hacer una inversión económica para adquirir el equipo necesario para el desarrollo de Cardiología Nuclear en esa Institucion

Esperando poder reunirnos con usted prontamente.

Cordialmente,

Dr. Ricardo Santiago Montalvo
Presidente

myr

 Exhibit 5

De: "cnieves@qalawpr.com" <cnieves@qalawpr.com>
A: "'Orestes Castellanos'" <ocastellanosrdz@yahoo.com>
Cc: msanchez@qalawpr.com, dfernandez@qalawpr.com

documentos necesarios para la firma del contrato de administración del Hospital     viernes, 17 de julio de 2009, 12:39 pm

Estimado doctor Castellanos:

Son varios los documentos que MEDHS deberá tener listos al momento del otorgamiento del contrato de administración del Hospital. A continuación incluimos una lista no exhaustiva de dichos documentos (cualquiera otro se lo indicaremos en su momento). En cuanto a SISSO, a pesar de que no será el obligado principal ante el Municipio, interesamos que también cumpla con todos los documentos de contratación pública como parte de su contrato con MEDHS (sobre todo porque estamos revisando el contrato entre el Municipio y MEDHS para que SISSO sea un garantizador de las obligaciones de MEDHS ante el Municipio).

Abajo incluimos una lista de los documentos que necesitamos de cada entidad:

**MEDHS**
- certificado de "good standing" actualizado expedido por el Departamento de Estado;
- certificación actualizada del Departamento de Hacienda sobre la presentación de planillas sobre contribución de ingresos (Forma SC 2888 o cualquiera otra adoptada por el Departamento de Hacienda para estos efectos) durante los últimos cinco (5) años fiscales (salvo que posea la certificación de exención expedida por el Departamento de Hacienda como corporación sin fines de lucro);
- una certificación de deuda actualizada del Departamento de Hacienda (Forma SC 3537 o cualquiera otra adoptada por el Departamento de Hacienda para estos efectos);
- certificaciones de deuda actualizadas y emitidas por el Centro de Recaudaciones e Ingresos Municipales (CRIM);
- certificaciones actualizadas del Departamento del Trabajo y Recursos Humanos de Puerto Rico concernientes a desempleo, incapacidad y seguro choferil, y de la Corporación del Fondo del Seguro del Estado, según sea el caso; y
- declaración jurada actualizada de conformidad con la Ley Número 428 de 22 de septiembre de 2004 (formulario incluido con el último borrador de contrato).

**SISSO**
- borrador de contrato MEDHS-SISSO con los últimos comentarios que le enviamos;
- certificado de incorporación de SISSO (Mayagüez)(poseemos un certificado pero de la corporación que se llama SISSO y opera en Ponce);
- resolución de la Junta de Directores autorizando a SISSO a emitir acciones;
- cualquier acuerdo de accionistas;
- evidencia bancaria del capital líquido generado como resultado de la venta de las acciones de la corporación;
- estatutos de la corporación;
- la certificación del Departamento de Hacienda sobre la presentación de planillas sobre contribución de ingresos (Forma SC 2888 o cualquiera otra adoptada por el Departamento de Hacienda para estos efectos) durante los últimos cinco (5) años fiscales;
- una certificación de deuda actualizada del Departamento de Hacienda (Forma SC 3537 o cualquiera otra adoptada por el Departamento de Hacienda para estos efectos);
- certificaciones de deuda actualizadas y emitidas por el Centro de Recaudaciones e Ingresos Municipales (CRIM);
- certificaciones del Departamento del Trabajo y Recursos Humanos de Puerto Rico concernientes a desempleo, incapacidad y seguro choferil, y de la Corporación del Fondo del Seguro del Estado, según sea el caso;
- declaración jurada actualizada de conformidad con la Ley Número 428 de 22 de septiembre de 2004 (formulario incluido con el último borrador de contrato).

No dude en comunicarse conmigo si tiene alguna duda sobre este asunto.

Saludos cordiales.

Los I. Nieves-Ortega
Cel: (787) 620-6776

Exhibit 6



ESTADO LIBRE ASOCIADO DE PUERTO RICO
MUNICIPIO DE MAYAGUEZ
**DEPTO. ASUNTOS LEGALES**
P.O. Box 447
Mayagüez, Puerto Rico 00681

Tel. 265-3636, Ext. 103, 104
834-3134

4 de agosto de 2009

Dr. Orestes Castellanos
Presidente
Medical Education and Health Services, Inc.
P. O. Box 8043
Marina Station
Mayagüez, P.R. 00682

Estimado doctor Castellanos:

Reciba usted un saludo cordial. Como usted sabe, el 12 de diciembre de 2006 el Municipio de Mayagüez (en adelante, el "Municipio") pre-adjudicó a favor de Medical Education and Health Services, Inc. (en adelante, "MEDHS") el proceso de solicitud de propuestas para la administración y operación del hospital Dr. Ramón E. Betances (en adelante, el "Hospital").

El Municipio y MEDHS se han visto desde entonces impedidos de otorgar un contrato para la administración y operación del Hospital, lo cual responde al largo proceso que se ha desarrollado para la salida del administrador actual. No obstante el tiempo transcurrido desde la pre-adjudicación del proceso, entendemos que MEDHS continúa interesado en continuar las conversaciones que conduzcan a un potencial contrato.

Por tal motivo, el Municipio interesa que MEDHS: (i) reitere su interés de continuar las conversaciones conducentes al contrato; y (ii) actualice la propuesta sometida como parte del RFP a los fines de actualizar los aspectos económicos y financieros, los aspectos relacionados a la operación y la administración del Hospital, el plan de desarrollo de éste, el plan de transición y cualquier otro aspecto que MEDHS entienda se ha visto afectado por las circunstancias actuales del Hospital. Le recordamos que las actualizaciones hechas a la propuesta deberán ser aceptadas por el Municipio para que puedan formar parte de un potencial contrato.

Agradeceremos nos someta por escrito la información antes descrita en o antes del 31 de agosto de 2009.

De usted tener alguna pregunta sobre este asunto, favor de comunicarse con el suscribiente a su conveniencia.

Atentamente,

**Lcdo. Efraín de Jesús Rodríguez**
**Gerente**

/clr

Lcdo. Efraín de Jesús Rodríguez
Depto. Asuntos Legales
Municipio de Mayagüez
Apartado 447
Mayagüez, P.R. 00681

00681÷8043

Dr. Orestes Castellanos
Presidente
Medical Education and Health Services, Inc.
P.O. Box 8043
Marina Station
Mayagüez, P.R. 00682

Exhibit 7

10 de agosto de 2009
Mayagüez, PR 00680

Lcdo. Efraín De Jesús
Gerente Depto. Asuntos Legales
Municipio de Mayagüez

Estimado Lcdo. De Jesús:

En respuesta a su carta del 4 de agosto de 2009, deseamos comunicar nuestro interés en continuar las conversaciones y negociaciones conducentes a un Contrato de Arrendamiento y Administración del Hospital Dr. Ramón E. Betances, Centro Médico de Mayagüez.

Durante los pasados 2 años hemos estado reuniéndonos con sus abogados y el Comité Negociador que usted preside. Al presente estamos por finalizar el contrato a ser firmado. Durante el transcurso de esta semana se le estará sometiendo una propuesta actualizada con énfasis en los aspectos económicos y financieros y el plan de desarrollo del hospital. Todo esto debido a que las circunstancias actuales del Hospital son muy diferentes a las de julio de 2006, cuando se sometió la propuesta original. Como es de su conocimiento la institución ha tenido un excesivo deterioro tanto en su planta física como en los servicios que brinda.

De acuerdo a información brindada por personas que hacen procedimientos en el Hospital, el área de Cardiovascular ha visto reducido el número de casos en menos del 50% de los casos reportados por la administración actual durante el 2006. Además se han abierto 2 Centros de Procedimientos Cardiovasculares y 2 Centros de Radio-oncología en la región, lo que lógicamente nos obliga a revisar nuestras proyecciones originales.

Entendemos y estamos firmemente convencidos que tenemos la capacidad de llevar al Hospital al lugar que ocupaba antes de la reforma de salud, en donde todas las disciplinas Medicas y la actividad académica estaba a la altura del Centro Médico de Río Piedras. Por lo tanto aun cuando las proyecciones cambien las metas y el compromiso con el Municipio y con la región Oeste sigue siendo el mismo.

Atentamente,

Dr. Orestes Castellanos Rodríguez
Presidente MEDHS



*Estado Libre Asociado de Puerto Rico*
*Municipio de Mayagüez*
*Oficina del Alcalde*

Exhibit 8



19 de agosto de 2009

Dr. Orestes Castellanos Rodríguez
Presidente
Medical Education and Health Services, Inc.
P.O. Box 8043
Marina Station
Mayagüez, PR 00682

**Re:** **Expresión de intención del Municipio para otorgar el Contrato para la Operación y la Administración del Hospital Dr. Ramón E. Betances del Centro Médico de Mayagüez**

Estimado doctor Castellanos

El Municipio de Mayagüez (en adelante, el "Municipio") y la compañía sin fines de lucro que usted preside, Medical Education and Health Services, Inc. (en adelante, "MEDHS") han alcanzado acuerdos preliminares que son mutuamente satisfactorios con relación al contrato de la referencia (en adelante, el "Contrato").

El Municipio tiene la intención de otorgar el Contrato, el cual se adjunta, provisto que MEDHS cumpla con aquellos requisitos cuyo cumplimiento deba efectuarse en o antes de la fecha de otorgamiento, en conformidad con las leyes del Estado Libre Asociado de Puerto Rico y el propio texto del Contrato.

