Exhibit 25



## *MEDICAL EDUCATION AND HEALTH SERVICES, INC.*

*Centro Médico Universitario Dr. Ramón Emeterio Betances*
PMB 391
P.O. Box 7999
Mayagüez, PR 00681

Tel. (787)652-9200
E-mail:medhspr@gmail.com

8 de diciembre de 2009

Lcdo. Ramfis Vélez  y- *Gonzales Oldular*
Administrador SISSO
Centro Médico de Mayagüez

Estimado Lcdo. Vélez:

Acuso recibo de su carta enviada vía correo electrónico durante la noche de del 7 diciembre de 2009 y entregada a la mano el día de hoy. En su comunicado hace referencia a la reunión sostenida con el Honorable Alcalde, en donde se presentó una serie de peticiones con la intención de conseguir alguna ayuda de la administración municipal, en cuanto a una posible moratoria en los pagos de utilidades y renta. Como usted muy bien dice, yo tengo conocimiento de lo que allí se discutió y la realidad de los hechos es que no se llegó a ningún acuerdo en cuanto a la solicitud antes mencionada y si en cuanto a una campaña coordinada entre el Municipio y el Hospital con la intención de levantar la imagen que se había deteriorado a raíz de la propaganda negativa por parte de Advanced Cardiology. Se acordó además, que el Municipio nos ayudaría en la gestión que se haría con el Banco de Desarrollo Económico para un préstamo y se acordó que se le estaría proveyendo al Municipio de un espacio en el cuarto piso del hospital, para la construcción de un intensivo y un intermedio temporero para el centro de traumas. Se acordó que estaríamos ayudando al Municipio a buscar el contratista que haría la construcción y que haríamos las certificaciones para que el Municipio pudiera hacer los desembolsos de dinero al contratista y de esta manera agilizar la construcción y que estuviera lista para "las justas". También se acordó que nosotros solicitaríamos una reunión con los abogados de Atlantis y los del Municipio para buscar un acuerdo, fuera de los tribunales, que resolviera las diferencias entre la administración del hospital y esa compañía. En ningún momento el Alcalde se comprometió con nosotros a que se suspendieran los pagos de renta y utilidades. Tan es así que envió luego al Lcdo. Cesar Miranda a reunirse con este servidor, como Presidente de MEDHS, para hablar nuevamente de lo que se había solicitado. En dicha reunión, en la cual estuvo presente el Dr. Orlando Marini, el Lcdo. Miranda fue categórico en cuanto a que el alcalde no podía condonar los pagos a que estamos obligados, pero que se estudiaría la manera de ver cómo nos podían ayudar, por lo que se presentó la posibilidad de buscar posibles inversionistas que pudieran aportar capital para la operación del hospital. Como puede ver en ningún momento MEDHS ha recibido del Municipio confirmación alguna para la posposición de los pagos de renta o utilidades. La carta enviada al Alcalde de ninguna manera supone una ratificación de suspensión o moratoria alguna de pagos. Es por esto, que SISSO viene obligada a hacer los pagos según estipulado en el contrato.

Quiero dejar meridianamente claro que el contrato para la operación del hospital es entre el Municipio y MEDHS. SISSO es el sub-contratista que trae MEDHS para que lleve a cabo la administración. Existen unas obligaciones contractuales que no se pueden eludir ya que nos pondrían en incumplimiento del contrato otorgado entre MEDHS y el Municipio. Actualmente no se nos ha entregado los informes financieros a que viene obligado SISSO presentar a MEDHS, a pesar que los hemos solicitados en múltiples ocasiones. Tampoco se nos ha hecho los pagos según estipulado en el contrato y lo que es peor, se puso un "Stop Payment" al pago de renta de noviembre, después de haber "rebotado" el cheque en dos ocasiones, lo que provoco que los representantes de la oficina de finanzas municipales se personaran a mi oficina a solicitar que se le hiciera el pago inmediatamente ya que habíamos ocasionado un problema en el flujo de caja del municipio. Le solicité el pago a su oficina de finanzas y estoy en espera del mismo para poder nosotros hacer el pago al Municipio. Con respecto a los pagos, le recuerdo que los mismos tienen que ser a nombre de MEDHS y no del Municipio de Mayagüez. Esto aplica también a todos los informes y documentos requeridos. Ni el municipio ni ningún representante de este, está autorizado a recibir pagos o documentos que viene SISSO obligado a hacer directamente a MEDHS. Toda comunicación que tenga que ver con la operación del hospital y que quiera hacer SISSO, será con MEDHS y no con el municipio.

Como puede ver Licenciado, los pagos, entrega de documentos ni ninguna obligación de SISSO con MEDHS se ha pospuesto o suspendido. Nosotros seguiremos haciendo las gestiones necesarias para obtener alguna ayuda del Municipio. De obtenerla, la transferiríamos, de buena fe, a SISSO. Al presente se encuentran en incumplimiento del contrato, lo que nos pone a nosotros en incumplimiento con nuestras obligaciones contractuales con el Municipio. Como cuestión de hechos, le estoy enviando copia de la carta enviada a MEDHS por parte de los abogados del municipio, recordándole que el pago de renta no es el único incumplimiento de SISSO con respecto al contrato, por lo que al igual que nos notifica el Municipio, nosotros le notificamos a usted que esta comunicación constituye la notificación de la falta de pago y que cuenta con 5 días para emitir el pago correspondiente y entrega de los documentos múltiples veces solicitados.

Esperando haber aclarado este asunto, quedo.

Muy respetuosamente,

Dr. Orestes Castellanos Rodríguez
Presidente MEDHS

Cc: Lcdo Carlos Nieves
Cc: Lcdo. Efraín de Jesús

Exhibit 26

5

ELMHS

### *MEDICAL EDUCATION AND HEALTH SERVICES, INC.*


*Una organización al servicio de su salud*

*Centro Médico Universitario Dr. Ramón Emeterio Betances*
**PMB 391**
**P.O. Box 7999**         Tel. (787)652-9200
**Mayagüez, PR 00681**         E-mail:medhspr@gmail.com

30 de diciembre de 2009

Lcdo. Ramfis Vélez
Administrador SISSO
Centro Médico Académico
Dr. Ramón E. Betances

Estimado Lcdo. Vélez:

Sirva la presente para desearle a usted y a su equipo de trabajo un feliz y prospero año 2010

En los pasados meses le hemos cursado varios comunicados y facturas tanto de consumo de energía eléctrica y agua como de renta. En los comunicados, se les aclara que el contrato para la administración del hospital es entre el Municipio y MEDHS y que MEDHS trae a SISSO como subcontratista para operar el hospital. Se les ha aclarado, que no existe entre el Municipio y MEDHS ningún acuerdo para condonar ni posponer los pagos de renta y utilidades a los que estamos obligados contractualmente. Tampoco existe acuerdo alguno entre MEDHS y SISSO con ese propósito. Se les ha señalado que, ningún empleado municipal ni representante legal del Municipio, está autorizado a recibir documentos o pagos que tienen que ser dirigidos a MEDHS. Tampoco pueden, bajo ningún concepto, llevar a cabo negociaciones o conversaciones conducentes a alterar la relación contractual entre MEDHS y el Municipio o entre MEDHS y SISSO.

Con respecto a los pagos de renta y utilidades, se les ha enviado la factura con la copia de la factura que el Municipio envía. A pesar de las gestiones hechas, no hemos tenido ninguna respuesta positiva su parte. Con este comunicado, se les está entregando las facturas correspondientes al consumo de energía eléctrica del mes de octubre y renta del mes de enero. Se le recuerda que el mes pasado se envió la factura de consumo de energía eléctrica del mes de septiembre, por la cantidad de $173,081.36 y la misma tampoco se ha pagado. Al presente su deuda de renta es de $249,999.99, su deuda de agua es de $38,324.83 (mes de septiembre solamente) y su deuda de energía eléctrica es de $354,205.54, para un total adeudado de $642,530.36.

Su incumplimiento nos pone a nosotros en incumplimiento, lo que nos pone, a su vez, en riesgo de una acción legal en nuestra contra por parte del Municipio. Entiendo que hemos cumplido con los términos del contrato, dándole un término de tiempo para que cumplan con sus obligaciones de pago. Aun así, han hecho caso omiso a nuestros comunicados anteriores. Es por esto que le

estamos dando 10 días laborables para pagar la totalidad de su deuda con MEDHS. De no hacerlo, nos veríamos obligados a recurrir a una acción legal por incumplimiento de contrato.

Esperamos su pronta atención a este asunto.

Sin otro particular quedo.

Atentamente,

_____
Dr. Orestes Castellanos Rodríguez
Presidente MEDHS

Anejo: Facturas AEE, AAA y Municipio.

cc. Lcdo. Efraín De Jesús



28 de enero de 2010

*Vía email, fax y correo certificado*

Dr. Orestes Castellanos
Presidente
Medical Education and Health Services, Inc.
PMB 391
PO Box 7999
Mayagüez Puerto Rico 00681

Dr. Orlando Marini
Presidente
Sistemas Integrados de Salud del Suroeste, Inc.
PO Box 8043
Marina Station
Mayagüez, P.R. 00682

**RE:** **Terminación del Contrato para la Operación y Administración del Hospital Dr. Ramón E. Betances del Centro Médico de Mayagüez**

Estimados doctores Castellanos y Marini:

El Municipio de Mayagüez y Medical Education and Health Services, Inc. (en adelante "MEDHS") otorgaron el 27 de agosto de 2009 el Contrato para la Operación y Administración del Hospital Dr. Ramón E. Betances del Centro Médico de Mayagüez (en adelante, el "Contrato"). En dicho Contrato también compareció Sistemas Integrados de Salud del Suroeste, Inc. (en adelante, "SISSO") en calidad de deudor solidario, administrador y operador del Hospital.

La razón del Municipio para otorgar el Contrato fue el compromiso asumido por MEDHS y SISSO de administrar, operar y desarrollar el Hospital conforme a los más altos estándares de la industria. A tales efectos, MEDHS y SISSO le representaron al Municipio que obtendrían garantías acreditativas de la capacidad de ambos contratistas para administrar, operar y desarrollar el Hospital según el estándar antes mencionado. A pesar de lo anterior, MEDHS y SISSO han incurrido consistentemente en incumplimientos que demuestran su clara incapacidad para alcanzar ese objetivo.

El 8 de diciembre de 2009, le notificamos a MEDHS que el Departamento de Finanzas del Municipio nos había informado que el cheque emitido por ésta para el pago del canon de arrendamiento por el mes de noviembre de 2009 fue devuelto por insuficiencia de fondos. La devolución del cheque emitido por MEDHS constituyó un evento de Falta de Pago bajo el

Artículo 5.3 y un Evento de Incumplimiento bajo el Artículo 10.1 del Contrato. Por ese motivo, nos dirigimos al Doctor Castellanos en esa misma fecha para solicitarle estricto cumplimiento con esta obligación, lo cual instruimos que hicieran dentro del periodo de quince (15) días inmediatamente posterior a la fecha de dicha comunicación. Al día de hoy, ni MEDHS ni SISSO han pagado el canon de arrendamiento para el mes de noviembre, como tampoco el pago de diciembre. Este incumplimiento ha continuado por más de treinta (30) días, por lo cual el Municipio se encuentra en posición de terminar el Contrato de forma inmediata.

Además del incumplimiento antes descrito, MEDHS y SISSO también han incumplido de forma continua con otras obligaciones contractuales.

1. Falta de Pago por Servicios Básicos. El Artículo 6.2.2 del Contrato establece la obligación de MEDHS y SISSO de pagar los servicios básicos de agua y luz, entre otros, según los términos allí dispuestos. El Municipio le ha enviado a MEDHS facturas por el consumo de agua potable y energía eléctrica en los meses de septiembre y octubre de 2009. MEDHS recibió las facturas de agua potable para dichos meses los días 28 de octubre de 2009 y 15 de noviembre de 2009, respectivamente. De igual forma, MEDHS recibió las facturas de energía eléctrica los días 1 y 29 de diciembre de 2009, respectivamente. A la fecha de esta comunicación, ni MEDHS ni SISSO le han pagado al Municipio la porción de las facturas que le corresponde según el Artículo 6.2.2 del Contrato.

2. Incumplimiento de Ciertas Condiciones Financieras Restrictivas. Las secciones 8.5(a)1 y 8.5(a)2 del Contrato exigen que la operación del Hospital cuente con un capital líquido inicial mínimo de cinco millones de dólares ($5,000,000) y con una línea de crédito para uso de capital de operaciones de tres millones de dólares ($3,000,000), respectivamente. MEDHS y SISSO debían someter documentos acreditativos de la existencia de esas garantías financieras en la fecha de otorgamiento del Contrato. Han transcurrido más de ciento cuarenta y cinco (145) días desde entonces y no han sido capaces de aportar los cinco millones de dólares ($5,000,000) de capital inicial y la línea de crédito a la que se comprometieron.

3. Incumplimiento con la Obligación de Obtener Seguros y la Fianza de Pago. El Artículo 9 establece la obligación de MEDHS y SISSO de obtener, presentar ante el Municipio y mantener seguros de propiedad y contingencia y de responsabilidad pública, así como una fianza para asegurar el cumplimiento de las obligaciones de pago al Municipio. Los certificados de dichos seguros y la fianza debieron ser sometidos a la atención del Municipio dentro de siete (7) días inmediatamente posteriores a la fecha de efectividad del Contrato. El término para presentar la certificación ante el Municipio venció el 3 de septiembre de 2009, por lo cual han transcurrido más de ciento cuarenta y cinco (145) días sin que MEDHS o SISSO hayan evidenciado al Municipio la expedición de las pólizas de seguro y la fianza que se comprometieron a obtener.

La seriedad de tales incumplimientos es prueba categórica de la incapacidad de MEDHS y SISSO para desempeñar sus obligaciones bajo el Contrato. La precaria situación económica del Hospital, causada por la aparente falta de liquidez de SISSO, evidencia que la operación del Hospital está en serio riesgo de colapsar: hay insuficiencia de personal básico necesario, insuficiencia de materiales para la facultad médica, incertidumbre sobre el pago de nómina, y aun peor, el riesgo de que no se logre la reacreditación de la institución pautada para febrero de 2010. Existe, por tanto, una emergencia de salud pública que el Municipio tiene que atender con la mayor premura y determinación. El Municipio está resuelto a evitar que la situación del Hospital continúe agravándose, arriesgando la salud y la vida de los mayagüezanos y los residentes del área oeste. Por tal motivo le notificamos la terminación inmediata del Contrato, constituyendo la fecha de esta comunicación la Fecha de Terminación.

Bajo el Artículo 10.2 del Contrato, MEDHS y SISSO se comprometieron a entregarle al Municipio los Bienes Arrendados en la Fecha de Terminación. A estos fines he designado un comité de trabajo, integrado por el Doctor Freddie Román, Lcdo. Efraín de Jesús y Lcda. Magda Acevedo, que estará el 1 de febrero a las 9:00 AM en sus oficinas, en el área de administración del Hospital, para finiquitar los trámites de transferencia de posesión del Hospital y así evitar que se afecten o interrumpan los servicios de salud que allí se ofrecen.