Cordialmente,

José Guillermo Rodríguez

Anejos

Exhibit 9

*/5*

MUNICIPIO AUTÓNOMO DE MAYAGÜEZ

**CONTRATO PARA LA OPERACIÓN Y LA ADMINISTRACIÓN
DEL HOSPITAL DR. RAMÓN E. BETANCES DEL
CENTRO MÉDICO DE MAYAGÜEZ**

---

ENTRE
EL MUNICIPIO AUTÓNOMO DE MAYAGÜEZ
Y
MEDICAL EDUCATION AND HEALTH SERVICES, INC

27 DE AGOSTO DE 2009

# TABLA DE CONTENIDOS

**ARTÍCULO 1**    DEFINICIONES; INTERPRETACIÓN .................................................. 3

**ARTÍCULO 2**    BIENES ARRENDADOS Y OTRAS OBLIGACIONES ....................... 10

**ARTÍCULO 3**    DURACIÓN DEL CONTRATO ........................................................ 16

**ARTÍCULO 4**    ADMINISTRACIÓN, OPERACIÓN, DEPARTAMENTOS Y SERVICIOS
CLÍNICOS, RESIDENCIAS E INTERNADOS ................................... 16

**ARTÍCULO 5**    RENTA ......................................................................................... 21

**ARTÍCULO 6**    EQUIPOS BIOMÉDICOS, SERVICIOS, MEJORAS Y SEGURIDAD  23

**ARTÍCULO 7**    GRAVÁMENES, CONTRIBUCIONES Y OTROS CARGOS
GUBERNAMENTALES ................................................................... 26

**ARTÍCULO 8**    INFORMES FINANCIEROS, INFORMES OPERACIONALES,
AUDITORÍAS, VISITAS, SUPERVISIÓN, CONDICIONES FINANCIERAS
RESTRICTIVAS Y ADMINISTRACIÓN DEL CONTRATO .............. 28

**ARTÍCULO 9**    SEGUROS E INDEMNIZACIONES................................................. 33

**ARTÍCULO 10**  INCUMPLIMIENTO Y TERMINACIÓN DEL CONTRATO .............. 37

**ARTÍCULO 11**  SUBCONTRATACIONES; CESIÓN DEL CONTRATO; CAMBIO    DE
CONTROL ..................................................................................... 40

**ARTÍCULO 12**  POLÍTICA CONTRA EL DISCRIMEN Y LA IGUALDAD DE
OPORTUNIDADES ........................................................................ 42

**ARTÍCULO 13**  PROCESO DE RESOLUCIÓN DE DISPUTAS ............................... 43

**ARTÍCULO 14**  CLÁUSULAS MISCELÁNEAS........................................................ 45

       Anejo A – Plano del Centro de Trauma ........................................ 52

       Anejo B – Plan de Desarrollo........................................................ 53

       Anejo C – Propuesta de RFP de MEDHS........................................ 54

       Anejo D – Estudio de Título del Centro Médico ............................ 55

       Anejo E – Plano "As Built" del Centro Médico.............................. 56

       Anejo F – Área Aproximada de Algunos de los Bienes Inmuebles Arrendados....... 57

       Anejo G – Bienes Inmuebles Ocupados por Otros Inquilinos del Centro Médico ... 58

       Anejo H – Lista de Estadísticas a Ser Sometidos en los Informes Mensuales.......... 59

       Anejo I – Estados Financieros Proyectados ................................... 60

       Anejo J – Declaración Jurada en Cumplimiento de la Ley Núm. 428 ...................... 61

2

**PREÁMBULO**

Este contrato para la operación y administración del Hospital Dr. Ramón E. Betances del Centro Médico de Mayagüez (el "Contrato") es otorgado en la fecha de 27 de agosto de 2009 por el Municipio Autónomo de Mayagüez, Número de Seguro Social Patronal 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, representado en este acto por su Alcalde, Hon. José Guillermo Rodríguez Rodríguez (en adelante, el "Alcalde"), mayor de edad, casado, administrador público y vecino de Mayagüez, Puerto Rico, quien ha sido debidamente facultado para comparecer y representar el Municipio Autónomo de Mayagüez en este acto por la Ley Núm. 81 de 30 de agosto de 1991, según enmendada, conocida como la Ley de Municipios Autónomos de Puerto Rico (en adelante, el "Municipio"), la Ordenanza Núm. 53, Serie 1999-2000 del 8 de diciembre de 1999 y la Ordenanza Núm. 12, Serie 2000-2001 del 1 de agosto de 2000 de la Asamblea Municipal de Mayagüez; y por Medical Education and Health Services, Inc., una corporación sin fines de lucro creada bajo la Ley de Corporaciones del Estado Libre Asociado de Puerto Rico, Número de Seguro Social Patronal 66-0660473, con oficinas en Mayagüez, Puerto Rico, representada por su Presidente, Orestes Castellanos Rodríguez, mayor de edad, soltero, médico y vecino de Mayagüez, Puerto Rico, autorizado para suscribir el Contrato mediante resolución de la Junta de Directores de la Corporación (en adelante, "MEDHS") (en conjunto, las "Partes").

De otra parte, comparece a este acto en calidad de garantizador solidario de las obligaciones de MEDHS ante el Municipio, Sistemas Integrados de Salud del Suroeste, Inc., (en adelante, "SISSO") una corporación con fines de lucro creada bajo la Ley General de Corporaciones de Puerto Rico con el propósito de administrar y operar el Hospital, con número de Seguro Social Patronal 660-071-5098 con oficinas en Mayagüez Puerto Rico, representada por su Presidente, Orlando Marini Román, mayor de edad, casado, médico, y vecino de Mayagüez, Puerto Rico, autorizado para suscribir el Contrato mediante resolución de la Junta de Directores de la Corporación (en adelante, el "Subcontratista Administrador").

**ARTÍCULO 1        DEFINICIONES; INTERPRETACIÓN**

1.1    Definiciones.

1. "Administrador Anterior" – Se refiere Advanced Cardiology, Inc., la entidad corporativa que administró y operó el Hospital desde el año 2000 al año 2009.

2. "Actos de Dios" – Serán aquellos sucesos de la naturaleza en que las Partes y terceros no intervienen, tal cuales terremotos, maremotos, huracanes, tormentas eléctricas, inundaciones y otros similares.

3. "Administrador del Contrato" – Será la persona natural o jurídica a ser nombrada, facultada o contratada para que realice la supervisión y el monitoreo del desempeño de MEDHS con respecto a sus obligaciones bajo el Contrato. Las obligaciones y facultades del Administrador del Contrato son dispuestas de forma general en la Sección 8.6.

3

4. "Agencias Acreditadoras" – Serán entidades no gubernamentales con la facultad para evaluar y certificar la calidad de los Servicios de Salud, tal cuales la *Joint Commission on Accreditation of Healthcare Organizations*, la *Accreditation Council for Graduate Medical Education*, sus sucesoras y cualquier otra entidad acreditadora futura.

5. "Autorización" – El acuerdo escrito y final entre las Partes mediante el cual el Municipio autoriza que se realice el Proyecto de Mejoras sometido por MEDHS, sujeto a que MEDHS y el Promotor cumplan con las condiciones y los términos establecidos en el acuerdo.

6. "Bienes Inmuebles Arrendados" – Son aquellos bienes que por su naturaleza, destino o por ley constituyen bienes inmuebles bajo los artículos 261 a 264 del Código Civil de Puerto Rico[1] y que forman o formarán parte de los Bienes Arrendados en o después de la Fecha de Efectividad de conformidad con las secciones 2.2, 2.4, 2.5 y 2.6 del Contrato.

7. "Bienes Muebles Arrendados" – Son los bienes que cumplen con las definiciones de los artículos 265 a 272 del Código Civil de Puerto Rico[2] y que son definidos en la Sección 2.3 del Contrato.

8. "Bienes Arrendados" – Son los bienes que son necesarios para la administración y operación del Hospital. El término Bienes Arrendados se referirá a los Bienes Inmuebles Arrendados y Bienes Muebles Arrendados existentes a la Fecha de Efectividad o añadidos posteriormente a estas categorías, según permitido por el Contrato.

9. "Cambio de Control" – Será: (a) la venta, alquiler, transferencia, traspaso o cualquier otra forma de transferencia, en una o en una serie de transacciones, de todos o sustancialmente todos los activos de MEDHS o del Subcontratista Administrador; (b) la consolidación de MEDHS o el Subcontratista Administrador con otra persona o entidad, la fusión de MEDHS o el Subcontratista Administrador con otra persona o entidad, o la fusión de otra persona o entidad en MEDHS o el Subcontratista Administrador o cualquier evento similar en cual cincuenta por ciento (50%) de los acciones con derecho al voto se cambien o intercambien por dinero, otras acciones o propiedades; o (c) la adopción de una resolución o plan por los accionistas de MEDHS o el Subcontratista Administrador relacionado con la liquidación o disolución de MEDHS o el Subcontratista Administrador.

10. "Centro de Trauma" – Será el hospital equipado para proveer servicios médicos de emergencia a pacientes que hayan sufrido lesiones traumáticas 24 horas al día, 365 días al año. El Centro de Trauma compartirá el mismo edificio donde está ubicada la Sala de Emergencias del Hospital (Ver Anejo A.2). Éste estará compuesto por la Sala de Estabilización, un área de tratamiento intensivo, una sala de operaciones y un helipuerto, entre otras áreas de servicio necesarias para este tipo de hospital. El Centro de Trauma se encuentra en fase de construcción a la fecha del otorgamiento del Contrato.

11. "Contrato" – Es el contrato para la administración y la operación del Hospital Dr. Ramón E. Betances del Centro Médico de Mayagüez; los siguientes documentos se incorporan al



---

[1] 31 L.P.R.A.§§ 1041-1044
[2] 31 L.P.R.A.§§ 1061-1068

4

Contrato: (i) la Propuesta de RFP; (ii) los anejos identificados en la Tabla de Contenidos; (iii) las Autorizaciones y sus cambios posteriores; y (iv) cualquier otro documento que las Partes, mediante mutuo acuerdo escrito, estimen adecuado añadir luego de la Fecha de Efectividad. De existir conflictos futuros en cuanto a la interpretación de los documentos que forman parte del Contrato, las Partes acuerdan que éstos prevalecerán en el siguiente orden:

(1) el Contrato;
(2) los anejos identificados en la Tabla de Contenidos (excluyendo la Propuesta de RFP);
(3) la Propuesta de RFP;
(4) las Autorizaciones y sus cambios posteriores; y
(5) cualquier otro documento que las Partes han añadido luego de la Fecha de Efectividad mediante mutuo acuerdo escrito.

12. "Contribuciones" – Serán las obligaciones de MEDHS, como persona jurídica autorizada para hacer negocios en el Estado Libre Asociado de Puerto Rico, ante el Departamento de Hacienda, el CRIM, los municipios o cualquier otra Entidad Gubernamental, de pagar tributos por concepto de ingresos, arbitrios, patentes, contribuciones sobre la propiedad mueble e inmueble, seguros, derechos y permisos requeridos por las Leyes Aplicables.

13. "Daños Indirectos" – Son los daños en forma de pérdida económica o reputación que no son consecuencia directa de una violación o incumplimiento del Contrato.

14. "Deuda Contributiva" – Será toda cantidad que advenga vencida y exigible por concepto de pago de Contribuciones, cargos gubernamentales generales y especiales, ordinarios y extraordinarios, previstos o imprevistos, de cualquier tipo y naturaleza que de tiempo en tiempo, durante el Término del Contrato, sean impuestos o exigidos, en relación a los derechos de uso, posesión, habitación, administración y operación de los Bienes Arrendados independientemente de que dichos cargos sean hechos directamente a MEDHS o a través, o en nombre, del Municipio.

15. "Entidad Gubernamental" – Es cualquier rama de gobierno, departamento, agencia, entidad, instrumentalidad o corporación pública del Estado Libre Asociado de Puerto Rico o el Gobierno Federal de Estados Unidos de América.