Atentamente,

José Guillermo Rodríguez

Exhibit 29

RC-2010-000819

## MUNICIPIO AUTÓNOMO DE MAYAGÜEZ



# CONTRATO PARA LA OPERACIÓN Y LA ADMINISTRACIÓN DEL HOSPITAL DR. RAMÓN E. BETANCES DEL CENTRO MÉDICO DE MAYAGÜEZ

ENTRE

EL MUNICIPIO AUTÓNOMO DE MAYAGÜEZ

Y

MAYAGÜEZ MEDICAL CENTER – DR. RAMÓN EMETERIO BETANCES

29 DE ENERO DE 2010



## TABLA DE CONTENIDOS

ARTÍCULO 1    DEFINICIONES; INTERPRETACIÓN ........................................................ 3

ARTÍCULO 2    BIENES ARRENDADOS Y OTRAS OBLIGACIONES .......................... 10

ARTÍCULO 3    DURACIÓN DEL CONTRATO ................................................................ 15

ARTÍCULO 4    ADMINISTRACIÓN, OPERACIÓN, DEPARTAMENTOS Y SERVICIOS CLÍNICOS, RESIDENCIAS E INTERNADOS ........................................ 15

ARTÍCULO 5    RENTA ...................................................................................................... 20

ARTÍCULO 6    EQUIPOS BIOMÉDICOS, SERVICIOS, MEJORAS Y SEGURIDAD . 22

ARTÍCULO 7    GRAVÁMENES, CONTRIBUCIONES Y OTROS CARGOS GUBERNAMENTALES ............................................................................ 25

ARTÍCULO 8    INFORMES FINANCIEROS, INFORMES OPERACIONALES, AUDITORÍAS, VISITAS, SUPERVISIÓN, CONDICIONES FINANCIERAS RESTRICTIVAS Y ADMINISTRACIÓN DEL CONTRATO ............... 27

ARTÍCULO 9    SEGUROS E INDEMNIZACIONES ....................................................... 32

ARTÍCULO 10   INCUMPLIMIENTO Y TERMINACIÓN DEL CONTRATO ............... 35

ARTÍCULO 11   SUBCONTRATACIONES; CESIÓN DEL CONTRATO; CAMBIO DE CONTROL ................................................................................................ 39

ARTÍCULO 12   POLÍTICA CONTRA EL DISCRIMEN Y LA IGUALDAD DE OPORTUNIDADES ................................................................................ 41

ARTÍCULO 13   PROCESO DE RESOLUCIÓN DE DISPUTAS ................................... 42

ARTÍCULO 14   CLÁUSULAS MISCELÁNEAS ............................................................. 44

Anejo A – Plano del Centro de Trauma ................................................................. 51

Anejo B – Plan de Desarrollo ............................................................................... 52

Anejo C – Propuesta de MMC .............................................................................. 54

Anejo D – Estudio de Título del Centro Médico ................................................... 55

Anejo E – Plano "As Built" del Centro Médico ..................................................... 56

Anejo F – Área Aproximada de Algunos de los Bienes Inmuebles Arrendados ....... 57

Anejo G – Bienes Inmuebles Ocupados por Otros Inquilinos del Centro Médico ... 58

Anejo H – Lista de Estadísticas a Ser Sometidos en los Informes Mensuales .......... 59

Anejo I – Estados Financieros Proyectados ........................................................... 60

Anejo J – Declaración Jurada en Cumplimiento de la Ley Núm. 428 ...................... 61

29 de enero de 2010

<u>**VIA FACSIMILE (787) 265-2270**</u>
<u>**Y CORREO ORDINARIO**</u>

Hon. José G. Rodríguez Rodríguez
Oficina del Alcalde
Apartado 447
Municipio de Mayagüez
Mayagüez, Puerto Rico 00681

**Asunto: Cancelación Contrato para la Operación**
**y Administración del Centro Médico de**
**Mayagüez**

Honorable Alcalde:

Le acuso recibo de su carta fechada 28 de enero de 2010, mediante la cual el Municipio de Mayagüez resuelve y da por terminado, efectivo inmediatamente, el Contrato para la Operación y la Administración del Hospital Dr. Ramón Emeterio Betances del Centro Médico de Mayagüez suscrito en 27 de agosto de 2009 (el "Contrato"), entre el Municipio Autónomo de Mayagüez, Medical Educational and Health Services, Inc. ("MEDHS") y Sistemas Integrados de Salud del Sur Oeste, Inc. ("SISSO").

SISSO accede y acepta la terminación del Contrato por parte del Municipio de Mayagüez. También reconoce que tanto MEDHS como SISSO incumplieron con los requisitos establecidos en el Contrato referentes a la aportación de capital necesaria para financiar las operaciones del Centro Médico de Mayagüez. Dicho incumplimiento se debió a que la única aportación de capital fue hecha por el suscribiente. Contrario a las representaciones que el Dr. Orestes Castellanos le hiciera tanto al Municipio de Mayagüez como al que suscribe, MEDHS y/o el Dr. Castellanos nunca aportaron ni han aportado, cantidad alguna para cumplir con los requisitos iniciales de capitalización dispuestos en los Artículos 8.5(a)1. y 8.5(a)2. del Contrato. Al incumplir MEDHS con sus obligaciones de capitalización bajo el Contrato, y por ende SISSO, las operaciones del Centro Médico de Mayagüez se han visto afectadas ya que SISSO no ha

tenido capital de trabajo suficiente llevar a cabo, con un solo inversionista, la operación del Centro Médico de Mayagüez según contempláramos originalmente y según le representamos al Municipio. Además y según le informáramos en la reunión que el suscribiente y el Dr. Castellanos sostuvimos con usted, ni MEDHS ni SISSO, cuentan actualmente con los fondos y los dineros suficientes y adecuados para continuar administrando el Hospital; ni para llevar a cabo las mejoras a la planta física del Hospital que propendan su desarrollo según nos comprometiéramos originalmente con el Municipio; ni para adquirir los equipos y materiales de trabajo necesarios para operar de manera eficiente el Hospital

En atención a todo lo anterior, aceptamos la resolución y terminación del Contrato por parte del Municipio de Mayagüez y nos ponemos a la disposición del Municipio de Mayagüez para coordinar la transición de las operaciones del hospital a la entidad que designe el Municipio de Mayagüez.

SISTEMAS INTEGRADOS DE SALUD DEL
SUR OESTE, INC.

Por: _____
Dr. Orlando Marini Román
Presidente

c: Medical Educational and Health Services, Inc.
   Lcdo. Kermit Ortiz

## PREÁMBULO

Este contrato para la operación y administración del Hospital Dr. Ramón E. Betances del Centro Médico de Mayagüez (el "Contrato") es otorgado en la fecha de 29 de enero de 2010 por el Municipio Autónomo de Mayagüez, Número de Seguro Social Patronal 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, representado en este acto por su Alcalde, Hon. José Guillermo Rodríguez Rodríguez (en adelante, el "Alcalde"), mayor de edad, casado, administrador público y vecino de Mayagüez, Puerto Rico, quien ha sido debidamente facultado para comparecer y representar el Municipio Autónomo de Mayagüez en este acto por la Ley Núm. 81 de 30 de agosto de 1991, según enmendada, conocida como la Ley de Municipios Autónomos de Puerto Rico (en adelante, el "Municipio"), y Mayagüez Medical Center-Dr. Ramón Emeterio Betances, una corporación con fines de lucro creada bajo la Ley de Corporaciones del Estado Libre Asociado de Puerto Rico, Número de Seguro Social Patronal 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, con oficinas en Mayagüez, Puerto Rico, representada por el Lcdo. Antonio José Santos Prats, mayor de edad, casado, abogado y vecino de Guaynabo, Puerto Rico, autorizado para suscribir el Contrato mediante resolución de la Junta de Directores de la Corporación (en adelante, "MMC") (en conjunto, las "Partes").

Es el deseo de las Partes otorgar el presente Contrato, el cual se regirá por las leyes, usos y costumbres comerciales vigentes en el Estado Libre Asociado de Puerto Rico y, en especial por los siguientes:

## TÉRMINOS Y CONDICIONES

### ARTÍCULO 1        DEFINICIONES; INTERPRETACIÓN

1.1    Definiciones.

1. "Actos de Dios" – Serán aquellos sucesos de la naturaleza en que las Partes y terceros no intervienen, tal cuales terremotos, maremotos, huracanes, tormentas eléctricas, inundaciones y otros similares.

2. "Administrador del Contrato" – Será la persona natural o jurídica a ser nombrada, facultada o contratada para que realice la supervisión y el monitoreo del desempeño de MMC con respecto a sus obligaciones bajo el Contrato. Las obligaciones y facultades del Administrador del Contrato son dispuestas de forma general en la Sección 8.6.

3. "Advanced Cardiology, Inc." – la entidad corporativa que administró y operó el Hospital desde el año 2000 hasta el 31 de agosto de 2009.

4. "Agencias Acreditadoras" – Serán entidades no gubernamentales con la facultad para evaluar y certificar la calidad de los Servicios de Salud, tal cuales la *Joint Commission on Accreditation of Healthcare Organizations*, la *Accreditation Council for Graduate Medical Education*, sus sucesoras y cualquier otra entidad acreditadora futura.



3

5.  "Autorización" – El acuerdo escrito y final entre las Partes mediante el cual el Municipio autoriza que se realice el Proyecto de Mejoras sometido por MMC, sujeto a que MMC y el Promotor cumplan con las condiciones y los términos establecidos en el acuerdo.

6.  "Bienes Inmuebles Arrendados" – Son aquellos bienes que por su naturaleza, destino o por ley constituyen bienes inmuebles bajo los artículos 261 a 264 del Código Civil de Puerto Rico[1] y que forman o formarán parte de los Bienes Arrendados en o después de la Fecha de Efectividad de conformidad con las secciones 2.2, 2.4, 2.5 y 2.6 del Contrato.

7.  "Bienes Muebles Arrendados" – Son los bienes que cumplen con las definiciones de los artículos 265 a 272 del Código Civil de Puerto Rico[2] y que son definidos en la Sección 2.3 del Contrato.

8.  "Bienes Arrendados" – Son los bienes que son necesarios para la administración y operación del Hospital. El término Bienes Arrendados se referirá a los Bienes Inmuebles Arrendados y Bienes Muebles Arrendados existentes a la Fecha de Efectividad o añadidos posteriormente a estas categorías, según permitido por el Contrato.

9.  "Cambio de Control" – Será: (a) la venta, alquiler, transferencia, traspaso o cualquier otra forma de transferencia, en una o en una serie de transacciones, de todos o sustancialmente todos los activos de MMC; (b) la consolidación de MMC con otra persona o entidad, la fusión de MMC o con otra persona o entidad, o la fusión de otra persona o entidad en MMC o cualquier evento similar en cual cincuenta por ciento (50%) de los acciones con derecho al voto se cambien o intercambien por dinero, otras acciones o propiedades; o (c) la adopción de una resolución o plan por los accionistas de MMC relacionado con la liquidación o disolución de MMC.

10. "Centro de Trauma" – Será el hospital equipado para proveer servicios médicos de emergencia a pacientes que hayan sufrido lesiones traumáticas 24 horas al día, 365 días al año. El Centro de Trauma compartirá el mismo edificio donde está ubicada la Sala de Emergencias del Hospital (Ver Anejo A.2). Éste estará compuesto por la Sala de Estabilización, un área de tratamiento intensivo, una sala de operaciones y un helipuerto, entre otras áreas de servicio necesarias para este tipo de hospital. El Centro de Trauma se encuentra en fase de construcción a la fecha del otorgamiento del Contrato.

11. "Contrato" – Es el contrato para la administración y la operación del Hospital Dr. Ramón E. Betances del Centro Médico de Mayagüez; los siguientes documentos se incorporan al Contrato: (i) la Propuesta de MMC; (ii) los anejos identificados en la Tabla de Contenidos; (iii) las Autorizaciones y sus cambios posteriores; y (iv) cualquier otro documento que las Partes, mediante mutuo acuerdo escrito, estimen adecuado añadir luego de la Fecha de Efectividad. De existir conflictos futuros en cuanto a la interpretación de los documentos que forman parte del Contrato, las Partes acuerdan que éstos prevalecerán en el siguiente orden:

(1) el Contrato;

---

[1] 31 L.P.R.A.§§ 1041-1044
[2] 31 L.P.R.A.§§ 1061-1068



4

(2) los anejos identificados en la Tabla de Contenidos (excluyendo la Propuesta);

(3) la Propuesta;

(4) las Autorizaciones y sus cambios posteriores; y

(5) cualquier otro documento que las Partes han añadido luego de la Fecha de Efectividad mediante mutuo acuerdo escrito.

12. "Contribuciones" – Serán las obligaciones de MMC, como persona jurídica autorizada para hacer negocios en el Estado Libre Asociado de Puerto Rico, ante el Departamento de Hacienda, el CRIM, los municipios o cualquier otra Entidad Gubernamental, de pagar tributos por concepto de ingresos, arbitrios, patentes, contribuciones sobre la propiedad mueble e inmueble, seguros, derechos y permisos requeridos por las Leyes Aplicables.

13. "Daños Indirectos" – Son los daños en forma de pérdida económica o reputación que no son consecuencia directa de una violación o incumplimiento del Contrato.

14. "Deuda Contributiva" – Será toda cantidad que advenga vencida y exigible por concepto de pago de Contribuciones, cargos gubernamentales generales y especiales, ordinarios y extraordinarios, previstos o imprevistos, de cualquier tipo y naturaleza que de tiempo en tiempo, durante el Término del Contrato, sean impuestos o exigidos, en relación a los derechos de uso, posesión, habitación, administración y operación de los Bienes Arrendados independientemente de que dichos cargos sean hechos directamente a MMC o a través, o en nombre, del Municipio.

15. "Entidad Gubernamental" – Es cualquier rama de gobierno, departamento, agencia, entidad, instrumentalidad o corporación pública del Estado Libre Asociado de Puerto Rico o el Gobierno Federal de Estados Unidos de América.

16. "Equipos Biomédicos" – Serán aquellos bienes muebles que forman parte de los Bienes Muebles Arrendados o que son adquiridos por MMC y/o los Subcontratistas durante el Término del Contrato para ayudar en el diagnóstico, tratamiento y seguimiento de los pacientes del Hospital.

17. "Estados Financieros Proyectados" – Se refiere al documento con los estados financieros proyectados de la operación y administración del Hospital, el cual será sometido por MMC como parte de su Propuesta dentro de treinta (30) días a partir de la Fecha de Efectividad, y el cual se anejará como parte del Contrato (Ver Anejo I), según enmendado. Si MMC no somete los Estados Financieros Proyectados dentro de dicho término, el Municipio, no obstante lo descrito en Artículo 10, podrá terminar el Contrato con treinta (30) días de notificación.

18. "Evento de Fuerza Mayor" – Serán las circunstancias o eventos que: (i) sean impredecibles, o si predecibles, no pudieron ser evitadas por MMC mediante un ejercicio razonable de diligencia, y que interfieran significativamente con el cumplimiento de las obligaciones bajo el Contrato; o (ii) constituyan un Acto de Dios, un acto de terrorismo o bioterrorismo, guerra (declarada o no declarada), disturbios o revolución, acto de un enemigo público, insurrección civil, desobediencia civil, fuego, desastre natural, huelga o cualquier otra forma de agitación



5

29. "Leyes Aplicables" – Son las leyes, ordenanzas, códigos, reglas, reglamentos, órdenes, interdictos, decretos, resoluciones, determinaciones, decisiones, sentencias o permisos de cualquier Entidad Gubernamental, actualmente vigente o que pudiera entrar en vigencia en el futuro, o cualquier acuerdo vinculante con una Entidad Gubernamental.

30. "Medical Education and Health Services, Inc." y "Sistemas Integrados de Salud del Suroeste, Inc." – las entidades corporativas que administraron y operaron el Hospital desde el 31 de agosto de 2009 hasta el 28 de enero de 2010.