16. "Equipos Biomédicos" – Serán aquellos bienes muebles que forman parte de los Bienes Muebles Arrendados o que son adquiridos por MEDHS y/o los Subcontratistas durante el Término del Contrato para ayudar en el diagnóstico, tratamiento y seguimiento de los pacientes del Hospital.

17. "Estados Financieros Proyectados" – Se refiere al documento con los estados financieros proyectados de la operación y administración del Hospital, el cual fue sometido por MEDHS como parte de la Propuesta de RFP, y el cual se aneja como parte del Contrato (Ver Anejo I), según enmendado.

18. "Evento de Fuerza Mayor" – Serán las circunstancias o eventos que: (i) sean impredecibles, o si predecibles, no pudieron ser evitadas por MEDHS mediante un ejercicio razonable de diligencia, y que interfieran significativamente con el cumplimiento de las obligaciones bajo el Contrato; o (ii) constituyan un Acto de Dios, un acto de terrorismo o bioterrorismo, guerra (declarada o no declarada), disturbios o revolución, acto de un enemigo público, insurrección civil, desobediencia civil, fuego, desastre natural, huelga o cualquier otra forma de agitación laboral que no sea atribuible al incumplimiento de MEDHS con respecto a sus obligaciones bajo el Contrato, convenio colectivo, si alguno, o a las Leyes Aplicables.

19. "Fecha del Cierre de Operaciones" – Será la fecha que MEDHS defina como aquélla del cierre de su año fiscal. La fecha del cierre de operaciones de la entidad subcontratada para administrar y operar el Hospital será similar a la Fecha del Cierre de Operaciones.

20. "Fecha de Efectividad" – Significará la fecha de otorgamiento del Contrato, 27 de agosto de 2009.

21. "Fecha de Terminación" – Será la fecha en que finalizará la vigencia del acuerdo entre MEDHS y el Municipio debido a Terminación del Contrato.

22. "Fecha de Vencimiento" – Significará la fecha de aniversario número treinta (30) del Contrato, contada a partir de la Fecha de Efectividad.

23. "Fracción de Consumo Individual de Agua" – Será la porción del consumo del servicio de agua potable que corresponde a cada una de las personas jurídicas con derecho de uso y habitación sobre cualquiera de los bienes inmuebles que componen el Centro Médico de Mayagüez.

24. "Fracción de Consumo Individual de Electricidad" – Será la porción del consumo del servicio de energía eléctrica que corresponde a cada una de las personas jurídicas con derecho de uso y habitación sobre cualquiera de los bienes inmuebles que componen el Centro Médico de Mayagüez.

25. "Grupos de Servicios de Cardiología" – Son las corporaciones que han sometido cartas de intención a MEDHS para adquirir Equipos Biomédicos pertinentes y ofrecer los Servicios de Cardiología en el Hospital, u otras corporaciones sucesoras o distintas con las cuales MEDHS alcance acuerdos finales. MEDHS ha identificado los Grupos de Servicios Cardiológicos como: Diagnostic Nuclear Medicine, Inc., Cardio Services, Inc. y Aguadilla Heart Center, Inc.

26. "Hospital" – Se refiere al Hospital Dr. Ramón E. Betances del Centro Médico de Mayagüez, el cual cuenta con la descripción física provista en la Sección 2.2.

27. "Hospital General" – Será una facilidad debidamente constituida como tal para prestar servicios a la comunidad los cuales incluirán, sin limitarse necesariamente a éstos, el diagnóstico de enfermedades y/o lesiones e intervenciones quirúrgicas a pacientes hospitalizados y ambulatorios, y para el tratamiento gineco-obstétrico, así como los servicios directamente relacionados que sean necesarios o convenientes, incluyendo pero sin limitarse a

éstos, servicios de transportación de ambulancia, servicios de enfermería, laboratorio, anestesia, radiología y radioterapia, análisis clínico, patología anatómica, nutrición y dietética, servicios farmacéuticos y de terapia respiratoria, entre otros servicios necesarios. En caso de duda sobre la interpretación del término hospital general, las Partes se referirán al Reglamento de Hospitales del Departamento de Salud.

28. "Interés Público" – Es el bienestar común de la mayoría de los mayagüezanos, procurado y protegido por el Gobierno Municipal de Mayagüez y su Alcalde.

29. "*Joint Commission*" – Se refiere a la organización sin fin de lucro *Joint Commission on Accreditation of Healthcare Organizations*.

30. "Leyes Aplicables" – Son las leyes, ordenanzas, códigos, reglas, reglamentos, órdenes, interdictos, decretos, resoluciones, determinaciones, decisiones, sentencias o permisos de cualquier Entidad Gubernamental, actualmente vigente o que pudiera entrar en vigencia en el futuro, o cualquier acuerdo vinculante con una Entidad Gubernamental.

31. "Mejoras Extraordinarias" – Será la construcción de estructuras nuevas y/o la expansión, el remplazo, la sustitución, la remodelación o la alteración de los Bienes Inmuebles Arrendados con la consecuencia de: (i) añadirles valor; y (ii) extender su vida útil. El término bienes inmuebles incluye aquellos bienes que forman parte del Hospital que no pueden moverse por si mismos ni ser trasladados de un lugar a otro, así como aquéllos que lo sean por virtud de las Leyes Aplicables. Algunos bienes inmuebles dentro del Hospital serán los sistemas de: (i) vapor, (ii) acondicionadores de aire, (iii) distribución de agua potable, (iv) distribución de energía, (v) alarma contra incendios, (vi) sistema de supresión de incendios, (vii) comunicaciones, (viii) gases médicos, y las estructuras que componen los Bienes Inmuebles Arrendados, entre otros.

32. "Mejoras Ordinarias" – Serán las obras de reparación y mantenimiento necesarias para la conservación del estado de los Bienes Arrendados, e incluirán, a modo de ilustración, reparaciones rutinarias de sistemas mecánicos de distribución tal cual tuberías de vapor, sistemas menores de electricidad, incluyendo subestaciones y transformadores, así como fallas menores en el sistema de distribución de agua. La pintura y el mantenimiento de las áreas verdes y las calles aledañas al Hospital, la rampa que conduce a la Sala de Emergencias, las rutas de entrada y salida al Centro Médico y el tanque elevado de agua potable del Centro Médico también serán consideradas Mejoras Ordinarias.

33. "Patentes Municipales" – Son las contribuciones impuestas y cobradas por el Municipio bajo las disposiciones de la Ley Núm. 113 de 10 de julio de 1974, según enmendada, conocida como Ley de Patentes Municipales, a toda persona dedicada con fines de lucro a la prestación de cualquier servicio, a la venta de cualquier bien a cualquier negocio financiero o negocio dentro de la jurisdicción del Municipio.

34. "Pérdidas-y-Gastos" – Significará toda pérdida, obligación, responsabilidad, daño (excluyendo Daños Indirectos), multa, demanda, procedimiento, penalidad, sentencia, transacción, depósito, cargo, impuesto, costo o gasto, incluyendo todos los honorarios y

7

costos razonables incurridos en conexión con la investigación, preparación, defensa o respuesta a cualquier procedimiento legal.

35. "Plan de Desarrollo" – Se refiere al documento constituido por el Plan Macro de Desarrollo que fue sometido por MEDHS como parte de la Propuesta de RFP, y que resume la estrategia de ésta con relación al desarrollo del Hospital y el cual se aneja como parte del Contrato (Ver Anejo B), según enmendado.

36. "Plan Estratégico" – Se refiere al plan de desarrollo del Hospital específicamente requerido por el Departamento de Salud de Puerto Rico en cumplimiento con el Reglamento de Hospitales.

37. "Proceso de Transición" – Será el proceso que se activará a partir de la fecha en que: (i) el Municipio notifique su intención de terminar el Contrato en conformidad a las disposiciones de éste; o (ii) los foros adjudicativos, con jurisdicción para entender sobre cualquier controversia relacionada a la decisión del Municipio de terminar el Contrato, se hayan expresado de forma final y firme. Durante el Proceso de Transición, las Partes realizarán aquellas prestaciones necesarias para la conclusión de su relación contractual con el fin último de lograr la transferencia coordinada de los Bienes Arrendados sin afectar adversamente los servicios ofrecidos en el Hospital. El Proceso de Transición comenzará desde la notificación de Terminación del Contrato por cualquiera de las Partes. El Proceso de Transición concluirá a la Fecha de Terminación.

38. "Profesional de Servicios de la Salud" – Significa toda persona debidamente autorizada por el Tribunal Examinador de Médicos, Junta Dental Examinadora, Colegio de Cirujanos Dentistas o la Junta Examinadora de Podiatras, y que ejerza la profesión de médico, osteópata, dentista o podiatra en Puerto Rico.

39. "Propuesta de RFP" – Se refiere a la propuesta sometida por MEDHS en respuesta a la solicitud de propuestas hecha por el Municipio para la administración y operación del Hospital ("RFP"), y las enmiendas hechas durante el proceso de evaluación de la propuesta. La Propuesta de RFP se aneja como parte del Contrato (Ver Anejo C).

40. "Proyecto de Mejoras" – Serán los proyectos propuestos por MEDHS y/o los Subcontratistas para realizar Mejoras Extraordinarias a los Bienes Inmuebles Arrendados.

41. "Reglamento de Hospitales" – Se refiere al Reglamento del Secretario de Salud Núm. 117 para Reglamentar el Licenciamiento, Operación y Mantenimiento de los Hospitales en el Estado Libre Asociado de Puerto Rico.

42. "Sala de Estabilización" – Será la primera fase del Centro de Trauma que será terminada y operada. La Sala de Estabilización compartirá el mismo edificio donde está ubicada la Sala de Emergencias (Ver Anejo A.2).

43. "Servicios de Cardiología" – Serán parte de los Servicios de Salud y comprenderán la línea completa de servicios de cuidado de enfermedades vasculares y del corazón.

8

44. "Servicios de Salud" – Serán los servicios de salud supraterciarios que MEDHS deberá ofrecer en el Hospital en cumplimiento con la Propuesta de RFP, el Plan de Desarrollo, el cual forma parte del Contrato, y de acuerdo a la facultad médica. Éstos incluirán los servicios de salud requeridos en un hospital terciario, según este término es definido en el Reglamento de Hospitales y otros servicios terapéuticos críticos, tal cuales lesiones de espina dorsal, trauma, quemados, medicina hiperbárica, neurocirugía y cirugía endovascular, entre otros.