31. "Mejoras Extraordinarias" – Será la construcción de estructuras nuevas y/o la expansión, el remplazo, la sustitución, la remodelación o la alteración de los Bienes Inmuebles Arrendados con la consecuencia de: (i) añadirles valor; y (ii) extender su vida útil. El término bienes inmuebles incluye aquellos bienes que forman parte del Hospital que no pueden moverse por sí mismos ni ser trasladados de un lugar a otro, así como aquéllos que lo sean por virtud de las Leyes Aplicables. Algunos bienes inmuebles dentro del Hospital serán los sistemas de: (i) vapor, (ii) acondicionadores de aire, (iii) distribución de agua potable, (iv) distribución de energía, (v) alarma contra incendios, (vi) sistema de supresión de incendios, (vii) comunicaciones, (viii) gases médicos, y las estructuras que componen los Bienes Inmuebles Arrendados, entre otros.

32. "Mejoras Ordinarias" – Serán las obras de reparación y mantenimiento necesarias para la conservación del estado de los Bienes Arrendados, e incluirán, a modo de ilustración, reparaciones rutinarias de sistemas mecánicos de distribución tal cual tuberías de vapor, sistemas menores de electricidad, incluyendo subestaciones y transformadores, así como fallas menores en el sistema de distribución de agua. La pintura y el mantenimiento de las áreas verdes y las calles aledañas al Hospital, la rampa que conduce a la Sala de Emergencias, las rutas de entrada y salida al Centro Médico y el tanque elevado de agua potable del Centro Médico también serán consideradas Mejoras Ordinarias.



33. "Patentes Municipales" – Son las contribuciones impuestas y cobradas por el Municipio bajo las disposiciones de la Ley Núm. 113 de 10 de julio de 1974, según enmendada, conocida como Ley de Patentes Municipales, a toda persona dedicada con fines de lucro a la prestación de cualquier servicio, a la venta de cualquier bien a cualquier negocio financiero o negocio dentro de la jurisdicción del Municipio.



34. "Pérdidas-y-Gastos" – Significará toda pérdida, obligación, responsabilidad, daño (excluyendo Daños Indirectos), multa, demanda, procedimiento, penalidad, sentencia, transacción, depósito, cargo, impuesto, costo o gasto, incluyendo todos los honorarios y costos razonables incurridos en conexión con la investigación, preparación, defensa o respuesta a cualquier procedimiento legal.

35. "Plan de Desarrollo" – Se refiere al documento constituido por el Plan Macro de Desarrollo que deberá ser sometido por MMC dentro de treinta (30) días después de otorgado el Contrato, y que resume la estrategia de ésta con relación al desarrollo del Hospital y el cual se anejará como parte del Contrato (Anejo B), según enmendada. Si MMC no somete el Plan de

7

Desarrollo dentro de dicho término, el Municipio, no obstante lo descrito en Artículo 10, podrá terminar el Contrato con treinta (30) días de notificación.

36. "Plan Estratégico" — Se refiere al plan de desarrollo del Hospital específicamente requerido por el Departamento de Salud de Puerto Rico en cumplimiento con el Reglamento de Hospitales.

37. "Proceso de Transición" — Será el proceso que se activará a partir de la fecha en que: (i) el Municipio notifique su intención de terminar el Contrato en conformidad a las disposiciones de éste; o (ii) los foros adjudicativos, con jurisdicción para entender sobre cualquier controversia relacionada a la decisión del Municipio de terminar el Contrato, se hayan expresado de forma final y firme. Durante el Proceso de Transición, las Partes realizarán aquellas prestaciones necesarias para la conclusión de su relación contractual con el fin último de lograr la transferencia coordinada de los Bienes Arrendados sin afectar adversamente los servicios ofrecidos en el Hospital. El Proceso de Transición comenzará desde la notificación de Terminación del Contrato por cualquiera de las Partes. El Proceso de Transición concluirá a la Fecha de Terminación.

38. "Profesional de Servicios de la Salud" — Significa toda persona debidamente autorizada por el Tribunal Examinador de Médicos, Junta Dental Examinadora, Colegio de Cirujanos Dentistas o la Junta Examinadora de Podiatras, y que ejerza la profesión de médico, osteópata, dentista o podiatra en Puerto Rico.

39. "Propuesta " — Se refiere a la comunicación sometida por MMC el 28 de diciembre de 2009 a la atención del Municipio para la adquisición de acciones de SISSO, y para la administración y operación del Hospital. La Propuesta se aneja como parte del Contrato (Ver Anejo C).



40. "Proyecto de Mejoras" — Serán los proyectos propuestos por MMC y/o los Subcontratistas para realizar Mejoras Extraordinarias a los Bienes Inmuebles Arrendados.



41. "Reglamento de Hospitales" — Se refiere al Reglamento del Secretario de Salud Núm. 117 para Reglamentar el Licenciamiento, Operación y Mantenimiento de los Hospitales en el Estado Libre Asociado de Puerto Rico.

42. "Sala de Estabilización" — Será la primera fase del Centro de Trauma que será terminada y operada. La Sala de Estabilización compartirá el mismo edificio donde está ubicada la Sala de Emergencias (Ver Anejo A.2).

43. "Servicios de Cardiología" — Serán parte de los Servicios de Salud y comprenderán la línea completa de servicios de cuidado de enfermedades vasculares y del corazón.

44. "Servicios de Salud" — Serán los servicios de salud supraterciarios que MMC deberá ofrecer en el Hospital en cumplimiento con la Propuesta, el Plan de Desarrollo, el cual forma parte del Contrato, y de acuerdo a la facultad médica. Éstos incluirán los servicios de salud requeridos en un hospital terciario, según este término es definido en el Reglamento de

Hospitales y otros servicios terapéuticos críticos, tal cuales lesiones de espina dorsal, trauma, quemados, medicina hiperbárica, neurocirugía y cirugía endovascular, entre otros.

45. "Subcontratistas" – Serán todas las personas naturales y jurídicas contratadas por MMC para ofrecer, total o parcialmente, los Servicios de Salud. El término "subcontratista" también incluirá aquellas personas naturales y jurídicas que subarrienden, total o parcialmente, los Bienes Arrendados, así como aquéllas que provean o suplan bienes y/o servicios a MMC o a los Subcontratistas.

46. "Terminación del Contrato" – Supondrá la finalización de la vigencia del Contrato antes de la Fecha de Vencimiento debido al incumplimiento por alguna o ambas de las Partes con respecto a sus obligaciones bajo el Contrato. Las causas de incumplimiento y el procedimiento a ser seguido por las Partes son dispuestos en el Contrato. La finalización de la vigencia del Contrato no extinguirá aquellas obligaciones entre las Partes que advengan vencidas y debidas durante el Término del Contrato y que no sean aclaradas o liquidadas durante el Proceso de Transición.

47. "Término del Contrato" – Será la duración total de la vigencia del Contrato bajo la premisa de que no ocurra Terminación del Contrato. El Término del Contrato transcurrirá desde la Fecha de Efectividad hasta la Fecha de Vencimiento, lo cual supone una duración de treinta (30) años.

48. "Torre Médica" – Será el conjunto de bienes inmuebles que incluirá un edificio comercial, un edificio de oficinas médicas y un edificio de estacionamientos, y el cual podría ser desarrollado dentro de los predios del Centro Médico.

49. "Valor Neto de los Equipos en los Libros" – Será el costo de la inversión original menos la amortización del costo por el tiempo incurrido a base de la vida útil de uno o varios de los Equipos Biomédicos o de los bienes muebles que sean propiedad de MMC.



50. "Valor Neto de las Mejoras Extraordinarias en los Libros " – Será el costo de la inversión original menos la amortización del costo por el tiempo incurrido a base de la vida útil de las Mejoras Extraordinarias.



1.2     Interpretación.

    (a) Cualquier palabra o término en singular incluirá su acepción en plural y viceversa. Las palabras o términos en género masculino incluirán sus acepciones femeninas y viceversa.

    (b) El término "día" significará día laborable, excluyendo sábados y días feriados en el Estado Libre Asociado, según este término es definido en el Art. 387 del Código Político del Estado Libre Asociado, salvo que el texto del Contrato indique expresamente lo contrario.

9

(c) El término "año" significará año calendario bajo el Estado Libre Asociado, salvo que el texto del Contrato indique expresamente lo contrario.

ARTÍCULO 2          BIENES ARRENDADOS Y OTRAS OBLIGACIONES

2.1     Acuerdo General.

2.1.1   <u>Arrendamiento</u>: El Municipio transfiere en arrendamiento a MMC el derecho de posesión y uso sobre los Bienes Inmuebles Arrendados y los Bienes Muebles Arrendados, según descritos en las Secciones 2.2 y 2.3 para que administre y opere el Hospital de conformidad con los términos y condiciones del Contrato. Los Bienes Muebles Arrendados y los Bienes Inmuebles Arrendados comprenderán la totalidad de los Bienes Arrendados a la Fecha de Efectividad.

Las Partes podrán incluir otros edificios, estructuras e infraestructura a los Bienes Inmuebles Arrendados durante el Término del Contrato en conformidad a las Secciones 2.6 y 6.3 del Contrato.

2.1.2 <u>Titularidad</u>: El Municipio le representa y garantiza a MMC que: (i) posee el título de propiedad de los Bienes Arrendados; y (ii) a la fecha del Estudio de Título que aparece en el Anejo D, su derecho de propiedad sobre los Bienes Arrendados no está afectado o limitado por carga y/o gravamen alguno.

2.2     Bienes Inmuebles Arrendados.

Los edificios, estructuras e infraestructura descritos a continuación constituyen la totalidad de los bienes inmuebles que componen el Hospital a la Fecha de Efectividad. Las Partes acuerdan que el plano "As-Built", incluido como Anejo E, (en adelante, el "Plano") será utilizado como una referencia gráfica describiendo de forma general la ubicación, forma y escala de los Bienes Inmuebles Arrendados.

Los Bienes Inmuebles Arrendados cuentan con la siguiente descripción física general:

(a) edificio principal (identificado en el Plano como la estructura comprendida por el Anejo Mecánico, Edificio Principal, Emergencias, Oficina Regional y Escuela de Enfermería) - estructura de hormigón con niveles de construcción que fluctúan entre uno (1) y seis (6) niveles, con una superficie total aproximada de cuatrocientos cuarenta mil dos cientos treinta y seis (440,236) pies cuadrados, descrito en más detalle en el Anejo F;

(b) estructuras anexas (identificadas en el Plano como Área de Máquinas y Edificio Oncológico); y

(c) áreas de estacionamiento (identificadas en el Plano como las áreas de estacionamiento y que están ubicadas al este y oeste de la entrada principal del Hospital, la cual se encuentra al este del Centro Médico y conecta con la carretera estatal PR-2).



10

El edificio identificado en el Plano como "Emergencias" no formará parte, en su totalidad, de los Bienes Inmuebles Arrendados. Las áreas del edificio, identificado en el Plano como "Emergencias", que sí formarán parte de los Bienes Inmuebles Arrendados se detallan gráficamente en el Anejo A.1. El remanente de dicho edificio constituirá parte de la Sala de Estabilización y posteriormente del Centro de Trauma, según se discute en la Sección 2.5.

MMC mantendrá el nombre del Hospital bajo la denominación "Hospital Dr. Ramón Emeterio Betances". El Municipio podrá autorizar que MMC incluya una referencia adicional con relación a ésta. MMC deberá solicitar por escrito dicha autorización y deberá obtener la autorización escrita del Municipio antes de utilizar tal referencia adicional en cualquier anuncio, rótulo, página en la "web", método de mercadeo, programa o campaña de publicidad del Hospital.

2.3    Bienes Muebles Arrendados.

Los Bienes Muebles Arrendados serán identificados y descritos en un inventario (en adelante, el "Inventario de Bienes Muebles") a ser preparado por las Partes dentro del período de treinta (30) días inmediatamente después de la Fecha de Efectividad. Las Partes colaborarán, coordinarán y asignarán los recursos materiales y humanos necesarios para realizar dicho inventario de forma diligente dentro del período antes acordado. Entre otros propósitos a ser acordados por las Partes, el Inventario de Bienes Muebles identificará su estado actual y si se encuentran actualmente en uso o desuso.

El Inventario de Bienes Muebles será estipulado por las Partes a la fecha de su finalización dentro del período de treinta (30) días y será incluido como parte del Contrato.



También constituirán parte de los Bienes Muebles Arrendados aquellos Equipos Biomédicos y otros bienes muebles adquiridos por MMC o los Subcontratistas: (i) en sustitución de alguno de los bienes que forma parte del Inventario de Bienes Muebles; o (ii) por el cual el Municipio pague el Valor Neto del Equipo en los Libros a MMC o los Subcontratistas, quien sea el titular, en o antes de la Fecha de Terminación o de Vencimiento.

El Municipio podrá considerar la variación de los términos de pago del Canon de Arrendamiento en conformidad a los resultados que refleje el Inventario de Bienes Muebles. El Municipio no variará la cantidad acordada del Canon de Arrendamiento independientemente de los resultados reflejados por el Inventario de Bienes Muebles.

2.4    Bienes Inmuebles No Incluidos en el Plano.

Las Partes reconocen que el Plano y la descripción de los Bienes Inmuebles Arrendados que surge de la Sección 2.2 no reflejan las cualidades actuales de éstos de manera precisa. Ciertos subarrendatarios de Advanced Cardiology, Inc. han construido mejoras o estructuras adicionales que, aun cuando existen actualmente en el Hospital, no surgen del Plano o de la Sección 2.2. En específico, las Partes reconocen que se han realizado ampliaciones

11



estructurales al Hospital, las cuales han sido construidas para oficinas profesionales y para colocar y operar un acelerador lineal.

Las Partes reconocen la existencia de esas estructuras y las incluyen como parte de los Bienes Inmuebles Arrendados.

2.5    Bienes Constitutivos del Centro de Trauma.

Las Partes reconocen y acuerdan que la Autoridad para el Financiamiento de la Infraestructura construye actualmente en el Hospital las Fases 3 y 4 del Centro de Trauma. La Fase 1, la cual comprende la Sala de Estabilización, ha supuesto ampliaciones al edificio donde ubica la Sala de Emergencias del Hospital y la Fase 2, el helipuerto, será construido en el área identificada en el Plano con el nombre "gazebo", según mostrado en el Anejo A.2. La Fase 3 consiste de la etapa final de construcción del Centro de Trauma (Anejo A.2) y supone ampliaciones al edificio donde ubica la Sala de Emergencias del Hospital. Las ampliaciones al edificio de Sala de Emergencias que serán utilizadas exclusivamente para el servicio de atención de emergencias y no para la atención de casos de trauma formarán parte de los Bienes Inmuebles Arrendados una vez termine su construcción.

Las Partes acuerdan que los bienes muebles e inmuebles que constituyan la Sala de Estabilización, y posteriormente el Centro de Trauma, no formarán parte de los Bienes Arrendados cuando sean terminados. MMC procederá con respecto a ellos de conformidad con lo dispuesto en la Sección 4.1.12. La Sala de Estabilización y el Centro de Trauma, junto al helipuerto, son descritos gráficamente en los Anejos A.1 y A.2 respectivamente.

2.6    Bienes Inmuebles Futuros.

2.6.1    Notificación de la Propuesta para Realizar el Proyecto de Mejoras: MMC notificará por escrito al Municipio el interés suyo o el interés de cualquier Subcontratista (en adelante, el "Promotor") de realizar Proyectos de Mejoras. Aunque el Promotor sea una persona distinta a MMC, ésta última será la persona principalmente obligada ante el Municipio del cumplimiento de las disposiciones detalladas a continuación. Las Mejoras Extraordinarias propuestas por MMC en el Plan de Desarrollo deberán ser sometidas a la evaluación del Municipio en calidad de Proyecto de Mejoras, de conformidad con el proceso descrito en la Sección 2.6.2.