45. "Subcontratistas" – Serán todas las personas naturales y jurídicas contratadas por MEDHS para ofrecer, total o parcialmente, los Servicios de Salud, incluido el Subcontratista Administrador. El término "subcontratista" también incluirá aquellas personas naturales y jurídicas que subarrienden, total o parcialmente, los Bienes Arrendados, así como aquéllas que provean o suplan bienes y/o servicios a MEDHS o a los Subcontratistas.

46. "Subcontratista Administrador" – Se refiere a Sistemas Integrados de Salud del Suroeste, Inc.

47. "Terminación del Contrato" – Supondrá la finalización de la vigencia del Contrato antes de la Fecha de Vencimiento debido al incumplimiento por alguna o ambas de las Partes con respecto a sus obligaciones bajo el Contrato. Las causas de incumplimiento y el procedimiento a ser seguido por las Partes son dispuestos en el Contrato. La finalización de la vigencia del Contrato no extinguirá aquellas obligaciones entre las Partes que advengan vencidas y debidas durante el Término del Contrato y que no sean aclaradas o liquidadas durante el Proceso de Transición.

48. "Término del Contrato" – Será la duración total de la vigencia del Contrato bajo la premisa de que no ocurra Terminación del Contrato. El Término del Contrato transcurrirá desde la Fecha de Efectividad hasta la Fecha de Vencimiento, lo cual supone una duración de treinta (30) años.

49. "Torre Médica" – Será el conjunto de bienes inmuebles que incluirá un edificio comercial, un edificio de oficinas médicas y un edificio de estacionamientos, y el cual podría ser desarrollado dentro de los predios del Centro Médico.

50. "Valor Neto de los Equipos en los Libros" – Será el costo de la inversión original menos la amortización del costo por el tiempo incurrido a base de la vida útil de uno o varios de los Equipos Biomédicos o de los bienes muebles que sean propiedad de MEDHS.

51. "Valor Neto de las Mejoras Extraordinarias en los Libros " – Será el costo de la inversión original menos la amortización del costo por el tiempo incurrido a base de la vida útil de las Mejoras Extraordinarias.

1.2    Interpretación.

(a) Cualquier palabra o término en singular incluirá su acepción en plural y viceversa. Las palabras o términos en género masculino incluirán sus acepciones femeninas y viceversa.

9

(b) El término "día" significará día laborable, excluyendo sábados y días feriados en el Estado Libre Asociado, según este término es definido en el Art. 387 del Código Político del Estado Libre Asociado, salvo que el texto del Contrato indique expresamente lo contrario.

(c) El término "año" significará año calendario bajo el Estado Libre Asociado, salvo que el texto del Contrato indique expresamente lo contrario.

CLÁUSULAS Y CONDICIONES

**ARTÍCULO 2**                    **BIENES ARRENDADOS Y OTRAS OBLIGACIONES**

2.1    Acuerdo General.

2.1.1  Arrendamiento: El Municipio transfiere en arrendamiento a MEDHS el derecho de posesión y uso sobre los Bienes Inmuebles Arrendados y los Bienes Muebles Arrendados, según descritos en las Secciones 2.2 y 2.3 para que administre y opere el Hospital de conformidad con los términos y condiciones del Contrato. Los Bienes Muebles Arrendados y los Bienes Inmuebles Arrendados comprenderán la totalidad de los Bienes Arrendados a la Fecha de Efectividad.

Las Partes podrán incluir otros edificios, estructuras e infraestructura a los Bienes Inmuebles Arrendados durante el Término del Contrato en conformidad a las Secciones 2.6 y 6.3 del Contrato.

2.1.2  Titularidad: El Municipio le representa y garantiza a MEDHS que: (i) posee el título de propiedad de los Bienes Arrendados; y (ii) a la fecha del Estudio de Título que aparece en el Anejo D, su derecho de propiedad sobre los Bienes Arrendados no está afectado o limitado por carga y/o gravamen alguno.

2.1.3  Acuerdo con Relación al Subcontratista Administrador: MEDHS se compromete ante el Municipio con respecto al Subcontratista Administrador a lo siguiente:

a) otorgar un contrato con Sistemas Integrados de Salud del Suroeste, Inc., el Subcontratista Administrador, para administrar y operar el Hospital de conformidad con los términos de este Contrato.
b) utilizar únicamente como administrador y operador del Hospital, durante el término de este Contrato, a Sistemas Integrados de Salud del Suroeste, Inc. Cualquier cambio a estos efectos deberá cumplir con las cláusulas y condiciones de este Contrato.

2.1.4  Garantía del Subcontratista Administrador:  Por su parte, además de todas las obligaciones asumidas por el Subcontratista Administrador bajo su contrato con MEDHS, éste también se obliga solidaria y mancomunadamente con respecto a y por motivo de todas las representaciones hechas, y los compromisos y obligaciones de MEDHS bajo el Contrato.

10

2.2    Bienes Inmuebles Arrendados.

Los edificios, estructuras e infraestructura descritos a continuación constituyen la totalidad de los bienes inmuebles que componen el Hospital a la Fecha de Efectividad. Las Partes acuerdan que el plano "As-Built", incluido como Anejo E, (en adelante, el "Plano") será utilizado como una referencia gráfica describiendo de forma general la ubicación, forma y escala de los Bienes Inmuebles Arrendados.

Los Bienes Inmuebles Arrendados cuentan con la siguiente descripción física general:

(a) edificio principal (identificado en el Plano como la estructura comprendida por el Anejo Mecánico, Edificio Principal, Emergencias, Oficina Regional y Escuela de Enfermería) - estructura de hormigón con niveles de construcción que fluctúan entre uno (1) y seis (6) niveles, con una superficie total aproximada de cuatrocientos cuarenta mil dos cientos treinta y seis (440,236) pies cuadrados, descrito en más detalle en el Anejo F;

(b) estructuras anexas (identificadas en el Plano como Área de Máquinas y Edificio Oncológico); y

(c) áreas de estacionamiento (identificadas en el Plano como las áreas de estacionamiento y que están ubicadas al este y oeste de la entrada principal del Hospital, la cual se encuentra al este del Centro Médico y conecta con la carretera estatal PR-2).

El edificio identificado en el Plano como el "Consorcio" podrá ser añadido como uno de los Bienes Arrendados una vez MEDHS alcance un acuerdo con una institución de educación médica debidamente acreditada (en adelante, la "Escuela de Medicina"), según requerido en la Sección 4.2.

El edificio identificado en el Plano como "Emergencias" no formará parte, en su totalidad, de los Bienes Inmuebles Arrendados. Las áreas del edificio, identificado en el Plano como "Emergencias", que sí formarán parte de los Bienes Inmuebles Arrendados se detallan gráficamente en el Anejo A.1. El remanente de dicho edificio constituirá parte de la Sala de Estabilización y posteriormente el Centro de Trauma, según se discute en la Sección 2.5.

MEDHS mantendrá el nombre del Hospital bajo la denominación "Hospital Dr. Ramón Emeterio Betances". El Municipio podrá autorizar que MEDHS incluya una referencia adicional con relación a ésta. MEDHS deberá solicitar por escrito dicha autorización y deberá obtener la autorización escrita del Municipio antes de utilizar tal referencia adicional en cualquier anuncio, rótulo, página en la "web", método de mercadeo, programa o campaña de publicidad del Hospital.

2.3    Bienes Muebles Arrendados.

Los Bienes Muebles Arrendados serán identificados y descritos en un inventario (en adelante, el "Inventario de Bienes Muebles") a ser preparado por las Partes dentro del periodo de treinta (30) días inmediatamente después de la Fecha de Efectividad. Las Partes colaborarán, coordinarán y asignarán los recursos materiales y humanos necesarios para realizar dicho

11

inventario de forma diligente dentro del periodo antes acordado. Entre otros propósitos a ser acordados por las Partes, el Inventario de Bienes Muebles identificará su estado actual y si se encuentran actualmente en uso o desuso.

El Inventario de Bienes Muebles será estipulado por las Partes a la fecha de su finalización dentro del periodo de treinta (30) días y será incluido como parte del Contrato.

También constituirán parte de los Bienes Muebles Arrendados aquellos Equipos Biomédicos y otros bienes muebles adquiridos por MEDHS o los Subcontratistas: (i) en sustitución de alguno de los bienes que forma parte del Inventario de Bienes Muebles; o (ii) por el cual el Municipio pague el Valor Neto del Equipo en los Libros a MEDHS o los Subcontratistas, quien sea el titular, en o antes de la Fecha de Terminación o de Vencimiento.

El Municipio podrá considerar la variación de los términos de pago del Canon de Arrendamiento en conformidad a los resultados que refleje el Inventario de Bienes Muebles. El Municipio no variará la cantidad acordada del Canon de Arrendamiento independientemente de los resultados reflejados por el Inventario de Bienes Muebles.

2.4     Bienes Inmuebles No Incluidos en el Plano.

Las Partes reconocen que el Plano y la descripción de los Bienes Inmuebles Arrendados que surge de la Sección 2.2 no reflejan las cualidades actuales de éstos de manera precisa. Ciertos subarrendatarios del Administrador Anterior han construido mejoras o estructuras adicionales que, aun cuando existen actualmente en el Hospital, no surgen del Plano o de la Sección 2.2. En específico, las Partes reconocen que se han realizado ampliaciones estructurales al Hospital, las cuales han sido construidas para oficinas profesionales y para colocar y operar un acelerador lineal.

Las Partes reconocen la existencia de esas estructuras y las incluyen como parte de los Bienes Inmuebles Arrendados.

2.5     Bienes Constitutivos del Centro de Trauma.

Las Partes reconocen y acuerdan que la Autoridad para el Financiamiento de la Infraestructura construye actualmente en el Hospital las Fases 3 y 4 del Centro de Trauma. La Fase 1, la cual comprende la Sala de Estabilización, ha supuesto ampliaciones al edificio donde ubica la Sala de Emergencias del Hospital y la Fase 2, el helipuerto, será construido en el área identificada en el Plano con el nombre "gazebo", según mostrado en el Anejo A.2. La Fase 3 consiste de la etapa final de construcción del Centro de Trauma (Anejo A.2) y supone ampliaciones al edificio donde ubica la Sala de Emergencias del Hospital. Las ampliaciones al edificio de Sala de Emergencias que serán utilizadas exclusivamente para el servicio de atención de emergencias y no para la atención de casos de trauma formarán parte de los Bienes Inmuebles Arrendados una vez termine su construcción.

Las Partes acuerdan que los bienes muebles e inmuebles que constituyan la Sala de Estabilización, y posteriormente el Centro de Trauma, no formarán parte de los Bienes

12

Arrendados cuando sean terminados. MEDHS procederá con respecto a ellos de conformidad con lo dispuesto en la Sección 4.1.12. La Sala de Estabilización y el Centro de Trauma, junto al helipuerto, son descritos gráficamente en los Anejos A.1 y A.2 respectivamente.