2.6.2    Evaluación del Proyecto de Mejoras: Como parte de la evaluación de los Proyectos de Mejoras que sean propuestos al Municipio, las Partes acuerdan lo siguiente:

(a)    el Municipio podrá exigir a MMC todos los documentos, los datos y la información que le permitan tomar una decisión informada sobre el Proyecto de Mejoras. Los documentos, los datos y la información incluirán, sin limitarse únicamente a éstos, planos preliminares, especificaciones técnicas e informes de estudios preliminares, resoluciones o permisos de las Entidades Gubernamentales, entre otros (en adelante, los "Documentos y Datos del Proyecto de Mejoras"). El Municipio revisará y estudiará los Documentos y Datos del Proyecto de Mejoras en un término razonable,



12

inmediatamente posterior a la fecha en que el Administrador del Contrato certifique por escrito haber recibido dichos documentos. El Promotor no comenzará ningún Proyecto de Mejoras sin que MMC cuente con la Autorización, la cual será previa y escrita, sin excepción alguna;

(b) las Partes deberán reunirse y acordar las respectivas obligaciones y derechos con relación al costo, los pagos a realizarse y la titularidad con respecto a las Mejoras Extraordinarias que finalmente surjan del Proyecto de Mejoras;

(c) si existe un acuerdo entre las Partes y el Municipio entiende que es adecuado autorizar el Proyecto de Mejoras, el Municipio notificará por escrito a MMC su decisión de autorizar el Proyecto de Mejoras y la justificará detallando los acuerdos alcanzados con MMC (en adelante, la "Autorización");

(d) si el Municipio decide autorizar el Proyecto de Mejoras, los gastos de producción de los Documentos y Datos del Proyecto de Mejoras podrán ser acreditados por el Municipio según las Partes acuerden y sea dispuesto en la Autorización; y

(e) las Autorizaciones y cualquier cambio posterior a éstas serán añadidos al Contrato en calidad de enmiendas.

Con relación a las fases posteriores a la autorización para emprender el Proyecto de Mejoras, las Partes acuerdan lo siguiente:

(f) MMC someterá informes mensuales al Administrador del Contrato sobre el desarrollo de las fases de diseño, planificación, desarrollo y construcción del Proyecto de Mejoras;

(g) los informes descritos en el inciso anterior podrán ser sometidos con una frecuencia distinta si las Partes así lo acuerdan por escrito;

(h) como regla general, las Mejoras Extraordinarias deberán ser diseñadas, planificadas, desarrolladas y construidas de conformidad con los Documentos y Datos del Proyecto de Mejoras; y

(i) cualquier orden de cambio que impacte adversamente el Proyecto de Mejoras, ya sea en costo o en tiempo, deberá ser notificada al Municipio y autorizada por éste previo a que el Promotor autorice al contratista a proceder.

2.6.3  <u>Obligación de Obtener Precios Competitivos</u>: Como parte del proceso de evaluación del Proyecto de Mejoras, dispuesto en la sección anterior, el Municipio prestará especial atención al estimado de costos sometido por MMC y al proceso utilizado por el Promotor para obtenerlo. El Municipio no otorgará créditos por aquellos Proyectos de Mejoras cuyos precios sean, según su apreciación, irrazonables. Por esta razón el Municipio prefiere y recomienda que los estimados de costos sean adquiridos mediante procesos competitivos que promuevan la transparencia y la competitividad de precios. Según dispuesto en la Sección 2.6.2(a), el Municipio revisará y estudiará los Documentos y Datos del Proyecto de Mejoras en un término de treinta (30) días laborables, contados a partir de la fecha en que el Administrador del Contrato certifique por escrito haber recibido dichos documentos.

2.6.4  <u>Derecho Preferencial para el Desarrollo de la Torre Médica</u>: MMC tendrá un derecho preferencial para ser considerado por el Municipio, de éste último entenderlo necesario y adecuado, para emprender el potencial desarrollo de la Torre Médica. Con este propósito, el



Municipio le otorgará a MMC los derechos de superficie para construir allí la Torre Médica, sujeto a que MMC someta todos los documentos relacionados al plan de desarrollo de la Torre Médica. Dichos documentos y el proyecto estarán sujetos a la evaluación y la autorización por parte del Municipio, según ha sido dispuesto en la Sección 2.6 del Contrato. El Derecho de Construir la Torre Médica estará vigente durante un periodo de seis (6) años desde la Fecha de Efectividad. De transcurrir este término y MMC no ejercer el Derecho de Construir la Torre Médica, el Municipio podrá otorgar a cualquier otra entidad o personas los derechos de superficie necesarios para el desarrollo. Se entenderá que MMC ha ejercido el Derecho de Construir la Torre Médica si obtiene los permisos gubernamentales necesarios para emprender el desarrollo y si comienza materialmente la fase de construcción dentro del periodo de seis (6) años antes dispuesto. El Municipio podrá realizar gestiones de buena fe para asistir a MMC en la obtención de los permisos gubernamentales necesarios con relación al proyecto de desarrollo de la Torre Médica. El Derecho de Construir la Torre Médica es subsidiario a los derechos de arrendamiento, administración y operación otorgados por el Municipio a MMC bajo el Contrato, por lo cual, en el evento que el Contrato termine por cualquier motivo, éste también terminará.

2.7    Accesión.

Las Mejoras Extraordinarias accederán a favor del Municipio ya sea: (i) antes de la Fecha de Terminación o de Vencimiento según acuerden las Partes en la Autorización; o (ii) en la Fecha de Terminación o de Vencimiento, sujeto al pago de cualquier compensación necesaria de conformidad con las disposiciones del Contrato y/o las Autorizaciones, definidas en la sección anterior.

2.8    Usos.

2.8.1    Provisión de los Servicios de Salud en General.

MMC poseerá, usará, administrará y operará los Bienes Arrendados en calidad de Hospital General. MMC ofrecerá los Servicios de Salud según altos estándares de la industria de hospitales y los términos del Contrato.

2.8.2    Forma de la Posesión y Uso de los Bienes Arrendados.

MMC acepta y reconoce que el Municipio no consiente el uso y posesión incondicional de los Bienes Arrendados. Por tal razón, MMC poseerá y usará los Bienes Arrendados de conformidad con lo siguiente:

(a) operará y administrará los Bienes Arrendados de forma pacífica y sin molestar o afectar el funcionamiento de las demás actividades que se desarrollan en otros edificios y áreas dentro del perímetro del Centro Médico, los cuales no son parte de los Bienes Arrendados y los cuales son administrados u operados por otras Entidades Gubernamentales y personas privadas;



(b) no permitirá que los Bienes Arrendados sean utilizados, parcial o totalmente, de tal forma que limite o afecte adversamente el derecho de titularidad del Municipio sobre éstos, o de tal forma que constituya causa para reclamaciones de terceros;

(c) no sobrecargará o acumulará desperdicios sólidos en o alrededor de los Bienes Inmuebles Arrendados;

(d) no causará daños a los Bienes Arrendados ni permitirá las emisiones de ruidos u olores en niveles irrazonables;

(e) no permitirá que ninguno de sus Subcontratistas o visitantes actúen en contravención a lo dispuesto en esta Sección 2.8.2; y

(f) operará, administrará, usará y poseerá el Hospital en conformidad a las Leyes Aplicables.

2.9    Prohibición de Actos que Afecten la Titularidad del Municipio.

MMC no venderá, cederá, permutará o gravará de forma alguna los Bienes Arrendados, los cuales son y continuarán siendo propiedad exclusiva del Municipio durante el Término del Contrato.

## ARTÍCULO 3    DURACIÓN DEL CONTRATO

3.1    Término del Contrato.

El Término del Contrato será de treinta (30) años y transcurrirá desde la Fecha de Efectividad hasta la Fecha de Vencimiento, salvo si el Contrato terminase antes, según las disposiciones del Artículo 10.

## ARTÍCULO 4    ADMINISTRACIÓN, OPERACIÓN, DEPARTAMENTOS Y SERVICIOS CLÍNICOS, RESIDENCIAS E INTERNADOS

4.1    Administración y Operación del Hospital.

4.1.1    Licencias y Acreditaciones: MMC mantendrá vigentes durante el Término del Contrato todos los permisos, acreditaciones, certificaciones y licencias (en adelante, las "Licencias") que se encuentren en vigor en la Fecha de Efectividad. La pérdida de las Licencias podrá ser causa para la Terminación del Contrato, salvo si dicha pérdida es consecuencia exclusiva de la culpa o la negligencia del Municipio.

MMC también cumplirá con todos los requisitos establecidos en las Leyes Aplicables para la adquisición y mantenimiento de otros permisos, acreditaciones, certificaciones y licencias que sean necesarias luego de la Fecha de Efectividad para el funcionamiento del Hospital. MMC también cumplirá con todos los criterios de acreditación establecidos por las Agencias



Acreditadoras. Sin limitar su cumplimiento con las Leyes Aplicables, MMC dedicará particular atención a las siguientes:

(a) Ley Núm. 101 de 26 de junio de 1965, según enmendada, conocida como Ley de Facilidades de Salud;

(b) Reglamento Núm. 117 para Reglamentar el Licenciamiento, Operación y Mantenimiento de los Hospitales en el Estado Libre Asociado de Puerto Rico;

(c) Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, conocida como Ley de Certificados de Necesidad y Conveniencia del Departamento de Salud;

(d) Ley Núm. 133 de 18 de junio de 1999, según enmendada, conocida como Ley sobre la Protección y Seguridad de los Infantes en las Instituciones Hospitalarias de Puerto Rico;

(e) Ley Núm. 225 de 23 de julio de 1974, según enmendada, conocida como Ley sobre Servicios de Ambulancias Terrestres y Aéreas;

(f) Ley Núm. 47 de 4 de enero de 2003, según enmendada, conocida como Ley para Regular los Turnos de Trabajo de los Médicos Internos y Residentes en Puerto Rico;

(g) Ley Núm. 35 de 28 de junio de 1994, según enmendada, conocida como Ley para la Asistencia Médica en Hospitales en Casos de Emergencias Médicas;

(h) La ley federal del 14 de agosto de 1935 conocida como Ley del Seguro Social ("Social Security Act") y enmiendas posteriores, incluidas la ley federal del 7 de abril de 1986 conocida en inglés como *Consolidated Omnibus Budget Reconciliation Act* ("COBRA") y las cláusulas de ésta última conocidas como la *Examination and Treatment for Emergency Medical Conditions and Women in Labor* ("EMTALA");

(i) La ley federal del 21 de agosto de 1996 conocida como *Health Insurance Portability and Accountability Act* ("Ley HIPAA");

(j) Ley Núm. 9 de 11 de octubre de 1987, según enmendada, conocida como Ley para Reglamentar la Práctica de la Enfermería en el Estado Libre Asociado de Puerto Rico;

(k) Ley Núm. 97 de 25 de junio de 1962, según enmendada, conocida como Ley sobre Bancos de Sangre;

(l) La ley federal del 31 de octubre de 1988 conocida como *Clinical Laboratory Improvement Amendments*;

(m) La ley federal del 28 de noviembre de 1990 conocida como *Safe Medical Devices Act*;

(n) Ley Núm. 296 de 25 de septiembre de 2002, según enmendada, conocida como "Ley de Donaciones Anatómicas de Puerto Rico";

(o) Ley Núm. 194 de 25 de agosto de 2000, según enmendada, conocida como "Carta de Derechos y Responsabilidades del Paciente";

(p) Ley Núm. 247 de 3 de septiembre de 2004, según enmendada, mejor conocida como "Ley de Farmacia de Puerto Rico";

(q) Servicios radiológicos, 42 CFR 482.26; y

(r) Servicios de Laboratorio, Ley 97 de junio de 1962 y su reglamento, según enmendados.

MMC tendrá durante la vigencia del Contrato el derecho de utilizar el Certificado de Necesidad y Conveniencia (en adelante, el "CNC") que el Departamento de Salud ha expedido a solicitud del Municipio para la administración y la operación del Hospital. MMC,

16

sin embargo, reconoce que el CNC pertenece al Municipio y que, en el evento de Terminación del Contrato, el derecho para utilizar el CNC será exclusivamente del Municipio.

4.1.2  <u>Recursos Humanos</u>: MMC empleará o contratará Profesionales de Servicios de la Salud y el personal de apoyo necesario que estén bien calificados y que estén al día en el cumplimiento con sus licencias y cualquier requerimiento del Estado Libre Asociado de Puerto Rico para ejercer su profesión.

A modo de asegurar la continuidad de los Servicios de Salud, MMC contratará el personal no-gerencial que actualmente labora en el Hospital por un periodo probatorio inicial de noventa (90) días.  MMC se compromete a evaluar a dichos empleados y a tomar una decisión final en torno a su retención, durante el periodo de noventa (90) días inmediatamente posterior a la Fecha de Efectividad.

MMC cumplirá con las Leyes Aplicables que sean pertinentes a los temas de recursos humanos y condiciones de trabajo cumpliendo, específicamente, con los requisitos establecidos en el Capítulo VIII del Reglamento de Hospitales sobre Recursos Humanos.

4.1.3  <u>Estructura de Gobierno del Hospital</u>: La Junta de Directores nombrará un director ejecutivo y un director médico en conformidad a los requisitos establecidos en el Reglamento de Hospitales.  La Junta de Directores habrá nombrado las personas que ocuparán los puestos de Director Ejecutivo y Director Médico a la Fecha de Efectividad.

4.1.4  <u>Normas, Procedimientos y Política Institucional</u>: La Junta de Directores de MMC formulará las normas, los procedimientos y la política institucional del Hospital con relación a aspectos financieros, administrativos, calidad del servicio ofrecido a los pacientes y la seguridad en el Hospital.  En particular, la Junta de Directores establecerá normas y procedimientos con el fin de desarrollar:



(a)  el Plan Estratégico del Hospital, el cual será revisado dentro de los primeros seis (6) meses de operaciones;
(b)  un sistema de control de las finanzas y el presupuesto del Hospital, el cual será revisado dentro de los primeros seis (6) meses de operaciones;
(c)  un programa de seguridad para los visitantes, pacientes y empleados del Hospital;
(d)  un plan de uso y mantenimiento de los Bienes Inmuebles y de los Equipos Biomédicos;
(e)  un programa de mejoramiento continuo de la calidad del servicio que integre mecanismos de medición de desempeño y de los niveles de satisfacción de los pacientes, empleados, personal médico y visitantes; y
(f)  cualquier otro plan o programa que sea requerido por el Municipio luego del otorgamiento del Contrato.

4.1.5  <u>Programa de Mejoramiento Continuo de la Calidad del Servicio</u>: El plan de mejoramiento continuo de la calidad del servicio, requerido en el inciso (e) de la sección anterior, así como cualquier otro plan o programa pertinente, se regirá por los criterios usados por la *Joint Commission* en su sistema de medida de desempeño (en inglés, "Performance

17

Measurement System"), basado en diversos informes de desempeño (en inglés, "Performance Reports") los cuales, a la Fecha de Efectividad, están basados en tres áreas de desempeño (en inglés, "Performance Areas") y varios estándares (en inglés, "Performance Standards") bajo cada una de las áreas. MMC designará un grupo de trabajo que diseñará e implementará un sistema similar al usado por la *Joint Commission* en sus procesos de acreditación como parte de los planes y programas adoptados para el mejoramiento continuo de la calidad del servicio.

4.1.6  <u>Facultad Médica</u>: La Junta de Directores del Hospital someterá al Municipio, dentro del periodo de seis (6) meses inmediatamente posterior a la Fecha de Efectividad, datos sobre el número de médicos, especialidades necesarias y el tipo de pacientes a ser atendidos, en conformidad a los departamentos y servicios clínicos que creará o mantendrá en operación durante el Término del Contrato.