2.6    Bienes Inmuebles Futuros.

2.6.1    Notificación de la Propuesta para Realizar el Proyecto de Mejoras: MEDHS notificará por escrito al Municipio el interés suyo o el interés de cualquier Subcontratista (en adelante, el "Promotor") de realizar Proyectos de Mejoras. Aunque el Promotor sea una persona distinta a MEDHS, ésta última será la persona principalmente obligada ante el Municipio del cumplimiento de las disposiciones detalladas a continuación. Las Mejoras Extraordinarias propuestas por MEDHS en el Plan de Desarrollo deberán ser sometidas a la evaluación del Municipio en calidad de Proyecto de Mejoras, de conformidad con el proceso descrito en la Sección 2.6.2.

2.6.2    Evaluación del Proyecto de Mejoras: Como parte de la evaluación de los Proyectos de Mejoras que sean propuestos al Municipio, las Partes acuerdan lo siguiente:

(a) el Municipio podrá exigir a MEDHS todos los documentos, los datos y la información que le permitan tomar una decisión informada sobre el Proyecto de Mejoras. Los documentos, los datos y la información incluirán, sin limitarse únicamente a éstos, planos preliminares, especificaciones técnicas e informes de estudios preliminares, resoluciones o permisos de las Entidades Gubernamentales, entre otros (en adelante, los "Documentos y Datos del Proyecto de Mejoras"). El Municipio revisará y estudiará los Documentos y Datos del Proyecto de Mejoras en un término razonable, inmediatamente posterior a la fecha en que el Administrador del Contrato certifique por escrito haber recibido dichos documentos. El Promotor no comenzará ningún Proyecto de Mejoras sin que MEDHS cuente con la Autorización, la cual será previa y escrita, sin excepción alguna;

(b) las Partes deberán reunirse y acordar las respectivas obligaciones y derechos con relación al costo, los pagos a realizarse y la titularidad con respecto a las Mejoras Extraordinarias que finalmente surjan del Proyecto de Mejoras;

(c) si existe un acuerdo entre las Partes y el Municipio entiende que es adecuado autorizar el Proyecto de Mejoras, el Municipio notificará por escrito a MEDHS su decisión de autorizar el Proyecto de Mejoras y la justificará detallando los acuerdos alcanzados con MEDHS (en adelante, la "Autorización");

(d) si el Municipio decide autorizar el Proyecto de Mejoras, los gastos de producción de los Documentos y Datos del Proyecto de Mejoras podrán ser acreditados por el Municipio según las Partes acuerden y sea dispuesto en la Autorización; y

(e) las Autorizaciones y cualquier cambio posterior a éstas serán añadidos al Contrato en calidad de enmiendas.

Con relación a las fases posteriores a la autorización para emprender el Proyecto de Mejoras, las Partes acuerdan lo siguiente:

(f) MEDHS someterá informes mensuales al Administrador del Contrato sobre el desarrollo de las fases de diseño, planificación, desarrollo y construcción del Proyecto de Mejoras;

(g) los informes descritos en el inciso anterior podrán ser sometidos con una frecuencia distinta si las Partes así lo acuerdan por escrito;

(h) como regla general, las Mejoras Extraordinarias deberán ser diseñadas, planificadas, desarrolladas y construidas de conformidad con los Documentos y Datos del Proyecto de Mejoras; y

(i) cualquier orden de cambio que impacte adversamente el Proyecto de Mejoras, ya sea en costo o en tiempo, deberá ser notificada al Municipio y autorizada por éste previo a que el Promotor autorice al contratista a proceder.

2.6.3  Obligación de Obtener Precios Competitivos: Como parte del proceso de evaluación del Proyecto de Mejoras, dispuesto en la sección anterior, el Municipio prestará especial atención al estimado de costos sometido por MEDHS y al proceso utilizado por el Promotor para obtenerlo. El Municipio no otorgará créditos por aquellos Proyectos de Mejoras cuyos precios sean, según su apreciación, irrazonables. Por esta razón el Municipio prefiere y recomienda que los estimados de costos sean adquiridos mediante procesos competitivos que promuevan la transparencia y la competitividad de precios. Según dispuesto en la Sección 2.6.2(a), el Municipio revisará y estudiará los Documentos y Datos del Proyecto de Mejoras en un término de treinta (30) días laborables, contados a partir de la fecha en que el Administrador del Contrato certifique por escrito haber recibido dichos documentos.

2.6.4  Derecho Preferencial para el Desarrollo de la Torre Médica: MEDHS tendrá un derecho preferencial para ser considerado por el Municipio, de éste último entenderlo necesario y adecuado, para emprender el potencial desarrollo de la Torre Médica. Con este propósito, el Municipio le otorgará a MEDHS los derechos de superficie para construir allí la Torre Médica, sujeto a que MEDHS someta todos los documentos relacionados al plan de desarrollo de la Torre Médica. Dichos documentos y el proyecto estarán sujetos a la evaluación y la autorización por parte del Municipio, según ha sido dispuesto en la Sección 2.6 del Contrato. El Derecho de Construir la Torre Médica estará vigente durante un periodo de seis (6) años desde la Fecha de Efectividad. De transcurrir este término y MEDHS no ejercer el Derecho de Construir la Torre Médica, el Municipio podrá otorgar a cualquier otra entidad o personas los derechos de superficie necesarios para el desarrollo. Se entenderá que MEDHS ha ejercido el Derecho de Construir la Torre Médica si obtiene los permisos gubernamentales necesarios para emprender el desarrollo y si comienza materialmente la fase de construcción dentro del periodo de seis (6) años antes dispuesto. El Municipio podrá realizar gestiones de buena fe para asistir a MEDHS en la obtención de los permisos gubernamentales necesarios con relación al proyecto de desarrollo de la Torre Médica. El Derecho de Construir la Torre Médica es subsidiario a los derechos de arrendamiento, administración y operación otorgados por el Municipio a MEDHS bajo el Contrato, por lo cual, en el evento que el Contrato termine por cualquier motivo, éste también terminará. MEDHS podrá ceder el Derecho a Construir la Torre Médica únicamente al Subcontratista Administrador. Este último no podrá ceder este derecho.

14

2.7    Accesión.

Las Mejoras Extraordinarias accederán a favor del Municipio ya sea: (i) antes de la Fecha de Terminación o de Vencimiento según acuerden las Partes en la Autorización; o (ii) en la Fecha de Terminación o de Vencimiento, sujeto al pago de cualquier compensación necesaria de conformidad con las disposiciones del Contrato y/o las Autorizaciones, definidas en la sección anterior.

2.8    Usos.

2.8.1    Provisión de los Servicios de Salud en General.

MEDHS poseerá, usará, administrará y operará los Bienes Arrendados en calidad de Hospital General. MEDHS ofrecerá los Servicios de Salud según altos estándares de la industria de hospitales y los términos del Contrato.

2.8.2    Forma de la Posesión y Uso de los Bienes Arrendados.

MEDHS acepta y reconoce que el Municipio no consiente el uso y posesión incondicional de los Bienes Arrendados.  Por tal razón, MEDHS poseerá y usará los Bienes Arrendados de conformidad con lo siguiente:

(a) operará y administrará los Bienes Arrendados de forma pacífica y sin molestar o afectar el funcionamiento de las demás actividades que se desarrollan en otros edificios y áreas dentro del perímetro del Centro Médico, los cuales no son parte de los Bienes Arrendados y los cuales son administrados u operados por otras Entidades Gubernamentales y personas privadas;

(b) no permitirá que los Bienes Arrendados sean utilizados, parcial o totalmente, de tal forma que limite o afecte adversamente el derecho de titularidad del Municipio sobre éstos, o de tal forma que constituya causa para reclamaciones de terceros;

(c) no sobrecargará o acumulará desperdicios sólidos en o alrededor de los Bienes Inmuebles Arrendados;

(d) no causará daños a los Bienes Arrendados ni permitirá las emisiones de ruidos u olores en niveles irrazonables;

(e) no permitirá que ninguno de sus Subcontratistas o visitantes actúen en contravención a lo dispuesto en esta Sección 2.8.2; y

(f) operará, administrará, usará y poseerá el Hospital en conformidad a las Leyes Aplicables.

2.9 Prohibición de Actos que Afecten la Titularidad del Municipio.

MEDHS no venderá, cederá, permutará o gravará de forma alguna los Bienes Arrendados, los cuales son y continuarán siendo propiedad exclusiva del Municipio durante el Término del Contrato.

## ARTÍCULO 3    DURACIÓN DEL CONTRATO

3.1 Término del Contrato.

El Término del Contrato será de treinta (30) años y transcurrirá desde la Fecha de Efectividad hasta la Fecha de Vencimiento, salvo si el Contrato terminase antes, según las disposiciones del Artículo 10.

## ARTÍCULO 4    ADMINISTRACIÓN, OPERACIÓN, DEPARTAMENTOS Y SERVICIOS CLÍNICOS, RESIDENCIAS E INTERNADOS

4.1 Administración y Operación del Hospital.

4.1.1 Licencias y Acreditaciones: MEDHS mantendrá vigentes durante el Término del Contrato todos los permisos, acreditaciones, certificaciones y licencias (en adelante, las "Licencias") que se encuentren en vigor en la Fecha de Efectividad. La pérdida de las Licencias podrá ser causa para la Terminación del Contrato, salvo si dicha pérdida es consecuencia exclusiva de la culpa o la negligencia del Municipio.