La Junta de Directores establecerá normas y procedimientos para la evaluación, selección, nombramiento y otorgación de privilegios clínicos a futuros miembros de la facultad médica.

MMC cumplirá con los otros requisitos establecidos en el Reglamento de Hospitales sobre la facultad médica.

4.1.7  <u>Departamentos y Servicios Clínicos</u>: MMC creará y/o mantendrá en operación, como mínimo, los siguientes departamentos:

(a) medicina interna, incluyendo la división de cardiología;
(b) cirugía general, vascular, neurocirugía y cirugía ortopédica (según la disponibilidad de neurocirujanos);
(c) anestesiología;
(d) sala de emergencias;
(e) laboratorio;
(f) farmacia;
(g) radiología;
(h) otros departamentos de apoyo y mantenimiento.

Los departamentos, así como los servicios clínicos necesarios para la operación de éstos, serán dirigidos, administrados y operados de conformidad con las disposiciones del Capítulo XI del Reglamento de Hospitales.

MMC ofrecerá en todo momento, como mínimo, servicios de medicina interna, cirugía general, ortopedia, pediatría, ginecología, obstetricia y sala de emergencias, veinticuatro (24) horas al día, los trescientos sesenta y cinco (365) días del año, durante el Término del Contrato.

4.1.8  <u>Internos y Residentes</u>: MMC establecerá programas de internado y de residencia de conformidad con la Ley para Regular los Turnos de Trabajo de los Médicos Internos y Residentes de Puerto Rico.



18

MMC mantendrá el programa de residencia en medicina interna actualmente existente y en colaboración con la Escuela de Medicina de Ponce. MMC también obtendrá, dentro del término de veinticuatro (24) meses inmediatamente posterior a la Fecha de Efectividad, la aprobación de las Agencias Acreditadoras para la creación de programas de residencia en cirugía general y en medicina de emergencia. Estos programas de residencia serán establecidos de acuerdo a los requisitos del Tribunal Examinador de Médicos de Puerto Rico y del Consejo de Educación Médica Americana de la Asociación Médica Americana o sus respectivos sucesores.

4.1.9 Expedientes Clínicos e Información de Salud de los Pacientes: MMC cumplirá con las reglas de privacidad y seguridad de la información de los pacientes que son impuestas por la Ley HIPAA y el Capítulo XII, Artículos 5 al 10, del Reglamento de Hospitales.

4.1.10 Servicios de Enfermería: El servicio de enfermería será provisto de forma continua las veinticuatro (24) horas al día, los trescientos sesenta y cinco (365) días al año.

El personal de enfermería contará con la preparación, experiencia y capacitación necesarias para cumplir con los requisitos establecidos por:

    (a) la Junta Examinadora de Enfermeras y Enfermeros de Puerto Rico o su sucesor;
    (b) el Colegio de Profesionales de Enfermería de Puerto Rico o su sucesor; y
    (c) el Colegio de Enfermería Práctica o su sucesor.

Cada turno de trabajo contará con el personal de enfermería necesario para cubrir los servicios que MMC ofrecerá en el Hospital y suplir las necesidades de los pacientes, o según las Leyes Aplicables determinen. El personal de enfermería será asignado y usado de tal modo que MMC cumpla, como mínimo, con los siguientes requisitos:

    (a) garantizar la seguridad, el cumplimiento con el tratamiento y la completa satisfacción de las necesidades de cuidado de enfermería de cada paciente en conformidad con el Manual de Derechos del Paciente, el cual MMC implementará de acuerdo a lo dispuesto en la Sección 4.1.13; y

    (b) MMC asignará a cada unidad de cuidado de salud el patrón de personal ("staffing pattern") por categorías de pacientes.

MMC describirá en el Manual de Normas y Procedimientos Administrativos del Servicio de Enfermería, a ser implementado de acuerdo a lo dispuesto en la Sección 4.1.13, el método que usará MMC para determinar la asignación de personal de enfermería a los distintos departamentos, servicios clínicos y/o unidades de cuidado de salud. Las normas y procedimientos deberán atender, entre otras áreas, aquéllas de:

    (a) cuidado intensivo;
    (b) cuidado coronario;
    (c) unidades renales; y
    (d) sala de emergencias.

19

4.1.11 <u>Sala de Emergencias del Hospital</u>: El servicio de sala de emergencias del Hospital estará disponible veinticuatro (24) horas al día, los trescientos sesenta y cinco (365) días al año.

La Sala de Emergencias del Hospital será operada como una sala de nivel III o sala terciaria, según ésta es definida en el Reglamento de Hospitales. MMC cumplirá con los requisitos del Reglamento de Hospitales sobre el personal médico, personal de enfermería, seguridad, equipos, instrumentos, suministros y materiales, en conformidad a lo establecido por el Departamento de Salud en el Reglamento de Hospitales.

4.1.12 <u>Centro de Trauma</u>: Las Partes reconocen que la Administración de Servicios Médicos ("ASEM") es la operadora actual de la Sala de Estabilización y será la operadora del Centro de Trauma. Las Partes también reconocen que la ASEM requiere ciertos servicios del administrador del Hospital, por lo cual MMC otorgará todos aquellos acuerdos con ASEM que sean razonablemente necesarios para el funcionamiento adecuado de la Sala de Estabilización y el Centro de Trauma.

4.1.13 <u>Reglamentos y Manuales de Normas y Procedimientos</u>: MMC diseñará, aprobará e implementará todos los reglamentos y manuales de normas y procedimientos requeridos por las Leyes Aplicables, en particular por el Reglamento de Hospitales, dentro del periodo de sesenta (60) días inmediatamente posterior a la Fecha de Efectividad.

4.2    Centro Médico Académico Regional del Suroeste.

MMC colaborará en la creación dentro del Hospital de la sede administrativa del Centro Médico Académico Regional del Suroeste (en adelante, el "Centro Médico Académico"). MMC colaborará con el Centro Médico Académico con el fin de: (i) fortalecer y desarrollar un sistema integrado de salud pública en el área suroeste, tanto a nivel primario, secundario, como terciario; (ii) ofrecer y brindar servicios de salud costo efectivos, accesibles y de buena calidad; (iii) fortalecer y desarrollar los programas de educación para los médicos, enfermeras y demás personal, relacionados a los Servicios de Salud; y (iv) estimular el desarrollo la investigación clínica, epidemiológica y sociomédica.

## ARTÍCULO 5          RENTA

5.1    Canon de Arrendamiento.

MMC pagará al Municipio de Mayagüez un canon anual de arrendamiento de NOVECIENTOS MIL DÓLARES ($900,000) por el derecho de uso de los Bienes Arrendados (en adelante, el "Canon de Arrendamiento"). MMC pagará dicho canon en pagos mensuales de SETENTA Y CINCO MIL DÓLARES ($75,000). **El referido canon de arrendamiento será ingresado a la cuenta número 01-03-02-00-00-87.06 Renta de Locales y Propiedad Municipal.**

20

5.1.1   Incremento del Canon de Arrendamiento.

Las Partes acuerdan que cada cinco (5) años, a partir de la Fecha de Efectividad (en adelante, la "Fecha de Incremento de la Renta"), el Canon de Arrendamiento aumentará cinco (5%) puntos porcentuales con respecto a la cantidad vigente a la Fecha de Incremento de la Renta.

5.1.2   Fecha de la Emisión de los Pagos.

MMC pagará los Cánones de Arrendamiento un (1) mes por adelantado. Por tanto, MMC emitirá su primer pago al Municipio en la Fecha de Efectividad. Dicho primer pago del Canon de Arrendamiento será proporcional (a *pro rata*) al número de días calendario que resten para finalizar el mes calendario en que las Partes otorguen el Contrato. En adelante, MMC realizará cada pago del Canon de Arrendamiento en o antes del primer día laborable de cada mes calendario (la "Fecha de Pago". Si el Municipio no ha recibido el pago del Canon de Arrendamiento en o antes del segundo día laborable a partir de la Fecha de Pago, se entenderá que MMC ha incurrido en Falta de Pago y aplicarán las disposiciones de las Secciones 5.3 y 5.4.

5.2   Forma de Realizar los Pagos.

En todos los casos, los pagos deberán ser efectuados por correo o personalmente en el Departamento de Finanzas de la Oficina de Rentas Públicas del Municipio de Mayagüez, con dirección postal, P.O. Box 945 y 306 Mayagüez, P.R. 00681, mediante cheque emitido a nombre del Director de Finanzas del Municipio o en nombre del Municipio de Mayagüez.

Las Partes podrán acordar otras formas de pago luego de la Fecha de Efectividad. Los Cánones de Arrendamiento serán pagados íntegramente por MMC al Municipio en dólares estadounidenses sin descuentos, deducciones o reducciones.

5.3   Falta de Pago.

El Municipio entenderá que MMC ha incurrido en acto de incumplimiento con respecto a sus obligaciones bajo las Secciones 5.1 y 5.2 (en adelante, la "Falta de Pago") si: (i) el Municipio no ha recibido el pago íntegro allí establecido dentro de un periodo de dos (2) días laborables inmediatamente posterior a la Fecha de Pago; o (ii) si el Municipio ha recibido solamente el pago parcial del Canon de Arrendamiento dentro del término dispuesto en (i). En el evento de Falta de Pago, el Municipio notificará el hecho por escrito y por correo certificado a la siguiente dirección de MMC:

Lcdo. Kermit Ortíz Morales
470 Avenida César L. González
Urb. Roosevelt
San Juan, Puerto Rico 00918-2627




21

Pasados quince (15) días calendario a partir del recibo de la notificación, si MMC no ha saldado la cantidad adeudada, el Municipio podrá requerir el pago a la compañía fiadora que expida la Fianza de Pago, descrita en la Sección 9.4 del Contrato, terminar el Contrato de conformidad a lo dispuesto en el Artículo 10 o ambos.

5.4     Pago de Intereses por Falta de Pago.

El incumplimiento de MMC con el pago puntual del Canon de Arrendamiento supondrá la imposición de intereses sobre la cantidad debida en conformidad a las Tasas de Intereses Aplicables a Sentencias Judiciales, aplicables a deudas privadas, que estén prevalecientes al momento de surgir la deuda. Las Tasas de Intereses Aplicables a Sentencias Judiciales son publicadas por la Oficina del Comisionado de Instituciones Financieras de Puerto Rico en su página de la Web, www.cif.gov.pr/tiposinteres.html. Las deudas acumularán intereses desde la fecha en que el pago advino exigible por el Municipio hasta la fecha en que el Municipio recibe el pago íntegro de la cantidad adeudada.

## ARTÍCULO 6     EQUIPOS BIOMÉDICOS, SERVICIOS, MEJORAS Y SEGURIDAD

6.1     Equipos Biomédicos en General.

6.1.1   Manejo de Equipos Biomédicos: MMC desarrollará e implementará un plan para el manejo de los Equipos Biomédicos. El plan de manejo deberá cumplir con los requisitos establecidos en el Reglamento de Hospitales.

MMC también desarrollará, como parte de su plan de manejo, un plan de pruebas y mantenimiento de los Equipos Biomédicos y contará con los recursos humanos y el equipo técnico necesario para realizar las pruebas, el mantenimiento y la reparación de los Equipos Biomédicos.

6.1.2   Adquisición de Equipos Biomédicos: MMC y/o los Subcontratistas adquirirán Equipos Biomédicos durante el Término del Contrato para ofrecer los Servicios de Salud. En consideración a lo anterior, MMC hace las representaciones siguientes:

(a) MMC aumentará la oferta de habitaciones para pacientes a un total de doscientas (200) habitaciones, siendo cada una de ocupación sencilla, por lo cual también elevará el número total de camas a doscientas (200) unidades. Como parte de las obligaciones asumidas bajo la Sección 4.1.1 del Contrato, MMC no aumentará el número de camas en exceso del total autorizado en el CNC para el Hospital. MMC tampoco redistribuirá las camas entre categorías, aun dentro de la capacidad autorizada, sin antes obtener un CNC para esos efectos de conformidad con el Artículo 2 de la Ley de Certificados de Necesidad y Conveniencia del Departamento de Salud; y

(b) MMC transformará el Departamento de Radiología del Hospital en un Departamento de Imágenes Médicas de acuerdo al Plan de Desarrollo, la cual MMC presentará dentro de treinta (30) días a partir de la Fecha de Efectividad y el cual se anejará como parte del Contrato (Ver Anejo B). Si MMC no somete el Plan de Desarrollo dentro de



dicho término, el Municipio, no obstante lo descrito en Artículo 10, podrá terminar el Contrato de manera inmediata. Para este propósito, MMC adquirirá e instalará en el Hospital: (i) una máquina de tomografías computarizadas por emisión de positrones (por sus siglas en inglés, PET-CT); (ii) dos máquinas de rayos X digital; y (iii) una Cámara "Gamma Dual Head".

6.2     Servicios.

6.2.1   <u>Mantenimiento a la Infraestructura</u>:   MMC asignará los recursos humanos y económicos, y establecerá todas las pruebas, inspecciones, planes de mantenimiento y reparación, que sean necesarios y adecuados para que el Hospital cuente de forma continua con los servicios de agua potable, electricidad, vapor, oxígeno, acondicionador de aire, transportación, comunicación, alarma contra incendios, sistema de supresión de incendios y cualquier otro servicio necesario para ofrecer los Servicios de Salud con los estándares de calidad mínimos requeridos por el Departamento de Salud y las Agencias Acreditadoras.

6.2.2   <u>Pago de los Servicios Básicos</u>: MMC pagará por los servicios de teléfono, gas, vapor, disposición de desperdicios sólidos y cualquier otro gasto por concepto del consumo de servicios similares o relacionados dentro de los Bienes Inmuebles Arrendados. En cuanto al pago de agua potable y energía eléctrica, las Partes acuerdan lo siguiente:

(a) reconocen que el Centro Médico cuenta con un solo contador de energía eléctrica y un solo contador de agua potable, y que dichos contadores y cuentas están registrados a nombre del Municipio;

(b) no teniendo operaciones en el Centro Médico, el Municipio no consume ninguno de estos servicios;

(c) MMC pondrá las cuentas de agua potable y energía eléctrica del Centro Médico a su nombre, trámite que realizará directamente con la Autoridad de Acueductos y Alcantarillados y la Autoridad de Energía Eléctrica, respectivamente, dentro de un periodo de quince (15) días calendario contados a partir de la firma de esta enmienda;

(d) MMC le presentará al Municipio evidencia sobre el cambio de nombre de ambas cuentas;

(e) MMC se obligará a pagar la proporción del setenta y cinco por ciento (75%) del consumo total mensual de agua potable y energía eléctrica dentro del Centro Médico;

(f) MMC no será responsable del pago de deudas de la Administración de Rehabilitación Vocacional ("Rehabilitación Vocacional"), el Departamento de Salud y la Administración de Servicios de Salud Mental y Contra la Adicción ("ASSMCA") con la Autoridad de Energía Eléctrica ("AEE") y/o la Autoridad de Acueductos y Alcantarillados ("AAA") por concepto del consumo de energía eléctrica y/o agua potable en el Centro Médico antes o después de la Fecha de Efectividad;

(g) el Municipio y MMC establecerán los mecanismos administrativos que sean adecuados y necesarios con el fin de que MMC pueda cumplir cabalmente con sus obligaciones ante la AAA y la AEE, y que no se vea afectada por el incumplimiento de Administración de Rehabilitación Vocacional, el Departamento de Salud y la Administración de Servicios de Salud Mental y Contra la Adicción con respecto al



23

pago de sus obligaciones como consumidores de agua y energía eléctrica en el Centro Médico;

(h) los mecanismos administrativos antes mencionados pueden consistir de esfuerzos del Municipio para que Rehabilitación Vocacional, el Departamento de Salud y ASSMCA paguen por su consumo de agua potable y energía eléctrica en el Centro Médico, así como cualquier otra medida que se ajuste a los principios establecidos en esta Sección 6.2.2 del Contrato; y

(i) las Partes entienden que el pago de setenta y cinco (75%) asumido por MMC representa un estimado del consumo de los servicios en el Hospital y que es una medida temporal en lo que separa los contadores de agua potable y energía eléctrica entre los distintos inquilinos del Centro Médico; a estos efectos, dentro de un término de dieciocho (18) meses desde la Fecha de Efectividad, MMC someterá propuestas ante el Municipio para los proyectos de separación de contadores de agua potable y energía eléctrica. Dichos proyectos estarán sujetos a las disposiciones de la Sección 2.6.