MEDHS también cumplirá con todos los requisitos establecidos en las Leyes Aplicables para la adquisición y mantenimiento de otros permisos, acreditaciones, certificaciones y licencias que sean necesarias luego de la Fecha de Efectividad para el funcionamiento del Hospital. MEDHS también cumplirá con todos los criterios de acreditación establecidos por las Agencias Acreditadoras. Sin limitar su cumplimiento con las Leyes Aplicables, MEDHS dedicará particular atención a las siguientes:

(a) Ley Núm. 101 de 26 de junio de 1965, según enmendada, conocida como Ley de Facilidades de Salud;

(b) Reglamento Núm. 117 para Reglamentar el Licenciamiento, Operación y Mantenimiento de los Hospitales en el Estado Libre Asociado de Puerto Rico;

(c) Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, conocida como Ley de Certificados de Necesidad y Conveniencia del Departamento de Salud;

(d) Ley Núm. 133 de 18 de junio de 1999, según enmendada, conocida como Ley sobre la Protección y Seguridad de los Infantes en las Instituciones Hospitalarias de Puerto Rico;

(e) Ley Núm. 225 de 23 de julio de 1974, según enmendada, conocida como Ley sobre Servicios de Ambulancias Terrestres y Aéreas;

(f) Ley Núm. 47 de 4 de enero de 2003, según enmendada, conocida como Ley para Regular los Turnos de Trabajo de los Médicos Internos y Residentes en Puerto Rico;

16

(g) Ley Núm. 35 de 28 de junio de 1994, según enmendada, conocida como Ley para la Asistencia Médica en Hospitales en Casos de Emergencias Médicas;

(h) La ley federal del 14 de agosto de 1935 conocida como Ley del Seguro Social ("Social Security Act") y enmiendas posteriores, incluidas la ley federal del 7 de abril de 1986 conocida en inglés como *Consolidated Omnibus Budget Reconciliation Act* ("COBRA") y las cláusulas de ésta última conocidas como la *Examination and Treatment for Emergency Medical Conditions and Women in Labor* ("EMTALA");

(i) La ley federal del 21 de agosto de 1996 conocida como *Health Insurance Portability and Accountability Act* ("Ley HIPAA");

(j) Ley Núm. 9 de 11 de octubre de 1987, según enmendada, conocida como Ley para Reglamentar la Práctica de la Enfermería en el Estado Libre Asociado de Puerto Rico;

(k) Ley Núm. 97 de 25 de junio de 1962, según enmendada, conocida como Ley sobre Bancos de Sangre;

(l) La ley federal del 31 de octubre de 1988 conocida como *Clinical Laboratory Improvement Amendments*;

(m) La ley federal del 28 de noviembre de 1990 conocida como *Safe Medical Devices Act*;

(n) Ley Núm. 296 de 25 de septiembre de 2002, según enmendada, conocida como "Ley de Donaciones Anatómicas de Puerto Rico";

(o) Ley Núm. 194 de 25 de agosto de 2000, según enmendada, conocida como "Carta de Derechos y Responsabilidades del Paciente";

(p) Ley Núm. 247 de 3 de septiembre de 2004, según enmendada, mejor conocida como "Ley de Farmacia de Puerto Rico";

(q) Servicios radiológicos, 42 CFR 482.26; y

(r) Servicios de Laboratorio, Ley 97 de junio de 1962 y su reglamento, según enmendados.

MEDHS tendrá durante la vigencia del Contrato el derecho de utilizar el Certificado de Necesidad y Conveniencia (en adelante, el "CNC") que el Departamento de Salud ha expedido a solicitud del Municipio para la administración y la operación del Hospital. MEDHS, sin embargo, reconoce que el CNC pertenece al Municipio y que, en el evento de Terminación del Contrato, el derecho para utilizar el CNC será exclusivamente del Municipio.

4.1.2   Recursos Humanos: MEDHS empleará o contratará Profesionales de Servicios de la Salud y el personal de apoyo necesario que estén bien calificados y que estén al día en el cumplimiento con sus licencias y cualquier requerimiento del Estado Libre Asociado de Puerto Rico para ejercer su profesión.

A modo de asegurar la continuidad de los Servicios de Salud, MEDHS contratará el personal no-gerencial que actualmente labora en el Hospital por un periodo probatorio inicial de noventa (90) días. MEDHS se compromete a evaluar a dichos empleados y a tomar una decisión final en torno a su retención, durante el periodo de noventa (90) días inmediatamente posterior a la Fecha de Efectividad.

MEDHS cumplirá con las Leyes Aplicables que sean pertinentes a los temas de recursos humanos y condiciones de trabajo cumpliendo, específicamente, con los requisitos establecidos en el Capítulo VIII del Reglamento de Hospitales sobre Recursos Humanos.

17

4.1.3   Estructura de Gobierno del Hospital: La Junta de Directores nombrará un director ejecutivo y un director médico en conformidad a los requisitos establecidos en el Reglamento de Hospitales.  La Junta de Directores habrá nombrado las personas que ocuparán los puestos de Director Ejecutivo y Director Médico a la Fecha de Efectividad.

4.1.4   Normas, Procedimientos y Política Institucional: La Junta de Directores de MEDHS formulará las normas, los procedimientos y la política institucional del Hospital con relación a aspectos financieros, administrativos, calidad del servicio ofrecido a los pacientes y la seguridad en el Hospital.   En particular, la Junta de Directores establecerá normas y procedimientos con el fin de desarrollar:

(a) el Plan Estratégico del Hospital, el cual será revisado dentro de los primeros seis (6) meses de operaciones;

(b) un sistema de control de las finanzas y el presupuesto del Hospital, el cual será revisado dentro de los primeros seis (6) meses de operaciones;

(c) un programa de seguridad para los visitantes, pacientes y empleados del Hospital;

(d) un plan de uso y mantenimiento de los Bienes Inmuebles y de los Equipos Biomédicos;

(e) un programa de mejoramiento continuo de la calidad del servicio que integre mecanismos de medición de desempeño y de los niveles de satisfacción de los pacientes, empleados, personal médico y visitantes; y

(f) cualquier otro plan o programa que sea requerido por el Municipio luego del otorgamiento del Contrato.

4.1.5   Programa de Mejoramiento Continuo de la Calidad del Servicio: El plan de mejoramiento continuo de la calidad del servicio, requerido en el inciso (e) de la sección anterior, así como cualquier otro plan o programa pertinente, se regirá por los criterios usados por la *Joint Commission* en su sistema de medida de desempeño (en inglés, "Performance Measurement System"), basado en diversos informes de desempeño (en inglés, "Performance Reports") los cuales, a la Fecha de Efectividad, están basados en tres áreas de desempeño (en inglés, "Performance Areas") y varios estándares (en inglés, "Performance Standards") bajo cada una de las áreas.  MEDHS designará un grupo de trabajo que diseñará e implementará un sistema similar al usado por la *Joint Commission* en sus procesos de acreditación como parte de los planes y programas adoptados para el mejoramiento continuo de la calidad del servicio.

4.1.6   Facultad Médica: La Junta de Directores del Hospital someterá al Municipio, dentro del periodo de seis (6) meses inmediatamente posterior a la Fecha de Efectividad, datos sobre el número de médicos, especialidades necesarias y el tipo de pacientes a ser atendidos, en conformidad a los departamentos y servicios clínicos que creará o mantendrá en operación durante el Término del Contrato.

La Junta de Directores establecerá normas y procedimientos para la evaluación, selección, nombramiento y otorgación de privilegios clínicos a futuros miembros de la facultad médica.

MEDHS cumplirá con los otros requisitos establecidos en el Reglamento de Hospitales sobre la facultad médica.

4.1.7 <u>Departamentos y Servicios Clínicos</u>: MEDHS creará y/o mantendrá en operación, como mínimo, los siguientes departamentos:

(a) medicina interna, incluyendo la división de cardiología;
(b) cirugía general, vascular, neurocirugía y cirugía ortopédica (según la disponibilidad de neurocirujanos);
(c) anestesiología;
(d) sala de emergencias;
(e) laboratorio;
(f) farmacia;
(g) radiología;
(h) otros departamentos de apoyo y mantenimiento.

Los departamentos, así como los servicios clínicos necesarios para la operación de éstos, serán dirigidos, administrados y operados de conformidad con las disposiciones del Capítulo XI del Reglamento de Hospitales.

MEDHS ofrecerá en todo momento, como mínimo, servicios de medicina interna, cirugía general, ortopedia, pediatría, ginecología, obstetricia y sala de emergencias, veinticuatro (24) horas al día, los trescientos sesenta y cinco (365) días del año, durante el Término del Contrato.



MEDHS se compromete a culminar favorablemente las conversaciones con los Grupos de Servicios de Cardiología dentro del periodo de seis (6) meses inmediatamente posterior a la Fecha de Efectividad.

4.1.8 <u>Internos y Residentes</u>: MEDHS establecerá programas de internado y de residencia de conformidad con la Ley para Regular los Turnos de Trabajo de los Médicos Internos y Residentes de Puerto Rico.

MEDHS mantendrá el programa de residencia en medicina interna actualmente existente y en colaboración con la Escuela de Medicina. MEDHS también obtendrá, dentro del término de veinticuatro (24) meses inmediatamente posterior a la Fecha de Efectividad, la aprobación de las Agencias Acreditadoras para la creación de programas de residencia en cirugía general y en medicina de emergencia. Estos programas de residencia serán establecidos de acuerdo a los requisitos del Tribunal Examinador de Médicos de Puerto Rico y del Consejo de Educación Médica Americana de la Asociación Médica Americana o sus respectivos sucesores.

4.1.9 <u>Expedientes Clínicos e Información de Salud de los Pacientes</u>: MEDHS cumplirá con las reglas de privacidad y seguridad de la información de los pacientes que son impuestas por la Ley HIPAA y el Capítulo XII, Artículos 5 al 10, del Reglamento de Hospitales.

4.1.10 <u>Servicios de Enfermería</u>: El servicio de enfermería será provisto de forma continua las veinticuatro (24) horas al día, los trescientos sesenta y cinco (365) días al año.

El personal de enfermería contará con la preparación, experiencia y capacitación necesarias para cumplir con los requisitos establecidos por:

    (a) la Junta Examinadora de Enfermeras y Enfermeros de Puerto Rico o su sucesor;
    (b) el Colegio de Profesionales de Enfermería de Puerto Rico o su sucesor; y
    (c) el Colegio de Enfermería Práctica o su sucesor.

Cada turno de trabajo contará con el personal de enfermería necesario para cubrir los servicios que MEDHS ofrecerá en el Hospital y suplir las necesidades de los pacientes, o según las Leyes Aplicables determinen. El personal de enfermería será asignado y usado de tal modo que MEDHS cumpla, como mínimo, con los siguientes requisitos:

    (a) garantizar la seguridad, el cumplimiento con el tratamiento y la completa satisfacción de las necesidades de cuidado de enfermería de cada paciente en conformidad con el Manual de Derechos del Paciente, el cual MEDHS implementará de acuerdo a lo dispuesto en la Sección 4.1.13; y

    (b) MEDHS asignará a cada unidad de cuidado de salud el patrón de personal ("staffing pattern") por categorías de pacientes.

MEDHS describirá en el Manual de Normas y Procedimientos Administrativos del Servicio de Enfermería, a ser implementado de acuerdo a lo dispuesto en la Sección 4.1.13, el método que usará MEDHS para determinar la asignación de personal de enfermería a los distintos departamentos, servicios clínicos y/o unidades de cuidado de salud. Las normas y procedimientos deberán atender, entre otras áreas, aquéllas de:

    (a) cuidado intensivo;
    (b) cuidado coronario;
    (c) unidades renales; y
    (d) sala de emergencias.

4.1.11 <u>Sala de Emergencias del Hospital</u>: El servicio de sala de emergencias del Hospital estará disponible veinticuatro (24) horas al día, los trescientos sesenta y cinco (365) días al año.