El incumplimiento de cualquiera de estas obligaciones podrá ser causa suficiente para que el Municipio termine el Contrato sujeto a lo dispuesto en la Sección 10.1(e).

6.3    Mejoras Ordinarias y Mejoras Extraordinarias al Hospital.

MMC realizará las Mejoras Ordinarias necesarias para mantener el Hospital y otros bienes comunes del Centro Médico en condiciones óptimas.



MMC también podrá realizar Mejoras Extraordinarias al Hospital. La sustitución y rehabilitación de los Bienes Inmuebles Arrendados, así como la construcción de mejoras o ampliaciones a las estructuras que forman parte de los Bienes Inmuebles Arrendados no serán comenzadas sin notificar y solicitar la Autorización. MMC procederá a realizarlas únicamente con el consentimiento escrito del Municipio, según dispuesto en la Sección 2.6. La realización de Mejoras Extraordinarias en ausencia del consentimiento escrito del Municipio, constituirá un acto de mala fe que supondrá la renuncia a cualquier compensación por los costos y gastos incurridos para efectuarlas.

Las reparaciones y mantenimiento a los Bienes Arrendados, así como las Mejoras Extraordinarias serán realizadas de conformidad con los requisitos mínimos establecidos en las siguientes guías y códigos:

(a) *Guidelines for Design and Construction of Hospitals and Health Care Facilities* del Instituto Americano de Arquitectos (American Institute of Architects).

(b) *Life Safety Code 101* de la Asociación Nacional para la Protección Contra Incendios (National Fire Protection Association).

(c) *Standards for Health Care Facilities* de la Asociación Nacional para la Protección Contra Incendios (National Fire Protection Association).

24

(d) *Americans with Disabilities Act* (ADA) y las Leyes Aplicables con relación al diseño, construcción, remodelación, ampliación, mantenimiento y operación de facilidades de salud en Puerto Rico.

(e) *National Fire Prevention Code* (NFPA 1) de la Asociación Nacional para la Protección Contra Incendios (National Fire Protection Association).

(f) *Occupational Safety and Health Act* del Departamento del Trabajo Federal (US Department of Labor Occupational Safety and Health Administration).

(g) Ley Número 416 de 22 de septiembre de 2004, según enmendada, conocida como Ley sobre Política Pública Ambiental y el Reglamento Número 5717 para el Manejo de Desperdicios Sólidos No Peligrosos del 14 de diciembre de 1997.

(h) Ley Número 40 del 3 de agosto de 1993, según enmendada, conocida como Ley para Reglamentar la Práctica de Fumar en Lugares Públicos.

(i) Ley Núm. 133 del 18 de junio de 1999 y el Reglamento Número 102 para Reglamentar la Protección y Seguridad de Infantes, Neonatos o Recién Nacidos, Infantes y Niños en las Facilidades Hospitalarias de Puerto Rico.

(j) También será aplicable cualquier otro código, guía o reglamento vigente a la fecha en que los planos de diseño para la construcción de nuevas estructuras hayan sido endosados.

6.4     Seguridad en el Hospital.

MMC desarrollará e implementará un programa de seguridad que promueva un ambiente seguro dentro del Hospital para beneficio de los pacientes, empleados y visitantes del Hospital. El programa de seguridad protegerá y mantendrá los Bienes Arrendados en condiciones adecuadas para su uso.

MMC establecerá e implementará dicho programa de seguridad en conformidad a los requisitos establecidos en el Reglamento de Hospitales.

**ARTÍCULO 7         GRAVÁMENES, CONTRIBUCIONES Y OTROS CARGOS GUBERNAMENTALES**

7.1     Gravámenes, Contribuciones, Otros Cargos Gubernamentales y Cargos por Servicios.

7.1.1   <u>Prohibición y Obligación de Proteger los Bienes Arrendados de Gravámenes</u>: MMC mantendrá los Bienes Arrendados libres de todo gravamen, cargo o servidumbre excepto aquéllos existentes a la Fecha de Efectividad. Tampoco permitirá que materialistas, suplidores o vendedores creen, por virtud de reclamaciones que éstos pudieran tener o que pudieran surgir en relación a proyectos de construcción para la realización de Mejoras Extraordinarias, gravámenes o cargas que afecten, total o parcialmente, los Bienes Arrendados.

25

MMC también evitará que se creen gravámenes o cargas sobre los Bienes Arrendados mediante el pago diligente de toda contribución o cargo gubernamental por concepto de la posesión, uso, administración y operación de los Bienes Arrendados inmediatamente cuando dicha cantidad advenga vencida.

7.1.2    Obligación de Asumir Costos de Remover Gravamen: MMC asume la responsabilidad absoluta de asumir cualquier costo o gasto necesario para retirar cualquier gravamen o carga que sea creado luego de la Fecha de Efectividad sobre los Bienes Arrendados.

7.2    Contribuciones.

MMC pagará todas las Contribuciones con el fin de evitar que le sean impuestos multas, penalidades, intereses o en relación a Deudas Contributivas; provisto, sin embargo, que:

(a)    si, por ley, cualquier Contribución pudiese ser pagada a plazos a opción del contribuyente, MMC podrá pagar la Contribución a plazos durante el transcurso del periodo que permitan las Leyes Aplicables y MMC será responsable únicamente por los plazos que advengan vencidos durante el Término del Contrato; y

(b)    todas las Contribuciones de los años fiscales en los que el Término del Contrato comenzará y terminará serán distribuidos de tal modo que MMC pagará solamente las partes que correspondan a las porciones de los años contenidos dentro del Término del Contrato.

MMC informará al Municipio sobre cualquier Contribución que le sea exigida por alguna Entidad Gubernamental y sobre cualquier acción tomada por MMC con relación a la Contribución.

7.3    Exenciones Contributivas.

Por virtud de la facultad que le concede la Ley de Patentes Municipales, el Municipio podrá conceder a MMC exenciones, parciales o totales, sobre el pago de Patentes Municipales en consideración a circunstancias especiales que lo justifiquen. MMC deberá hacer la petición y presentar la evidencia necesaria que ponga a los funcionarios pertinentes del Municipio en posición de tomar una decisión informada.

El Municipio podría conceder incentivos con relación al pago de arbitrios de construcción y patentes municipales en consideración a los méritos y circunstancias de cada caso. La determinación para la otorgación del incentivo será realizada como parte del proceso dispuesto en la Sección 2.6 del Contrato. Cualquier determinación con respecto a arbitrios de construcción y patentes municipales será incluida en la Autorización. La otorgación potencial de estos incentivos se hará exclusivamente con relación a los Proyectos de Mejoras.

26

7.4    Recibos.

MMC someterá al Municipio, a solicitud de éste, y dentro de treinta (30) días desde la fecha en que la Contribución advenga vencida, recibos oficiales de la Entidad Gubernamental con facultad impositiva, o cualquier otra evidencia del pago de la Contribución.

ARTÍCULO 8          INFORMES FINANCIEROS, INFORMES OPERACIONALES, AUDITORÍAS, VISITAS, SUPERVISIÓN, CONDICIONES FINANCIERAS RESTRICTIVAS Y ADMINISTRACIÓN DEL CONTRATO

8.1    Informes.

MMC someterá mensualmente a la atención del Administrador del Contrato los siguientes estados financieros interinos de la operación del Hospital: (i) el Estado de Situación; (ii) el Estado de Ingresos y Gastos; y (iii) el Estado de Flujos de Efectivo (en conjunto, los "Informes Financieros Interinos"). Los Informes Financieros Interinos serán preparados bajo los principios de contabilidad generalmente aceptados.

El Municipio se reserva el derecho de solicitar estadísticas e informes sobre la administración del Hospital y la provisión de los Servicios de Salud, por lo cual MMC someterá inicialmente las estadísticas e informes interinos operacionales mensuales requeridos en el Anejo H (en adelante y en conjunto, los "Informes Operacionales").

MMC también someterá una copia de cualquier informe recibido durante el mes transcurrido de evaluaciones realizadas por las Agencias Acreditadoras o por las Entidades Gubernamentales de las operaciones del Hospital (en adelante, los "Informes de Agencias"), y de los asuntos administrativos necesarios para mantener al Municipio debidamente informado, sin menoscabo de lo dispuesto en el último párrafo de esta Sección 8.1 sobre informes de las Agencias Acreditadoras o de las Entidades Gubernamentales que señalen deficiencias.

Los Informes Financieros Interinos, los Informes Operacionales y los Informes de Agencias deberán ser sometidos mensualmente no más tarde del día quince (15) del mes calendario siguiente al periodo al cual aquellos pertenecen.

Además, MMC someterá anualmente, dentro de un periodo de noventa (90) días a partir de la Fecha del Cierre de Operaciones, los siguientes documentos:



(a)    el informe financiero de MMC auditado por un contador público autorizado independiente (en adelante, el "CPA Independiente"), con los estados financieros básicos incluyendo información suplementaria, según se requiera por los principios de contabilidad generalmente aceptados y pronunciamientos del Instituto Americano de Contadores Públicos Autorizados de los Estados Unidos de América; y uno o varios de los siguientes,

27

(b)  un informe anual del CPA Independiente, sobre hallazgos de deficiencias significativas o debilidades materiales en los controles internos que pueden afectar las cantidades presentadas en los informes financieros auditados;

(c)  un informe anual del CPA Independiente, sobre hallazgos detectados en las pruebas sobre incumplimiento con las Leyes Aplicables, con las cláusulas financieras contenidas en el Contrato y sobre cualquier otro asunto relevante al estado financiero auditado; y/o

(d)  si el CPA Independiente no tiene observaciones que informar en cuanto a los incisos (b) y (c) de esta Sección 8.1, así lo indicará al Municipio por escrito dentro del periodo de noventa (90) días antes definido.

MMC y el Municipio coordinarán la forma y cualquier solicitud por escrito de tiempo adicional solicitada por MMC para someter los informes antes descritos ante el Administrador del Contrato.

MMC también someterá a la atención del Administrador del Contrato cualquier otro informe, documento o información que le sea requerido, como parte del cumplimiento de sus obligaciones como administrador y operador del Hospital, por Entidades Gubernamentales y Agencias Acreditadoras. Cualquier informe de las Agencias Acreditadoras o de las Entidades Gubernamentales que señale deficiencias será sometido por MMC al Administrador del Contrato dentro de un término de siete (7) días de su recibo. MMC también someterá al Administrador del Contrato, dentro del plazo que le sea otorgado a MMC, cualquier plan correctivo que sea requerido en el informe de deficiencias por las Entidades Gubernamentales o las Agencias Acreditadoras.



8.2   Comité de Auditorías.

El Alcalde queda facultado para nombrar un comité de auditorías (en adelante, el "Comité de Auditorías"), según lo entienda necesario y conveniente para evaluar, analizar y estudiar las operaciones administrativas y fiscales del Hospital. Las facultades del Comité de Evaluación incluirán el análisis y el estudio del Plan Estratégico, el sistema de control de las finanzas, el presupuesto, las proyecciones económicas y financieras, las deficiencias, y la calidad de los servicios directamente ofrecidos por MMC o por los Subcontratistas en el Hospital, a tenor con el Interés Público. MMC proveerá al Comité de Auditorías, en conformidad con las Leyes Aplicables, los recursos, los documentos y la información que sean necesarios para que el Comité de Auditorías pueda realizar investigaciones, evaluaciones y análisis efectivos sobre las operaciones administrativas y fiscales que MMC efectúe en el Hospital durante el Término del Contrato.

Luego de su investigación, evaluación y análisis, el Comité de Auditorías preparará informes en los cuales detallará las determinaciones de hechos, conclusiones, opiniones jurídicas, señalamientos y recomendaciones al Alcalde en relación a las operaciones fiscales, operaciones médico-hospitalarias y la calidad de los Servicios de Salud.

MMC llevará a cabo operaciones contables y financieras de las actividades que efectúe en el Hospital, manteniendo records de esas actividades por un periodo mínimo de seis (6) años.

aprobación bancaria de la línea de crédito será evidenciada mediante la presentación de los documentos que el Municipio entienda adecuados.

3. MMC obtendrá de algunas o todas las personas naturales o jurídicas que posean acciones de ésta un compromiso de respaldo financiero para sustentar las operaciones del Hospital y cumplir con el Plan de Desarrollo. El capital así generado podrá ser usado para permitir a MMC cumplir con el Plan de Desarrollo, liquidez mínima y las reservas de capital adicional requeridos.

4. MMC tendrá reservas de cincuenta por ciento (50%) de las ganancias anuales para la adquisición de equipo y mejoras conforme al Plan de Desarrollo (en adelante, las Ganancias Acumuladas Restrictas"). Dicha reserva se nutrirá y estará basada en los ingresos netos proyectados de la operación del Hospital, según surgirá de los Estados Financieros Proyectados, a ser incluidos en el Anejo I. Los niveles de las Ganancias Acumuladas Restrictas se establecerán en los Estados Financieros Proyectados, a ser incluidos en el Anejo I, para el primer, segundo y tercer año de operaciones, respectivamente. Si MMC no logra alcanzar el nivel de Ganancias Acumuladas Restrictas antes mencionado, la garantía descrita en el inciso 3 anterior será activada por la diferencia entre las cantidades que representen la Ganancia Acumulada Restricta actual y la Ganancia Acumulada Restricta proyectada al término del tercer año. Cuando la garantía descrita en el inciso 3 anterior alcance un cincuenta por ciento (50%) de su monto total, MMC deberá restablecerla al cien por ciento (100%) dentro de ciento ochenta (180) días.

Los requisitos financieros y documentos que demuestren cumplimiento con los requisitos de los párrafos (1) y (2) anteriores, deberán ser sometidos a la Fecha de Efectividad.

(b) Que el pago de dividendos y el uso de las Ganancias Acumuladas Restrictas y de los Recursos Financieros sea restringido de la siguiente manera:

1. Restricciones al pago de dividendos para las acciones comunes.

MMC podrá declarar y pagar dividendos si el ingreso después del pago de contribuciones sobre ingresos de corporaciones ("net income") excede la cantidad de dos millones ($2,000,000) de dólares en cualquier año de operaciones, según reportados en los informes financieros requeridos en la Sección 8.1. El total de dividendos declarados y/o pagados a las acciones comunes y preferidas no excederá el cincuenta por ciento (50%) del ingreso neto después del pago de contribuciones sobre ingresos de corporaciones. El balance restante del ingreso neto será transferido a una partida de Ganancias Acumuladas Restrictas, las cuales serán usadas según descrito en la Sección 8.5(b)3b.

2. Que la liberación de la restricción del cincuenta por ciento (50%) en la declaración de dividendos a las acciones comunes se realice en conformidad a lo siguiente:

El Municipio podrá autorizar la liberación de la restricción del cincuenta por ciento (50%) de la declaración de dividendos a las acciones comunes luego del tercer año de operaciones, sujeto a que las Ganancias Acumuladas Restrictas del Hospital alcancen las cantidades establecidas según los Estados Financieros Proyectados a ser incluidos en el Anejo I. El total de dividendos declarados y/o




pagados a las acciones comunes y preferidas podrá alcanzar el setenta y cinco por ciento (75%) del ingreso neto después del pago de contribuciones sobre ingresos de corporaciones a partir del año de operaciones siguiente al año en que las Ganancias Acumuladas Restrictas excedan la cantidad antes mencionada.