La Sala de Emergencias del Hospital será operada como una sala de nivel III o sala terciaria, según ésta es definida en el Reglamento de Hospitales. MEDHS cumplirá con los requisitos del Reglamento de Hospitales sobre el personal médico, personal de enfermería, seguridad, equipos, instrumentos, suministros y materiales, en conformidad a lo establecido por el Departamento de Salud en el Reglamento de Hospitales.

4.1.12 <u>Centro de Trauma</u>: Las Partes reconocen que la Administración de Servicios Médicos ("ASEM") es la operadora actual de la Sala de Estabilización y será la operadora del Centro

de Trauma. Las Partes también reconocen que la ASEM requiere ciertos servicios del administrador del Hospital, por lo cual MEDHS otorgará todos aquellos acuerdos con ASEM que sean razonablemente necesarios para el funcionamiento adecuado de la Sala de Estabilización y el Centro de Trauma.

4.1.13 <u>Reglamentos y Manuales de Normas y Procedimientos</u>: MEDHS diseñará, aprobará e implementará todos los reglamentos y manuales de normas y procedimientos requeridos por las Leyes Aplicables, en particular por el Reglamento de Hospitales, dentro del periodo de sesenta (60) días inmediatamente posterior a la Fecha de Efectividad.

4.2     Relación con Instituciones de Educación.

MEDHS admite que sometió, como parte de la Propuesta de RFP, información a los efectos de crear un consorcio junto a una institución acreditada de educación médica de Puerto Rico para administrar y operar el Hospital en calidad de facilidad de salud/educativa (en inglés, "teaching hospital"). A estos efectos, MEDHS se compromete a hacer todas las gestiones necesarias para finalizar un acuerdo con alguna Escuela de Medicina para:

(a) establecer una relación de colaboración y cooperación para el desarrollo de programas educativos, investigativos y de provisión de servicios de salud; y

(b) arrendar (sujeto a lo dispuesto en la Sección 2.2) a la institución acreditada de educación médica el edificio conocido como "Consorcio" ofreciéndole términos que viabilicen su presencia en el Centro Médico y la creación potencial de un recinto medicina en Mayagüez.

4.3     Centro Médico Académico Regional del Suroeste.

MEDHS colaborará en la creación dentro del Hospital de la sede administrativa del Centro Médico Académico Regional del Suroeste (en adelante, el "Centro Médico Académico"). MEDHS colaborará con el Centro Médico Académico con el fin de: (i) fortalecer y desarrollar un sistema integrado de salud pública en el área suroeste, tanto a nivel primario, secundario, como terciario; (ii) ofrecer y brindar servicios de salud costo efectivos, accesibles y de buena calidad; (iii) fortalecer y desarrollar los programas de educación para los médicos, enfermeras y demás personal, relacionados a los Servicios de Salud; y (iv) estimular el desarrollo la investigación clínica, epidemiológica y sociomédica.

## ARTÍCULO 5                RENTA

5.1     Canon de Arrendamiento.

MEDHS pagará al Municipio de Mayagüez un canon anual de arrendamiento de NOVECIENTOS MIL DÓLARES ($900,000) por el derecho de uso de los Bienes Arrendados (en adelante, el "Canon de Arrendamiento"). MEDHS pagará dicho canon en pagos mensuales de SETENTA Y CINCO MIL DÓLARES ($75,000).

5.1.1   Incremento del Canon de Arrendamiento.

Las Partes acuerdan que cada cinco (5) años, a partir de la Fecha de Efectividad (en adelante, la "Fecha de Incremento de la Renta"), el Canon de Arrendamiento aumentará cinco (5%) puntos porcentuales con respecto a la cantidad vigente a la Fecha de Incremento de la Renta.

5.1.2   Fecha de la Emisión de los Pagos.

MEDHS pagará los Cánones de Arrendamiento un (1) mes por adelantado. Por tanto, MEDHS emitirá su primer pago al Municipio en la Fecha de Efectividad. Dicho primer pago del Canon de Arrendamiento será proporcional (a *pro rata*) al número de días calendario que resten para finalizar el mes calendario en que las Partes otorguen el Contrato. En adelante, MEDHS realizará cada pago del Canon de Arrendamiento en o antes del primer día laborable de cada mes calendario (la "Fecha de Pago". Si el Municipio no ha recibido el pago del Canon de Arrendamiento en o antes del segundo día laborable a partir de la Fecha de Pago, se entenderá que MEDHS ha incurrido en Falta de Pago y aplicarán las disposiciones de las Secciones 5.3 y 5.4.

5.2   Forma de Realizar los Pagos.

En todos los casos, los pagos deberán ser efectuados por correo o personalmente en el Departamento de Finanzas de la Oficina de Rentas Públicas del Municipio de Mayagüez, con dirección postal, P.O. Box 945 y 306 Mayagüez, P.R. 00681, mediante cheque emitido a nombre del Director de Finanzas del Municipio o en nombre del Municipio de Mayagüez.

Las Partes podrán acordar otras formas de pago luego de la Fecha de Efectividad. Los Cánones de Arrendamiento serán pagados íntegramente por MEDHS al Municipio en dólares estadounidenses sin descuentos, deducciones o reducciones.

5.3   Falta de Pago.

El Municipio entenderá que MEDHS ha incurrido en acto de incumplimiento con respecto a sus obligaciones bajo las Secciones 5.1 y 5.2 (en adelante, la "Falta de Pago") si: (i) el Municipio no ha recibido el pago íntegro allí establecido dentro de un periodo de dos (2) días laborables inmediatamente posterior a la Fecha de Pago; o (ii) si el Municipio ha recibido solamente el pago parcial del Canon de Arrendamiento dentro del término dispuesto en (i). En el evento de Falta de Pago, el Municipio notificará el hecho por escrito y por correo certificado a la siguiente dirección de MEDHS:

Dr. Orestes Castellanos
P.O. Box 8043
Marina Station
Mayagüez, Puerto Rico 00682

Pasados quince (15) días calendario a partir del recibo de la notificación, si MEDHS no ha saldado la cantidad adeudada, el Municipio podrá requerir el pago a la compañía fiadora que expida la Fianza de Pago, descrita en la Sección 9.4 del Contrato, terminar el Contrato de conformidad a lo dispuesto en el Artículo 10 o ambos.

5.4     Pago de Intereses por Falta de Pago.

El incumplimiento de MEDHS con el pago puntual del Canon de Arrendamiento supondrá la imposición de intereses sobre la cantidad debida en conformidad a las Tasas de Intereses Aplicables a Sentencias Judiciales, aplicables a deudas privadas, que estén prevalecientes al momento de surgir la deuda. Las Tasas de Intereses Aplicables a Sentencias Judiciales son publicadas por la Oficina del Comisionado de Instituciones Financieras de Puerto Rico en su página de la Web, www.cif.gov.pr/tiposinteres.html. Las deudas acumularán intereses desde la fecha en que el pago advino exigible por el Municipio hasta la fecha en que el Municipio recibe el pago íntegro de la cantidad adeudada.

## ARTÍCULO 6     EQUIPOS BIOMÉDICOS, SERVICIOS, MEJORAS Y SEGURIDAD

6.1     Equipos Biomédicos en General.

6.1.1   Manejo de Equipos Biomédicos: MEDHS desarrollará e implementará un plan para el manejo de los Equipos Biomédicos. El plan de manejo deberá cumplir con los requisitos establecidos en el Reglamento de Hospitales.

MEDHS también desarrollará, como parte de su plan de manejo, un plan de pruebas y mantenimiento de los Equipos Biomédicos y contará con los recursos humanos y el equipo técnico necesario para realizar las pruebas, el mantenimiento y la reparación de los Equipos Biomédicos.

6.1.2   Adquisición de Equipos Biomédicos: MEDHS y/o los Subcontratistas adquirirán Equipos Biomédicos durante el Término del Contrato para ofrecer los Servicios de Salud. En consideración a lo anterior, MEDHS hace las representaciones siguientes:

(a)     los Grupos de Servicios de Cardiología adquirirán e instalarán en el Hospital un inventario mínimo de Equipos Biomédicos para ofrecer los Servicios de Cardiología;

(b)     MEDHS aumentará la oferta de habitaciones para pacientes a un total de doscientas (200) habitaciones, siendo cada una de ocupación sencilla, por lo cual también elevará el número total de camas a doscientas (200) unidades. Como parte de las obligaciones asumidas bajo la Sección 4.1.1 del Contrato, MEDHS no aumentará el número de camas en exceso del total autorizado en el CNC para el Hospital. MEDHS tampoco redistribuirá las camas entre categorías, aun dentro de la capacidad autorizada, sin antes obtener un CNC para esos efectos de conformidad con el Artículo 2 de la Ley de Certificados de Necesidad y Conveniencia del Departamento de Salud; y

23

(c) MEDHS transformará el Departamento de Radiología del Hospital en un Departamento de Imágenes Médicas de acuerdo al Plan de Desarrollo presentado y el cual se aneja como parte del Contrato (Ver Anejo B). Para este propósito, MEDHS adquirirá e instalará en el Hospital: (i) una máquina de tomografías computarizadas por emisión de positrones (por sus siglas en inglés, PET-CT); (ii) dos máquinas de rayos X digital; y (iii) una Cámara "Gamma Dual Head".

6.2    Servicios.

6.2.1    <u>Mantenimiento a la Infraestructura</u>:    MEDHS asignará los recursos humanos y económicos, y establecerá todas las pruebas, inspecciones, planes de mantenimiento y reparación, que sean necesarios y adecuados para que el Hospital cuente de forma continua con los servicios de agua potable, electricidad, vapor, oxígeno, acondicionador de aire, transportación, comunicación, alarma contra incendios, sistema de supresión de incendios y cualquier otro servicio necesario para ofrecer los Servicios de Salud con los estándares de calidad mínimos requeridos por el Departamento de Salud y las Agencias Acreditadoras.