3. Que los usos permitidos de los Recursos Financieros y de las Ganancias Acumuladas Restrictas se realicen en conformidad a los siguiente:

   a. El capital líquido aportado definido en 8.5(a)(1) será utilizado exclusivamente para la adquisición de equipos nuevos y la realización de Mejoras Extraordinarias para el ofrecimiento de los Servicios de Salud y según el Plan de Desarrollo.

   b. Por su parte, las Ganancias Acumuladas Restrictas se reservarán para la adquisición de los equipos y las Mejoras Extraordinarias que sean necesarios para la operación de los grupos médicos que se integrarán a la facultad del Hospital, según se describe en el Plan de Desarrollo. Cualquier otro uso requerirá la aprobación del Municipio.

   c. La declaración de dividendos está restricta, excepto si se cumple con lo estipulado en la Sección 8.5(b)(1).

4. Liquidez mínima en la operación financiera del Hospital.

   a. MMC mantendrá una razón de liquidez en sus activos corrientes con respecto a los pasivos corrientes de 1:1 o sea, no menor de un dólar ($1) en activos corrientes por cada dólar ($1) de deuda o pasivos corrientes.

   b. De igual forma mantendrá una razón del total de activos con respecto al total de pasivos de 1.75:1 o sea, no menor de un dólar con setenta y cinco centavos ($1.75) en total de activos por cada dólar ($1) del total de deuda o pasivos del Hospital.

   c. De no mantenerse el mínimo de liquidez requerida en los dos incisos anteriores, se le requerirá a MMC gestionar la aportación de capital adicional necesario para cumplir los requisitos de liquidez. La garantía definida en 8.5(a)(3) también podrá ser usada para cumplir con los indicadores de liquidez mínima descritos en esta Sección 8.5(b)(4).

8.6   Administración del Contrato.



El Administrador del Contrato tendrá su oficina dentro del Hospital, sin cargo por el uso de esta oficina al Municipio, por lo cual las Partes identificarán un espacio de oficina adecuado para su uso dentro de los primeros treinta (30) días calendario inmediatamente posteriores a la Fecha de Efectividad.

El Administrador del Contrato será el representante del Alcalde y el Municipio ante MMC por lo cual contará con todas las facultades, derechos y deberes correspondientes al Municipio bajo el Contrato y las Leyes Aplicables. Todas las comunicaciones que la Partes deban sostener por escrito serán hechas a través del Administrador del Contrato según dispuesto en la Sección 14.2.



Las Partes entienden que, a pesar de que el Administrador del Contrato tendrá su oficina dentro de las facilidades del Hospital, éste no tendrá ningún tipo de autoridad sobre los empleados de MMC o cualquier de los Subcontratistas y que cualquier comunicación que deba realizar en relación a la administración del Contrato será hecha en conformidad a lo dispuesto en la Sección 14.2.

MMC notificará e invitará al Administrador del Contrato con siete (7) días de anticipación sobre la celebración de las reuniones ordinarias de la Junta de Directores de MMC. MMC también notificará e invitará al Administrador del Contrato a las reuniones extraordinarias de la Junta de Directores de MMC. Las notificaciones a las reuniones extraordinarias serán hechas en la misma fecha en que se les notifique a los miembros de la Junta de Directores.

## ARTÍCULO 9              SEGUROS E INDEMNIZACIONES

9.1     Seguro de Propiedad y Contingencia.

MMC obtendrá y mantendrá, a su propio costo, seguro de propiedad sobre los Bienes Arrendados y cualquier Mejora Extraordinaria que realice a éstos, en las cantidades que sean suficientes y equivalentes al costo total de reemplazo de aquéllos, sin deducción por depreciación, contra todo riesgo por pérdida física o daño que se incluya en la definición de una póliza de seguro para todo riesgo (en inglés, "All Risk") y extendida para incluir cubierta contra terremoto, movimientos de tierra, inundación, filtración de rociadores (en inglés, "sprinkler leakage"), ruptura de maquinaria y equipo eléctrico, riesgo de guerra, actos de terrorismo, tormentas, huracanes, explosión, desordenes civiles, accidentes causados por vehículos, helicópteros y aviones, demolición de estructuras y cualquier otro riesgo que el Municipio pudiera razonablemente designar. El seguro también cubrirá aumentos en los costos de construcción, costos de demolición y remoción de escombros y desperdicios.

9.2     Seguro de Responsabilidad Pública.



MMC obtendrá y mantendrá un seguro de responsabilidad pública, a su costo y para beneficio mutuo del Municipio y MMC, nombrando al Municipio como asegurado adicional, contra reclamaciones por lesiones personales, muerte y daños a la propiedad que surjan de la administración y operación del Hospital por parte MMC, ocurran éstas dentro de los Bienes Inmuebles Arrendados y/o en o alrededor a las áreas comunes compartidas con otros bienes inmuebles dentro del Centro Médico (incluyendo, sin limitación, lesión personal, muerte y daño a la propiedad que resulte de cualquier cambio, alteración, mejora o reparación de los Bienes Inmuebles Arrendados o áreas comunes) con límites que el Municipio entienda adecuados para protegerlo de sentencias o decisiones por lesiones, muerte y daños a la propiedad. A la Fecha de Efectividad, las Partes acuerdan que dicha póliza tendrá límites por la cantidad de cinco ($5,000,000) millones de dólares por evento y agregado por lesión corporal y muerte y por daños a la propiedad. La póliza de seguro aquí requerida responderá primariamente sobre cualquier otra póliza de seguro que el Municipio posea, excepto si la pérdida, reclamación o acción es causada por negligencia del Municipio.

32

9.3     Prueba de Responsabilidad Financiera por Impericia Profesional.

MMC obtendrá y mantendrá prueba de responsabilidad financiera, a su costo y para beneficio mutuo del Municipio y MMC, nombrando al Municipio como asegurado adicional, contra acciones civiles de reclamación de daños por culpa o negligencia por impericia profesional que causen sus empleados, contratistas, consultores y demás personal en el desempeño de su profesión mientras dichas personas actúen en cumplimiento de sus deberes y funciones en el Hospital. Los términos de la prueba de responsabilidad serán en conformidad al Artículo 41.050 de la Ley Núm. 77 de 19 de junio de 1957, según enmendada, conocida como el Código de Seguros de Puerto Rico.

9.4     Fianza de Pago.

MMC obtendrá, presentará ante el Municipio, y mantendrá una fianza de cumplimiento de pago (en adelante, la "Fianza de Pago") (en inglés, "Payment Bond") para asegurar el cumplimiento con las obligaciones de pago al Municipio aceptadas y acordadas por MMC de conformidad con las disposiciones del Contrato. MMC mantendrá efectiva la Fianza de Pago en todo momento durante el Término del Contrato. El valor de la Fianza de Pago será suficiente para cubrir la cantidad equivalente al pago de doce (12) cánones de arrendamiento. MEHDS someterá ante el Municipio el certificado de fianza al Municipio dentro del periodo de siete (7) días calendario inmediatamente posterior a la fecha de efectividad y en o antes de cada fecha de aniversario del contrato.

El Municipio activará su derecho de reclamar las cantidades debidas por MMC a la compañía fiadora que expida la Fianza de Pago según dispuesto en la Sección 5.3 del Contrato. MMC someterá copia del certificado de la Fianza de Pago al Municipio dentro del periodo de cinco (5) días laborables inmediatamente posterior a la Fecha de Efectividad.

9.5     Aprobación Municipal de los Seguros de MMC.

Antes de la obtención de cada póliza de seguro de propiedad requerido en las secciones 9.1 a 9.4, MMC proveerá al Municipio, para su aprobación, una descripción detallada o copia del o los certificados de seguro, incluyendo los límites de las pólizas. La obtención de las pólizas originales y la renovación de éstas deberán contar con la aprobación previa y por escrito del Municipio. MMC someterá copias de los certificados de seguro dentro del periodo de siete (7) días calendario desde la firma del Contrato y en o antes de cada fecha de aniversario del contrato. El Contrato no se registrará con la Oficina del Contralor conforme a la Sección 14.13 hasta que MMC presente las copias de los certificados de seguro al Municipio.

9.6     Seguros Suplementarios.

MMC obtendrá y mantendrá aquellos seguros, en las cantidades que de tiempo en tiempo las Partes consideren adecuadas, contra otros riesgos asegurables o cubiertos por las pólizas específicamente exigidas en este Artículo 9.   El Municipio no exige ningún seguro suplementario a la Fecha de Efectividad.

33

9.7    Aseguradoras y Pólizas.

Todos los seguros a ser obtenidos bajo este Artículo 9 serán obtenidos a través de aseguradores de capacidad reconocida y con licencia para hacer negocios en Puerto Rico y para asegurar riesgos en Puerto Rico. Los aseguradores tendrán una clasificación Best's Rating "A" o mejor, o si tal clasificación dejase de existir, una clasificación igual o mejor por un servicio de clasificación de aseguradores que sea aceptado por las Partes. MMC presentará y someterá ante el Municipio, a la Fecha de Efectividad, los certificados de seguro y las certificaciones de pago de éstas.

9.8    Ajustes.

(a)    Todas las pólizas de seguro requeridas en el Artículo 9 deberán incluir al Municipio como coasegurado.

(b)    Cada póliza contendrá una disposición a los efectos de que ningún acto u omisión de MMC o de los Subcontratistas afectará el límite de las obligaciones de la compañía aseguradora para el pago de las pérdidas que pudieran incurrirse.

9.9    Notificación de Cancelación.

Toda póliza contendrá un acuerdo de la compañía aseguradora a los efectos de que la póliza no será cancelada, no se deja de renovar ni será sustancialmente modificada sin que antes la aseguradora haya notificado por escrito al Municipio con al menos treinta (30) días de anticipación.



9.10    Obligación de MMC de Defender e Indemnizar al Municipio.

MMC defenderá e indemnizará al Municipio, a su Alcalde, sus empleados, contratistas, agentes y consultores (en adelante, cada uno un "Indemnizado del Municipio" y colectivamente, los "Indemnizados del Municipio") de y con respecto a cualquier Pérdida-y-Gasto que surja como resultado del ejercicio que realice MMC de sus derechos de uso, posesión, habitación, administración y operación de los Bienes Arrendados, sujeto a que la reclamación por Pérdida-y-Gasto sea atribuible a:

(a) lesiones físicas, enfermedad o muerte, o a lesión o destrucción de propiedad tangible que sea distinta a los Bienes Arrendados, causada o resultante de actos negligentes u omisiones de, o incumplimiento de las disposiciones en el Contrato por, MMC, sus oficiales, empleados, contratistas, agentes, consultores, Subcontratistas o cualquier persona que esté directa o indirectamente empleada por MMC o cualquier persona por cuyos actos MMC sea responsable, independientemente de si la reclamación, daño, pérdida o gasto es causado parcialmente por un Indemnizado del Municipio. Cuando dichos daños son causados parcialmente por la negligencia de un Indemnizado del Municipio, la responsabilidad de MMC será reducida en proporción a dicha negligencia a base de la figura de negligencia comparada;

34

(b) la violación de cualquier patente, marca registrada o derecho de autor relacionada a los Equipos Biomédicos o programas de informática usados por MMC o los Subcontratistas en el Hospital;

(c) cualquier responsabilidad por concepto de reclamaciones laborales o de condiciones de empleo de los empleados, los contratistas o los Subcontratistas; o

(d) cualquier daño causado a los Subcontratistas por causa de la Terminación del Contrato por incumplimiento de MMC.

En el caso de que una tercera persona presente una acción contra los Indemnizados del Municipio por concepto de cualquier reclamación que surja de eventos por los cuales MMC debe defender e indemnizar a los Indemnizados del Municipio, ningún compromiso, acuerdo o transacción de MMC sobre tales reclamaciones podrá ser efectiva sin el consentimiento del Indemnizado del Municipio o los Indemnizados del Municipio, salvo que: (i) no existan hallazgos o admisiones sobre violaciones a las Leyes Aplicables o violación de los derechos de las terceras personas; y (ii) el único remedio disponible sea monetario y sea pagado en su totalidad por MMC. Los compromisos, acuerdos o transacciones hechos por MMC serán vinculantes únicamente si el Indemnizado del Municipio o los Indemnizados del Municipio, contra quienes se presenta una acción, proveen su consentimiento a dicho compromiso, acuerdo o transacción por escrito.

Esta Sección 9.10 no negará, reducirá o limitará cualquier otra obligación que tenga MMC de indemnizar al Municipio, a su Alcalde, sus empleados, contratistas, agentes y consultores bajo las Leyes Aplicables. La obligación de indemnizar tampoco será limitada por ninguna póliza de seguro adquirida bajo el Artículo 9. Las disposiciones de esta Sección 9.10 subsistirán luego de la Fecha de Terminación y la Fecha de Vencimiento.

9.11   Excepción por Eventos de Fuerza Mayor.

MMC no está obligada a indemnizar a los Indemnizados del Municipio por Pérdidas-y-Gastos incurridos por éstos, si las Pérdidas-y-Gastos son causados por eventos, actos, circunstancias o condiciones que constituyan un Evento de Fuerza Mayor o que sean exclusivamente causados por el Municipio.

## ARTÍCULO 10    INCUMPLIMIENTO Y TERMINACIÓN DEL CONTRATO

10.1   Eventos que Constituirán Incumplimiento de MMC.

Los eventos que se describen a continuación (en adelante, los "Eventos de Incumplimiento") serán causa suficiente para la Terminación del Contrato. De ocurrir uno o varios de éstos, el Municipio podrá declarar en notificación escrita el incumplimiento de MMC con los términos y condiciones del Contrato. Una vez el Municipio envíe la notificación escrita a MMC (según se describe en los incisos (a) a (m)), el Municipio podrá usar los remedios disponibles bajo el Contrato y las Leyes Aplicables si:



35

(a)   MMC incumple sus obligaciones con relación al pago del Canon de Arrendamiento, Deuda Contributiva o cualquier otra cantidad de dinero debida al Municipio o Entidades Gubernamentales bajo el Contrato, de tal forma que MMC incumple con la cantidad y/o la forma del pago de aquéllos, y si el incumplimiento continúa por un periodo de treinta (30) días inmediatamente posterior a la notificación escrita del Municipio a MMC especificando las causas del incumplimiento; o

(b)   MMC incumple con cualquiera de los propósitos y/o fines que motivaron que el Municipio otorgara el Contrato, tal cual el desarrollo de los Servicios de Salud, las instalaciones e infraestructura del Hospital según surge de la Propuesta y el Contrato.