6.2.2    <u>Pago de los Servicios Básicos</u>: MEDHS pagará por los servicios de teléfono, gas, vapor, disposición de desperdicios sólidos y cualquier otro gasto por concepto del consumo de servicios similares o relacionados dentro de los Bienes Inmuebles Arrendados. En cuanto al pago de agua potable y energía eléctrica, las Partes acuerdan lo siguiente:

(a) reconocen que el Centro Médico cuenta con un solo contador de energía eléctrica y un solo contador de agua potable, y que dichos contadores y cuentas están registrados a nombre del Municipio;

(b) no teniendo operaciones en el Centro Médico, el Municipio no consume ninguno de estos servicios;

(c) MEDHS requerirá al Subcontratista Administrador que se obligue a pagar la proporción del setenta y cinco por ciento (75%) del consumo total mensual de agua potable y energía eléctrica dentro del Centro Médico;

(d) los pagos por concepto de agua potable y energía eléctrica deberán ser enviados al Municipio (mediante un proceso similar al acordado para el pago de los cánones de arrendamiento) dentro de un periodo de cinco (5) días desde la fecha de recibo de la factura, sujeto a los cargos por mora dispuestos en el Contrato; y

(e) MEDHS y el Subcontratista Administrador no serán responsables del pago de deudas del Administrador Anterior, la Administración de Rehabilitación Vocacional ("Rehabilitación Vocacional"), el Departamento de Salud y la Administración de Servicios de Salud Mental y Contra la Adicción ("ASSMCA") con la Autoridad de Energía Eléctrica ("AEE") y/o la Autoridad de Acueductos y Alcantarillados ("AAA") por concepto del consumo de energía eléctrica y/o agua potable en el Centro Médico antes de la Fecha de Efectividad; y

(f) MEDHS procurará que, dentro de un término de dieciocho (18) meses desde la Fecha de Efectividad, el Subcontratista Administrador someta propuestas ante el Municipio para los proyectos de separación de contadores de agua potable y energía eléctrica entre los distintos inquilinos del Centro Médico. Dichos proyectos estarán sujetos a las disposiciones de la Sección 2.6.

24

El incumplimiento de cualquiera de estas obligaciones podrá ser causa suficiente para que el Municipio termine el Contrato sujeto a lo dispuesto en la Sección 10.1(e).

6.3    Mejoras Ordinarias y Mejoras Extraordinarias al Hospital.

MEDHS realizará las Mejoras Ordinarias necesarias para mantener el Hospital y otros bienes comunes del Centro Médico en condiciones óptimas.

MEDHS también podrá realizar Mejoras Extraordinarias al Hospital. La sustitución y rehabilitación de los Bienes Inmuebles Arrendados, así como la construcción de mejoras o ampliaciones a las estructuras que forman parte de los Bienes Inmuebles Arrendados no serán comenzadas sin notificar y solicitar la Autorización. MEDHS procederá a realizarlas únicamente con el consentimiento escrito del Municipio, según dispuesto en la Sección 2.6. La realización de Mejoras Extraordinarias en ausencia del consentimiento escrito del Municipio, constituirá un acto de mala fe que supondrá la renuncia a cualquier compensación por los costos y gastos incurridos para efectuarlas.

Las reparaciones y mantenimiento a los Bienes Arrendados, así como las Mejoras Extraordinarias serán realizadas de conformidad con los requisitos mínimos establecidos en las siguientes guías y códigos:

(a) *Guidelines for Design and Construction of Hospitals and Health Care Facilities* del Instituto Americano de Arquitectos (American Institute of Architects).

(b) *Life Safety Code 101* de la Asociación Nacional para la Protección Contra Incendios (National Fire Protection Association).

(c) *Standards for Health Care Facilities* de la Asociación Nacional para la Protección Contra Incendios (National Fire Protection Association).

(d) *Americans with Disabilities Act* (ADA) y las Leyes Aplicables con relación al diseño, construcción, remodelación, ampliación, mantenimiento y operación de facilidades de salud en Puerto Rico.

(e) *National Fire Prevention Code* (NFPA 1) de la Asociación Nacional para la Protección Contra Incendios (National Fire Protection Association).

(f) *Occupational Safety and Health Act* del Departamento del Trabajo Federal (US Department of Labor Occupational Safety and Health Administration).

(g) Ley Número 416 de 22 de septiembre de 2004, según enmendada, conocida como Ley sobre Política Pública Ambiental y el Reglamento Número 5717 para el Manejo de Desperdicios Sólidos No Peligrosos del 14 de diciembre de 1997.

25

(h) Ley Número 40 del 3 de agosto de 1993, según enmendada, conocida como Ley para Reglamentar la Práctica de Fumar en Lugares Públicos.

(i) Ley Núm. 133 del 18 de junio de 1999 y el Reglamento Número 102 para Reglamentar la Protección y Seguridad de Infantes, Neonatos o Recién Nacidos, Infantes y Niños en las Facilidades Hospitalarias de Puerto Rico.

(j) También será aplicable cualquier otro código, guía o reglamento vigente a la fecha en que los planos de diseño para la construcción de nuevas estructuras hayan sido endosados.

6.4    Seguridad en el Hospital.

MEDHS desarrollará e implementará un programa de seguridad que promueva un ambiente seguro dentro del Hospital para beneficio de los pacientes, empleados y visitantes del Hospital. El programa de seguridad protegerá y mantendrá los Bienes Arrendados en condiciones adecuadas para su uso.

MEDHS establecerá e implementará dicho programa de seguridad en conformidad a los requisitos establecidos en el Reglamento de Hospitales.

**ARTÍCULO 7      GRAVÁMENES, CONTRIBUCIONES Y OTROS CARGOS GUBERNAMENTALES**

7.1    Gravámenes, Contribuciones, Otros Cargos Gubernamentales y Cargos por Servicios.

7.1.1    <u>Prohibición y Obligación de Proteger los Bienes Arrendados de Gravámenes</u>: MEDHS mantendrá los Bienes Arrendados libres de todo gravamen, cargo o servidumbre excepto aquéllos existentes a la Fecha de Efectividad. Tampoco permitirá que materialistas, suplidores o vendedores creen, por virtud de reclamaciones que éstos pudieran tener o que pudieran surgir en relación a proyectos de construcción para la realización de Mejoras Extraordinarias, gravámenes o cargas que afecten, total o parcialmente, los Bienes Arrendados.

MEDHS también evitará que se creen gravámenes o cargas sobre los Bienes Arrendados mediante el pago diligente de toda contribución o cargo gubernamental por concepto de la posesión, uso, administración y operación de los Bienes Arrendados inmediatamente cuando dicha cantidad advenga vencida.

7.1.2    <u>Obligación de Asumir Costos de Remover Gravamen</u>: MEDHS asume la responsabilidad absoluta de asumir cualquier costo o gasto necesario para retirar cualquier gravamen o carga que sea creado luego de la Fecha de Efectividad sobre los Bienes Arrendados.

7.2    Contribuciones.

MEDHS pagará todas las Contribuciones con el fin de evitar que le sean impuestos multas, penalidades, intereses o en relación a Deudas Contributivas; provisto, sin embargo, que:

(a)    si, por ley, cualquier Contribución pudiese ser pagada a plazos a opción del contribuyente, MEDHS podrá pagar la Contribución a plazos durante el transcurso del periodo que permitan las Leyes Aplicables y MEDHS será responsable únicamente por los plazos que advengan vencidos durante el Término del Contrato; y

(b)    todas las Contribuciones de los años fiscales en los que el Término del Contrato comenzará y terminará serán distribuidos de tal modo que MEDHS pagará solamente las partes que correspondan a las porciones de los años contenidos dentro del Término del Contrato.

MEDHS informará al Municipio sobre cualquier Contribución que le sea exigida por alguna Entidad Gubernamental y sobre cualquier acción tomada por MEDHS con relación a la Contribución.

7.3    Exenciones Contributivas.

Por virtud de la facultad que le concede la Ley de Patentes Municipales, el Municipio podrá conceder a MEDHS exenciones, parciales o totales, sobre el pago de Patentes Municipales en consideración a circunstancias especiales que lo justifiquen. MEDHS deberá hacer la petición y presentar la evidencia necesaria que ponga a los funcionarios pertinentes del Municipio en posición de tomar una decisión informada.

El Municipio podría conceder incentivos con relación al pago de arbitrios de construcción y patentes municipales en consideración a los méritos y circunstancias de cada caso. La determinación para la otorgación del incentivo será realizada como parte del proceso dispuesto en la Sección 2.6 del Contrato. Cualquier determinación con respecto a arbitrios de construcción y patentes municipales será incluida en la Autorización. La otorgación potencial de estos incentivos se hará exclusivamente con relación a los Proyectos de Mejoras.

7.4    Recibos.

MEDHS someterá al Municipio, a solicitud de éste, y dentro de treinta (30) días desde la fecha en que la Contribución advenga vencida, recibos oficiales de la Entidad Gubernamental con facultad impositiva, o cualquier otra evidencia del pago de la Contribución.

**ARTÍCULO 8**          **INFORMES FINANCIEROS, INFORMES OPERACIONALES, AUDITORÍAS, VISITAS, SUPERVISIÓN, CONDICIONES FINANCIERAS RESTRICTIVAS Y ADMINISTRACIÓN DEL CONTRATO**

8.1     Informes.

MEDHS someterá mensualmente a la atención del Administrador del Contrato los siguientes estados financieros interinos de la operación del Hospital: (i) el Estado de Situación; (ii) el Estado de Ingresos y Gastos; y (iii) el Estado de Flujos de Efectivo (en conjunto, los "Informes Financieros Interinos"). Los Informes Financieros Interinos serán preparados bajo los principios de contabilidad generalmente aceptados.

El Municipio se reserva el derecho de solicitar estadísticas e informes sobre la administración del Hospital y la provisión de los Servicios de Salud, por lo cual MEDHS someterá inicialmente las estadísticas e informes interinos operacionales mensuales requeridos en el Anejo H (en adelante y en conjunto, los "Informes Operacionales").

MEDHS también someterá una copia de cualquier informe recibido durante el mes transcurrido de evaluaciones realizadas por las Agencias Acreditadoras o por las Entidades Gubernamentales de las operaciones del Hospital (en adelante, los "Informes de Agencias"), y de los asuntos administrativos necesarios para mantener al Municipio debidamente informado, sin menoscabo de lo dispuesto en el último párrafo de esta Sección 8.1 sobre informes de las Agencias Acreditadoras o de las Entidades Gubernamentales que señalen deficiencias.

Los Informes Financieros Interinos, los Informes Operacionales y los Informes de Agencias deberán ser sometidos mensualmente no más tarde del día quince (15) del mes calendario siguiente al periodo al cual aquellos pertenecen.

Además, MEDHS someterá anualmente, dentro de un periodo de noventa (90) días a partir de la Fecha del Cierre de Operaciones, los siguientes documentos:

(a)     el informe financiero de MEDHS y del Subcontratista Administrador del Hospital, auditado por un contador público autorizado independiente (en adelante, el "CPA Independiente"), con los estados financieros básicos incluyendo información suplementaria, según se requiera por los principios de contabilidad generalmente aceptados y pronunciamientos del Instituto Americano de Contadores Públicos Autorizados de los Estados Unidos de América; y uno o varios de los siguientes;

(b)     un informe anual del CPA Independiente, sobre hallazgos de deficiencias significativas o debilidades materiales en los controles internos que pueden afectar las cantidades presentadas en los informes financieros auditados;

(c)     un informe anual del CPA Independiente, sobre hallazgos detectados en las pruebas sobre incumplimiento con las Leyes Aplicables, con las cláusulas financieras contenidas en el Contrato y sobre cualquier otro asunto relevante al estado financiero auditado; y/o

28