(c)   MMC incumple su obligación de obtener y mantener los seguros requeridos en el Artículo 9 por un periodo de tiempo que exceda un término de siete (7) días calendario a partir de la fecha en que advengan exigibles o vencidos; o

(d)   MMC abandona o reduce los Servicios de Salud, temporal o permanentemente, sin autorización escrita del Municipio, por causas distintas a un evento de Fuerza Mayor. En el evento de que MMC necesite reducir los Servicios de Salud, MMC cumplirá con las obligaciones de notificación a la Secretaría Auxiliar para Reglamentación y Acreditación de Facilidades de Salud ("SARAFS"), según dispuestas en la Sección 10.6. Se entenderá que MMC no ha incurrido en un Evento de Incumplimiento bajo este inciso si cumple con la notificación a SARAFS y recibe la autorización de ésta para el cierre parcial o reducción de los Servicios de Salud; o

(e)   MMC incumple con las obligaciones dispuestas en el Artículo 12 del Contrato por un periodo de treinta (30) días consecutivos luego de la notificación escrita del Municipio conteniendo una descripción de las causas del incumplimiento; provisto, sin embargo, que las Partes acuerdan que durante el término de treinta (30) días, las Partes negociarán de buena fe para llegar a un acuerdo con relación a un programa de remediación que permita a MMC desempeñar y cumplir sus obligaciones bajo el Artículo 12; o

(f)   MMC incumple cualquiera de sus obligaciones bajo el Contrato por un periodo de treinta (30) días consecutivos luego de recibir notificación escrita del Municipio conteniendo una descripción de las causas del incumplimiento; provisto, sin embargo, que si MMC demuestra que, aun desplegando la debida diligencia, no puede corregir las causas del incumplimiento, el Municipio pueda discrecionalmente alcanzar un acuerdo con MMC para permitirle corregir el incumplimiento; o

(g)   se efectúa algún procedimiento de expropiación forzosa por alguna entidad del Gobierno del Estado Libre Asociado de Puerto Rico o el Gobierno Federal mediante el cual el Municipio pierda la titularidad de algunos o todos los Bienes Arrendados; o

(h)   pierde la licencia expedida por el Departamento de Salud para la operación del Hospital; o



36



(i)    MMC o alguno de sus oficiales es encontrado convicto o se declara culpable de delito grave o de delito relacionado a fondos, función o propiedad pública, según dispuestos en la Ley Núm. 428 de 22 de septiembre de 2004; o

(j)    MMC concluye razonablemente que no puede cumplir cualquiera de sus obligaciones bajo el Contrato para lo cual notificará por escrito al Municipio dentro de un término de sesenta (60) días. El Proceso de Transición dispuesto en la Sección 10.6 se activará si el Municipio acepta por escrito las razones provistas por MMC.

10.2    Entrega de la Posesión.

MMC entregará al Municipio, en conformidad al Proceso de Transición, los Bienes Arrendados en la Fecha de Vencimiento o en la Fecha de Terminación para la posesión y uso inmediato del Municipio. Según dispuesto en el Artículo 7, MMC entregará los Bienes Arrendados y las Mejoras Extraordinarias sin cargas, gravámenes o reclamaciones de MMC o de terceros.

10.3    Remedios disponibles al Municipio.

Una vez ocurra un Evento de Incumplimiento, el Municipio podrá, a su entera discreción, ejercer uno o más de los remedios siguientes: (i) terminar el Contrato mediante el envío de notificación escrita a MMC, cumpliendo con las condiciones dispuestas en la Sección 10.1 o en cualquier otra disposición del Contrato; y/o (ii) ejercer cualquier otro derecho o remedio que el Municipio tenga disponible bajo las Leyes Aplicables.

10.4    Posesión de Mala Fe de los Bienes Arrendados.

Si MMC retiene la posesión parcial o total de los Bienes Arrendados luego de la Fecha de Vencimiento o de la Fecha de Terminación, advendrá poseedor de mala fe asumiendo las consecuencias dispuestas por las Leyes Aplicables. MMC será responsable por toda Pérdida-y-Gasto que el Municipio sufra como resultado de la posesión de mala fe.

10.5    Procedimientos bajo la Ley de Quiebras.

Si MMC adviene insolvente o inicia voluntariamente procedimientos bajo alguna o varias Leyes Aplicables pertinentes a procesos de quiebras o insolvencia de personas naturales o jurídicas; o si se comienza algún proceso contra MMC y dicho proceso no es desestimado dentro de un periodo de treinta (30) días, si MMC comienza un procedimiento de quiebras bajo el Código de Quiebras de Estados Unidos (en inglés, US Bankruptcy Code (en adelante, el "Código"); MMC renunciará voluntariamente al término de sesenta (60) días que provee el Código (o el periodo que en ese momento esté vigente bajo el Código) para aceptar o rechazar el Contrato como contrato ejecutable (en inglés, "executory contract") y deberá, inmediatamente después de radicar un recurso ante la Corte de Quiebras para recibir las protecciones del Código o al ser notificado por escrito por el Municipio, asumir o rechazar el Contrato, pagar el Canon de Arrendamiento y cualquier otra cantidad de dinero debida bajo el

Contrato y continuará realizando dichos pagos conforme a los términos y condiciones del Contrato.

10.6    Proceso de Transición.

Las Partes se comprometen a desplegar el mayor grado de diligencia, buena fe y cooperación durante el Proceso de Transición para garantizar que los Servicios de Salud no serán irrazonablemente interrumpidos. Cualquier interrupción, sin embargo, será hecha en conformidad a las Leyes Aplicables. En caso de que sea necesario cesar temporal y parcialmente las operaciones del Hospital, MMC notificará por escrito, con copia al Administrador del Contrato, a SARAFS sobre su intención, la fecha del cese pretendido y la razón. La notificación será hecha con no menos de treinta (30) días de anticipación a la fecha del cese de operaciones. MMC incluirá en la notificación escrita la fecha en la cual proyecta reanudar las operaciones cesadas. Para efectos del Contrato, un "cierre parcial" será evidenciado por una disminución de la utilización de las camas de veinticinco por ciento (25%) o más de éstas, o el cierre total de la Sala de Emergencias.

La comunicación entre las Partes, sus representantes y/o agentes será continua y efectiva. Cada una de las Partes nombrará a un representante el cual será la persona de contacto para atender, en primera instancia, las comunicaciones y coordinar los procedimientos del Proceso de Transición.

Durante el Proceso de Transición, MMC podrá retirar del Hospital únicamente los bienes muebles que: (i) MMC adquirió; (ii) no sustituyen los Bienes Muebles Arrendados; y (iii) por los cuales MMC no ha recibido compensación del Municipio.

10.7    Compensación por Bienes Muebles y Mejoras Extraordinarias Durante el Proceso de Transición.

10.7.1 <u>Compensación por Bienes Muebles</u>: En caso de Terminación del Contrato, el Municipio o el futuro administrador del Hospital podrá optar por adquirir algunos o todos los Equipos Biomédicos y otros bienes muebles que sean propiedad de MMC, no hayan sido adquiridos para sustituir Bienes Muebles Arrendados y que se encuentren en uso en el Hospital. A estos efectos, el Administrador del Contrato Municipio notificará por escrito a MMC, en cualquier momento durante el Proceso de Transición, su intención de evaluar los Equipos Biomédicos y otros bienes muebles adquiridos por MMC y/o los Subcontratistas. A partir de la notificación del Administrador del Contrato, las Partes deberán reunirse dentro de un plazo de quince (15) días para evaluar el inventario y discutir los términos para la adquisición de los Equipos Biomédicos y otros bienes muebles. La compensación que pagará el Municipio o el futuro administrador del Hospital por los Equipos Biomédicos y otros bienes muebles que interesen adquirir estará basada en el Valor Neto de los Equipos en los Libros.

Los Equipos Biomédicos y otros bienes muebles serán adquiridos por el Municipio o el futuro administrador del Hospital conforme a una política tipo "AS IS, WHERE IS", con las





38

Contrato y continuará realizando dichos pagos conforme a los términos y condiciones del Contrato.

10.6   Proceso de Transición.

Las Partes se comprometen a desplegar el mayor grado de diligencia, buena fe y cooperación durante el Proceso de Transición para garantizar que los Servicios de Salud no serán irrazonablemente interrumpidos. Cualquier interrupción, sin embargo, será hecha en conformidad a las Leyes Aplicables. En caso de que sea necesario cesar temporal y parcialmente las operaciones del Hospital, MMC notificará por escrito, con copia al Administrador del Contrato, a SARAFS sobre su intención, la fecha del cese pretendido y la razón. La notificación será hecha con no menos de treinta (30) días de anticipación a la fecha del cese de operaciones. MMC incluirá en la notificación escrita la fecha en la cual proyecta reanudar las operaciones cesadas. Para efectos del Contrato, un "cierre parcial" será evidenciado por una disminución de la utilización de las camas de veinticinco por ciento (25%) o más de éstas, o el cierre total de la Sala de Emergencias.

La comunicación entre las Partes, sus representantes y/o agentes será continua y efectiva. Cada una de las Partes nombrará a un representante el cual será la persona de contacto para atender, en primera instancia, las comunicaciones y coordinar los procedimientos del Proceso de Transición.

Durante el Proceso de Transición, MMC podrá retirar del Hospital únicamente los bienes muebles que: (i) MMC adquirió; (ii) no sustituyen los Bienes Muebles Arrendados; y (iii) por los cuales MMC no ha recibido compensación del Municipio.

10.7   Compensación por Bienes Muebles y Mejoras Extraordinarias Durante el Proceso de Transición.

10.7.1  Compensación por Bienes Muebles: En caso de Terminación del Contrato, el Municipio o el futuro administrador del Hospital podrá optar por adquirir algunos o todos los Equipos Biomédicos y otros bienes muebles que sean propiedad de MMC, no hayan sido adquiridos para sustituir Bienes Muebles Arrendados y que se encuentren en uso en el Hospital. A estos efectos, el Administrador del Contrato Municipio notificará por escrito a MMC, en cualquier momento durante el Proceso de Transición, su intención de evaluar los Equipos Biomédicos y otros bienes muebles adquiridos por MMC y/o los Subcontratistas. A partir de la notificación del Administrador del Contrato, las Partes deberán reunirse dentro de un plazo de quince (15) días para evaluar el inventario y discutir los términos para la adquisición de los Equipos Biomédicos y otros bienes muebles. La compensación que pagará el Municipio o el futuro administrador del Hospital por los Equipos Biomédicos y otros bienes muebles que interesen adquirir estará basada en el Valor Neto de los Equipos en los Libros.

Los Equipos Biomédicos y otros bienes muebles serán adquiridos por el Municipio o el futuro administrador del Hospital conforme a una política tipo "AS IS, WHERE IS", con las

38

garantías que se encuentren vigentes y sin ningún tipo de gravamen o carga sobre el titulo, o según se acuerde por escrito.

10.7.2 Compensación por Mejoras Extraordinarias: En caso de Terminación del Contrato, MMC podrá recibir compensación del Municipio por las Mejoras Extraordinarias construidas de buena fe y de conformidad con lo acordado en las Autorizaciones expedidas para los Proyectos de Mejoras, según dispuesto en la Sección 2.6. En dicho caso, el Municipio pagará a MMC una cantidad de dinero basada en el Valor Neto de las Mejoras Extraordinarias en los Libros y/o la Autorización.

10.7.3 Resolución de Disputas sobre el Valor Neto en los Libros: De no haber un acuerdo entre las Partes sobre el Valor Neto de los Equipos en los Libros y el Valor Neto de las Mejoras Extraordinarias en los Libros, las Partes acuerdan celebrar un proceso de resolución de disputas según descrito en el Artículo 13.

## ARTÍCULO 11    SUBCONTRATACIONES; CESIÓN DEL CONTRATO; CAMBIO DE CONTROL

11.1    Obligaciones de Terceros con Respecto a los Términos del Contrato.

MMC obligará por escrito a los Subcontratistas a cumplir plenamente con los términos, condiciones, obligaciones, compromisos, garantías y deberes aceptados por MMC bajo el Contrato. A estos efectos, MMC incluirá el Contrato como anejo de todo contrato que otorgue con los Subcontratistas (en adelante, el "Subcontrato") e incluirá una cláusula contractual que establecerá la obligación del Subcontratista a cumplir con todas las disposiciones del Contrato que no hayan sido incluidas en el Subcontrato y que sean pertinentes a la relación MMC-Subcontratista. Los subcontratos cumplirán con todos los requisitos del Gobierno de Puerto Rico pertinentes a la contratación pública.

El cumplimiento con lo dispuesto en esta Sección 11.1 no significará de forma alguna que MMC quedará relevada de sus obligaciones ante el Municipio bajo el Contrato. MMC entiende que solamente queda plenamente relevada de sus obligaciones bajo el Contrato mediante la cesión o el traspaso del Contrato a una tercera persona jurídica, en conformidad con la Sección 11.5.

11.2    Notificación al Municipio.

MMC notificará por escrito al Municipio su intención de otorgar cualquier Subcontrato con relación al uso, posesión, habitación, administración u operación de alguno de la totalidad o parte de cualquiera de los Bienes Inmuebles Arrendados. La validez de los Subcontratos queda condicionada a que MMC notifique por escrito al Municipio quince (15) días antes de la fecha prevista para el otorgamiento del Subcontrato. MMC incluirá en la notificación el borrador final del Subcontrato, sus anejos, documentos necesarios para su otorgamiento, así como aquella información que permita al Municipio: (i) evaluar si el Subcontrato cumple con los términos, condiciones, obligaciones, compromisos, garantías y deberes de MMC bajo el Contrato; y (ii) evaluar la capacidad financiera y operacional del potencial Subcontratista para



ofrecer los servicios que MMC interesa contratar. MMC podrá proceder con el otorgamiento del Subcontrato si el Municipio no presenta objeción o solicita más información por escrito dentro de un periodo de quince (15) días desde el recibo de la notificación de MMC.

El Municipio, sin embargo, podrá objetar cualquier acuerdo otorgado por MMC luego del término de treinta (30) días sujeto a que la causa para la objeción esté justificada en derecho.

11.3    Responsabilidad de MMC con Respecto a los Subcontratistas.

MMC debe contratar solamente con Subcontratistas que posean todos los permisos, licencias, aprobaciones y certificaciones requeridas bajo las Leyes Aplicables, así como los seguros adecuados, y las destrezas técnicas y la experiencia adecuadas para proveer los servicios y/o los bienes en conformidad a los términos, condiciones y estándares requeridos en este Contrato.  MMC supervisará diligentemente a cada Subcontratista y será responsable por todos los aspectos del servicio y/o los bienes suplidos por los Subcontratistas, ya sean directa o indirectamente empleados por MMC, y por todos los Subcontratistas que sean suplidores de MMC de materiales y equipos, incluyendo todos los actos, errores y omisiones cometidos por éstos.   En adición, MMC coordinará el trabajo de los Subcontratistas.  El uso de un Subcontratista para proveer un servicio y/o bienes requeridos bajo este Contrato, no exonerará a MMC de sus deberes, obligaciones y responsabilidades bajo este Contrato.  Mediante la firma de este Contrato, MMC certifica al Municipio que sus Subcontratistas cumplirán con todos los deberes, obligaciones y responsabilidades de la forma en que MMC las ha asumido bajo este Contrato.

11.4    Garantías y Certificaciones Provistas por los Subcontratistas.

MMC deberá obtener de los Subcontratistas las garantías y las certificaciones más favorables con relación a los servicios y/o los bienes provistos por éstos. MMC deberá mantener copias de todas las garantías y certificaciones (las cuales deberá proveer al Municipio en caso de ser solicitadas).    Si este Contrato termina antes de la expiración de tales garantías o certificaciones, MMC le asignará al Municipio todas las garantías y certificaciones de los Subcontratistas que están en efecto; siempre que cumplen con lo siguiente: (i) la asignación no relevará a MMC de sus obligaciones y garantías bajo este Contrato y (ii) MMC tendrá el derecho de imponer las garantías y certificaciones de los Subcontratistas para satisfacer las obligaciones de MMC bajo este Contrato.    MMC no llevará, ni permitirá cualquier Subcontratista o cualquier tercero bajo el control de MMC a tomar cualquier acción no permitido bajo este Contrato que puede invalidar, evitar o terminar cualquier garantía o certificación al equipo, materiales o servicios de la cual obtiene de otros.

11.5    Inexistencia de Relación Contractual

No se interpretará que este Contrato establece obligaciones o una relación contractual entre el Municipio y cualquier Subcontratista.

