**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **IN RE:** | |
| **MEDICAL EDUCATIONAL & HEALTH SERVICES, INC.** | **CASE NO. 10-04905 BKT** |
| **DEBTOR** | |
| | **Chapter 11** |
| **MEDICAL EDUCATIONAL & HEALTH SERVICES, INC.** | |
| **PLAINTIFF** | **ADV. NO.: 10-148** |
| **VS.** | |
| **INDEPENDENT MUNICIPALITY OF MAYAGUEZ, ET ALS.** | |
| **DEFENDANTS** | |
| | <span style="color:red">**FILED & ENTERED ON 09/02/2011**</span> |

**OPINION AND ORDER**

This matter is before the Court on a motion to dismiss [Docket No. 67] filed on March 5, 2011, by defendants Hon. Jose Guillermo Rodriguez (the "Mayor"), in his personal capacity, his wife Mrs. Marisel Mora Gonzalez ("Mrs. Gonzalez") and their conjugal partnership (collectively, "Defendants"). Medical Educational & Health Services, Inc. ("Debtor" and "Plaintiff") filed its opposition [Docket No. 85] to Defendants' motion to dismiss on April 12, 2011.

Plaintiff filed a complaint (the "Complaint") in the adversary alleging violations of civil rights and bringing claims against Defendants and co-defendants under section 1983 of Title 42 of the United States Code ("Section 1983") for Fourteenth Amendment violations. In addition, Plaintiff asserts

1

violations of the Racketeering Influenced Corruption Organization ("RICO") Act.
Defendants move to dismiss these claims for failure to state a claim under Rule
12(b)(6) of the Federal Rules of Civil Procedure ("FRCP").  Plaintiff further
asserts the following state law claims against Defendants: (1) breach of
contract; (2) fraud; (3) damages incidental to contract; (4) tortious
interference with contractual relations; (5) loss of opportunities and
reputation; (6) loss of business opportunity; and (7) damages to other sub-
lessors.  In their motion, Defendants ask this Court to dismiss these state law
claims for lack of jurisdiction.  For the reasons set forth below, Defendants'
motion to dismiss is GRANTED in part and DENIED in part.

## I.   FACTUAL BACKGROUND

Unless otherwise noted, the relevant allegations are derived from the
Complaint [Docket No. 1], which was filed on September 1, 2010.  We recite the
facts and all reasonable inferences to be drawn therefrom in the light most
favorable to Plaintiff.

On August 27, 2009, Plaintiff entered into an operation and administration
agreement (the "Lease") with the Autonomous Municipality of Mayagüez (the
"Municipality") to lease the Mayagüez Medical Center (the "Hospital").  The Lease
involved the participation of Sistemas Integrados de Salud del Sur Oeste, Inc.
("SISSO"), who entered into a sublease and administration agreement (the
"Sublease") directly with Plaintiff.  Under the Sublease, SISSO was authorized to
sub-sublease portions of the Hospital under its administration to various medical
service providers.  Because SISSO was obligated to pay rents to Plaintiff, the
Municipality required SISSO to guarantee the Lease since any default by SISSO
would necessarily result in Plaintiff defaulting on its own obligation to the
Municipality.  Acting on behalf of the Municipality, the Mayor signed the Lease.

Throughout the Complaint, Plaintiff argues that the Municipality, under the
direction of the Mayor, interfered with its ability to run the hospital and

breached its contractual duties to Plaintiff on various occasions.  For instance, the Municipality allegedly did not deliver possession of the Hospital until August 31, 2009 (four days after execution of the Lease), at which point Plaintiff discovered that three of the six floors were in a state of ruin and that the IRS had liens on every piece of equipment in the Hospital.  The Municipality allegedly misrepresented the condition of the Hospital by failing to advise Plaintiff of the Hospital's true condition.  Shortly thereafter, and allegedly without consulting with Plaintiff or considering the Lease, the Mayor announced at a press conference that the third floor of the Hospital would serve as a trauma ward.  Plaintiff, however, had allegedly designated the third floor to a pediatric ward and had already begun negotiating with the appropriate groups.  In turn, Plaintiff proposed that the Municipality repair another floor in order to accommodate both wards.  Moreover, on October 7, 2010, Plaintiff allegedly issued a letter to the Municipality proposing that the rent be renegotiated because only half of the floors were functional.  After the Municipality answered requesting specific proposals, Plaintiff submitted specific proposals for rent modification on November 2, 2010.

On November 13, 2009, the principal stockholder and CEO of SISSO, Dr. Orlando Marini ("Marini"), alleged a cash shortage that would inhibit SISSO from making timely payments to Plaintiff.  Based on this allegation, SISSO's minority stockholders transferred 45% of their interest to Marini in order to capitalize and save the corporation.  As an additional attempt to subsidize SISSO, Plaintiff allegedly agreed to temporarily relinquish its interest in SISSO by allowing SISSO to pay rent directly to the Municipality (which supposedly was an amount less than the rent SISSO was paying to Plaintiff).  Plaintiff alleges that this informal agreement was a good faith effort to help SISSO and promote the forward movement of the project.  Unbeknownst to Plaintiff, however, SISSO allegedly had collectibles totaling approximately $6,000,000, which Plaintiff argues could have been used as guarantee to raise capital.

3

On December 1, 2009, the Municipality informed Plaintiff that SISSO's tendered check bounced and demanded Plaintiff to pay the rent due. When Plaintiff informed SISSO of its noncompliance, SISSO allegedly explained that it was not required to pay rent because the Mayor advised SISSO that rent would not be paid by Plaintiff to the Municipality for a "reasonable period of time." Compl. p. 21. Thus, SISSO would allegedly not have to pay rent to Plaintiff. On December 8, 2010, the Municipality again demanded payment of the rent due from Plaintiff. Plaintiff allegedly responded to SISSO, reaffirming that no agreement had been reached with the Mayor and reminding SISSO that it was contractually obligated to Plaintiff, not to the Municipality. Plaintiff further demanded payment of rent due from SISSO.

On January 4, 2010, Plaintiff was allegedly advised that Marini of SISSO, Mr. Jose Quiros ("Quiros") of the Manati Medical Center ("MMC"), and the Mayor of the Municipality secretly met to discuss Quiros' acquisition of SISSO. At this meeting, the Municipality supposedly agreed to grant SISSO a six-month moratorium of rent and utility payments. As a result, SISSO could allegedly default on its obligation to Plaintiff and the Municipality would hold it harmless. Meanwhile, the Municipality continued to demand specific performance from Plaintiff. Allegedly, Plaintiff anticipated cancellation of the Lease, eviction of Plaintiff and its sub-lessees, and replacement by SISSO or its successor. Plaintiff immediately requested a meeting with Marini. Marini allegedly agreed, but conditioned his acceptance on having the meeting at the Mayor's counsel's office.

On January 5, 2010, representatives from the Municipality, SISSO, MMC and Plaintiff met. At the meeting, it was allegedly confirmed that Marini, Quiros, and the Mayor entered into an agreement in which Marini would sell its SISSO stock to Quiros, thereby transferring operation and administration of the Hospital to Quiros. Plaintiff refers to this agreement as the "scheme." Before the meeting ended, SISSO representatives allegedly offered Plaintiff $400,000 in exchange for control of Plaintiff and relinquishment of Plaintiff's sub-lessees'

4

facilities.  Plaintiff declined the offer.

On January 29, 2010, the Mayor, acting on behalf of the Municipality, allegedly messengered a letter to Plaintiff terminating the Lease for "lack of payment" and requesting immediate surrender of the Hospital.  Allegedly, the reason for the cancellation was a charade since the Municipality had supposedly granted the moratoria and knew that no rent was actually in arrears.  Plaintiff claims that the cancellation letter was in violation of Sections 13.1.1 of the Lease because the Municipality breached its duty to resolve disputes in good faith.  Also, the letter was not delivered to the contracted address in Section 14.2.

Marini allegedly responded to the Mayor's letter without authorization from Plaintiff and accepted the termination of the Lease.  Marini explained that SISSO was unable to finance the operation of the Hospital and agreed to surrender the Lease (yet there was no lease agreement between SISSO and the Municipality to be surrendered since SISSO was only a guarantor).  Allegedly, Marini's actions were taken in furtherance of the "scheme."  The Mayor allegedly accepted the surrender, ignored the contractual reality, and forgave SISSO's debt.  Shortly thereafter on February 1, 2010, Plaintiff responded to the Mayor's cancellation letter expressing its position that "the only parties in violation of the contract were the Municipality and SISSO." Compl. p. 30.  Moreover, Plaintiff allegedly invited the Municipality to reconsider its position.

On January 29, 2010, the Mayor signed MCC's proposal letter, which allegedly contained inaccurate representations regarding Plaintiff's position. Supposedly, the proposal letter falsely alleged that Plaintiff, together with SISSO and MMC, requested approval of the transfer and payment moratorium.  The Municipality's new lease agreement with MMC and SISSO designated SISSO to remain as administer of the Hospital, which contradicted the supposed cancellation.  At this point, Quiros had supposedly obtained control over SISSO.  MMC allegedly was representing itself as a new corporation acting under new contracts.

5

1   Simultaneously, MMC was "doing business as" SISSO.

2       On June 3, 2010, Plaintiff filed for relief under Chapter 11 of the
3   Bankruptcy Code and subsequently filed the Complaint in this adversary proceeding
4   on September 1, 2010.   Plaintiff alleges that the Mayor, on behalf of the
5   Municipality, conspired with Marini of SISSO to tortiously interfere with the
6   Lease.   Based on the foregoing factual allegations, Plaintiff brings this suit
7   for damages, averring that the Mayor's cancellation of the Lease deprived
8   Plaintiff of its property rights without due process of law.   In addition,
9   Plaintiff alleges that Defendants violated the RICO Act by influencing MMC and
10  SISSO to commit mail and interstate wire fraud.   Moreover, Plaintiff alleges that
11  Defendants are guilty of conspiring with co-defendants to violate RICO.   The
12  agreement as to the conspiracy between the Mayor and MMC allegedly required MMC
13  to falsely represent itself to potential sub-lessors and judicial forums as the
14  valid lessee of the Hospital.

15      In its answer, Defendants move to dismiss the Complaint for failure to
16  state a claim.   Moreover, Defendants deny a number of Plaintiffs allegations,
17  assert the affirmative defense of "Qualified Immunity", and argue that the Court
18  lacks jurisdiction to hear the additional state law claims.

19                          **II.   DISMISSAL STANDARD**

20

21      Pursuant to Rule 12(b)(6) of the FRCP, which is applicable to adversary
22  proceedings under Rule 7012 of the Federal Rules of Bankruptcy Procedure, a
23  defendant may file a motion to dismiss for failure to state a claim upon which
24  relief can be granted in response to an initial pleading.

25      In evaluating a motion to dismiss, the court "take[s] as true all well-
pleaded allegations and draw[s] all reasonable inferences in the plaintiff's
favor."   Ezra Charitable Trust v. Tyco Int'l, Ltd., 466 F.3d 1, 5-6 (1st Cir.
2006).   The inquiry is therefore limited to facts alleged in the complaint,
incorporated into the complaint, or susceptible to judicial notice.   See In re

6

Colonial Mortg. Bankers Corp., 324 F. 3d 12, 15 (1st Cir. 2003); Young v. Lepone, 305 F. 3d 1, 11 (1st Cir. 2002) ("The fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's Complaint."). "The Court's function on a Rule 12(b)(6) motion is not to weigh the evidence which might be presented at trial but merely to determine whether the Complaint itself is legally sufficient." Flamand v. Am. Intem. Group, Inc., 876 F. Supp. 356, 360 (D.P.R. 1994) (citing Festa v. Local 3 Int'l Bhd. Of Elec. Workers, 905 F.2d 25, 37 (2d Cir. 1990). "The court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, however, nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion." Cordero-Hernández v. Hernández-Ballesteros, 449 F.3d 240, 244 n.3 (1st Cir. 2006). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 129 S. Ct. 1937, (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). A plaintiff "must allege 'a plausible entitlement to relief'" in order to survive dismissal. Rodríguez-Ortíz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (citing Twombly, 550 U.S. at 544).

### III.   LEGAL ANALYSIS AND DISCUSSION

Defendants, who appear in their personal capacities only, ask the Court to grant their motion to dismiss on the basis that: (1) Plaintiff failed to state a claim under 42 U.S.C. § 1983 against Defendants for due process violations under the Fourteenth Amendment; (2) in the alternative, the Mayor is protected in his personal capacity from a law suit under the doctrine of qualified immunity; (3) Plaintiff failed to state a claim under the RICO Act, 18 U.S.C. § 1962(c) and § 1962(d); and (4) the Court lacks supplemental jurisdiction over Plaintiffs' auxiliary claims.  This Court will now proceed to consider Defendants' arguments.

**A. 42 U.S.C. § 1983 Claim**

7

Plaintiff brings the suit under Section 1983 against Defendants, seeking injunctive relief and damages for violation of Plaintiff's rights under the Fourteenth Amendment.  Section 1983 provides a cause of action against a person who, acting under color of state law, violated an individual's federally protected rights.  See 42 U.S.C. § 1983.  Officials sued in their individual or personal capacities are "persons" within the meaning of Section 1983, and can be sued for monetary damages, injunctive relief, and attorney's fees.  Hafer v. Melo, 502 U.S. 21, 31 (1991).  "While the plaintiff in an individual capacity suit need not establish a connection to governmental policy or custom, officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses."  Id. at 35.

In order to sustain an "individual capacity" claim under Section 1983, two – and only two – allegations are required.  First, the plaintiff must allege that some person has deprived him of a federal right.  Gomez v. Toledo, 446 U.S. 635, 640 (1980).  Second, the plaintiff must allege that the person who has deprived him of that right acted under color of state law.[1]  Id.  In satisfying the first element, it is not enough for a plaintiff to show that she suffered a deprivation.  Rather, a plaintiff must allege a deprivation of a constitutionally protected interest without due process of law.  Parratt v. Taylor, 451 U.S. 527, 537 (1981).  In addition, a plaintiff must demonstrate a causal connection linking the defendant's conduct to the alleged deprivation.  See Gutiérrez-Rodríguez v. Cartagena, 882 F.2d 553 (1st Cir. 1989).  To establish a "but for" causal connection, a plaintiff must show that the defendant was personally involved in the constitutional violation, see Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658 (1978), and that the conduct was either intentional,

---

[1] For section 1983 liability purposes, "a state employee generally acts under color of state law when, while performing in his official capacity or exercising his official responsibilities, he abuses the position given to him by the State."  *West v. Atkins,* 487 U.S. 42, 49 (1988).

8

grossly negligent, or amounted to a reckless indifference to the plaintiff's constitutional rights.  <u>See</u> <u>Simmons v. Dickhaut</u>, 804 F.2d 182, 185 (1st Cir. 1986).  Section 1983 applies to the Commonwealth of Puerto Rico and its instrumentalities with the same force as to any state.  <u>Deniz v. Mun. of Guaynabo</u>, 285 F.3d 142, 146 (1st Cir. 2002).

In the present case, Defendants move to dismiss the Section 1983 claims for failure to plead specific allegations against Defendants in their individual capacities.  To support this argument, Defendants recite the broad allegations asserted in the Complaint's fifth cause of action for damages for violation of civil rights pursuant to Section 1983:

"The joint actions, performed by co-defendants constitute an attempt to deprive [Plaintiff] of its property rights, without the benefit of due process of law.  It is so because the relevant actions were performed by state actors, the Municipality and its Mayor and associates….Their actions, performed under knowingly false pretenses, were directed to deprive [Plaintiff] of its rights. The remaining actors acted jointly with the state actors, with common intent. That, under civil rights law, 42 U.S.C. § 1983, makes them state actors and subject to the penalties provided by said law…. " Mot. To Dismiss p. 15; Compl. p. 39.

This Court agrees with Defendants that any "joint actions performed by co-defendants" lack the specificity to assert a claim against Defendants individually.  Moreover, the above allegations are conclusory and lack the factual support necessary to state a plausible claim to relief.  However, as Plaintiff argues in its opposition, Defendant's dismissal theory fails to consider the entirety of the Complaint.  We must look beyond the Complaint's poorly pled fifth cause of action and analyze the four corners of the Complaint, which includes the material attached or incorporated by reference, to determine if Plaintiff's pleading is adequate to allege Defendants' personal involvement in the conduct that violated a clearly established federal law.

Based on the facts alleged in the Complaint, there is absolutely no basis for Plaintiff's Section 1983 claim asserted against Mrs. Gonzalez or the conjugal partnership.  These co-defendants were clearly not state employees and could, therefore, not have acted under color of law.  Moreover, Plaintiff only included

them "to answer, financially, for the damages that [the Mayor's] unconstitutional and tortious actions have caused." Compl. p. 4.  Therefore, this Court dismisses the Section 1983 claims against Mrs. Gonzalez and the conjugal partnership because the Complaint is void of factual allegations that could connect co-defendants to the alleged due process violation.  Based upon the foregoing, Defendants' motion to dismiss Plaintiff's Section 1983 claim against Mrs. Gonzalez and the conjugal partnership is GRANTED.

We now must determine whether the four corners of the Complaint contain enough facts to state a plausible Section 1983 claim against the Mayor.

### i.   Deprivation of a Federal Right: Fourteenth Amendment

Regarding the first element of a Section 1983 claim, Plaintiff alleges that the Mayor's termination of the Lease between Plaintiff and the Municipality deprived Plaintiff of its procedural due process rights secured by the Fourteenth Amendment of the Constitution.  The Fourteenth Amendment "provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985).  To succeed on a Fourteenth Amendment procedural due process claim under Section 1983, a plaintiff must establish that: (1) he had a life, liberty or property interest; (2) the defendant, acting under color of state law, deprived him of that interest without due process; and (3) the defendant's alleged conduct was causally connected to the plaintiff's deprivation.  See id. at 538.  Moreover, property interests are not created by the Constitution, but instead are created by an independent source such as state law. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).

Upon review of the Complaint, Plaintiff alleges a plausible Fourteenth Amendment claim against the Mayor.  The Complaint asserts that Plaintiff, by contracting with the Municipality, acquired a protected property right in the leasehold of the Hospital.  Because the Fourteenth Amendment's protection of

10

"property" has been read broadly to extend protection to "any significant property interest," see Fuentes v. Shevin, 407 U.S. 67, 85 (1983), this asserted property interest in the leasehold sufficiently satisfies this element.  The Complaint also states that the Mayor, as the highest elected official of the Municipality, acted under color of state law when he terminated the Lease for "lack of payment" and requested immediate surrender of the property.

Specifically, Plaintiff alleges that the Mayor's termination letter violated Section 13.1.1 of the Lease, which details the contract's dispute resolution process.  Section 13.1.1 requires the parties to make good faith efforts to resolve any disputes between each other through formal negotiations. Formal negotiations would commence only after one party receives written notification from the opposing party describing the problem and proposed solution.   Plaintiff alleges that the Mayor, acting on behalf of the Municipality, breached his duty to send written notification to Plaintiff regarding Plaintiff's rent default.  Moreover, Plaintiff claims that the Mayor violated Section 14.2 of the Lease by delivering the termination notification to an incorrect address.  As a result, the termination deprived Plaintiff of its property interest in the leasehold without adequate notice or an opportunity to be heard.  This Court finds that these factual allegations are sufficient to assert a plausible deprivation of due process under the Fourteenth Amendment.

**ii.  Under Color of State Law**

In regards to the second element, Plaintiff alleges that the Mayor acted under color of Puerto Rican law when he, performing in his official capacity as Mayor of the Municipality, terminated the Lease.  Regarding the required showing of a causal connection, Defendants argue that the Complaint fails to allege that the Mayor "took any intentional decision regarding the lease contract status." This argument, however, is unconvincing and does not prevent Plaintiff from stating a claim against the Mayor.  Based on the Complaint's allegations and the

11

fact that the Mayor personally signed and sent the letter terminating the Lease, the Mayor's connection and personal involvement in the due process violation is established.

Thus, this Court holds that Plaintiff has adequately stated a plausible cause of action under Section 1983 for due process violations against the Mayor. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 569 (2007) (reiterating that Rule 8(a) "do[es] not require a heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."). Based upon the foregoing, Defendants' motion to dismiss Plaintiff's Section 1983 claim against the Mayor is DENIED.

**B. Qualified Immunity**

Defendants argue that in the alternative the Court finds that Plaintiff has sufficiently pled a Section 1983 claim against the Mayor, which we do, the Mayor is entitled to qualified immunity.

"Qualified immunity 'provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing the constitutional rights of private parties." Borges-Colón v. Román-Abreu, 438 F.3d 1, 18 (1st Cir. 2006) (quoting Whitfield v. Meléndez-Rivera, 431 F.3d 1, 6 (1st Cir. 2005)). To determine whether a public official is entitled to qualified immunity, the court applies a three-part test determining: "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue." Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004). The Court denies qualified immunity only if all three questions are answered in the affirmative. Id. at 110. "In order to conclude that the right which the official allegedly violated is 'clearly established,' the

12

contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).

Further, the Court must determine whether a similarly situated reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." <u>Singer v. Maine</u>, 49 F.3d 837, 844 (1st Cir. 1995). "Since qualified immunity is a defense, the burden of proving it rests with the defendant." <u>Gomez v. Toledo</u>, 446 U.S. 635, 641 (1980); <u>see</u> Fed. R. Civ. P. 8(c) (defendant must plead any "matter constituting an avoidance or affirmative defense").

In their motion to dismiss, Defendants provide a thorough recitation of the law regarding the defense and jump to the conclusion that "[D]efendants are entitled to qualified immunity." As Plaintiff contends in its opposition, the Defendants' motion completely fails to offer any arguments or specific facts in support of the alleged immunity from suit. As such, Defendants fail to meet their burden of pleading and their request for dismissal based on qualified immunity is DENIED.

**C. The RICO Claims**

In the Complaint's eleventh cause of action, Plaintiff claims that Defendants along with co-defendants violated and conspired to violate RICO. Plaintiff alleges that Defendants participated in a pattern of racketeering activity involving mail and wire fraud in violation 18 U.S.C. § 1962(c). In addition, Plaintiff avers that Defendants conspired to commit those fraudulent acts in violation of 18 U.S.C. § 1962(d). Defendants subsequently move to dismiss all RICO claims against them for failure to meet the pleading standard for claims brought under the RICO Act.

**i. Substantive Rico Claim**

13

To survive dismissal on a RICO action under § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). Although FRCP, Rule 8 usually allows a plaintiff to make general allegations in a complaint, see Fed. R. Civ. P. 8, more specific pleadings are required where fraud is alleged. Rule 9(b) requires that claims grounded in fraud be pled with particularity, and extends to pleading predicate acts of mail and wire fraud under RICO. Feinstein v. Resolution Trust Corp., 942 F.2d 34, 42 (1st Cir. 1991). To plead specificity in RICO, "the plaintiff must go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communication perpetrating that fraud." New England Data Serv. Inc. v. Becher, 829 F.2d 286, 291 (1st Cir. 1987).

In their motion to dismiss, Defendants argue that the allegations of mail and interstate wire fraud lack the particularity required to sustain a RICO cause of action. Moreover, Defendants aver that Plaintiff's allegations fail to establish an enterprise and a pattern of racketeering activity to state a valid claim. We shall discuss each in turn.

### a. Enterprise

An enterprise consists of "any union or group of individuals associated in fact." Boyle v. U.S., 129 U.S. 2239, 2243 (2009). Moreover, RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct." U.S. v. Turkette, 452 U.S. 580, 583 (1981). In the Complaint, Plaintiff identifies SISSO as the enterprise, stating that "[c]o-defendants' first victim was … SISSO, which is, in 'RICO' terms, the [e]nterprise." Compl. p. 51. It is well established, however, that the enterprise itself cannot be a RICO defendant. "The person or persons alleged to be engaged in racketeering activity must be entities distinct from the enterprise." Odishelidze v. Aetna Life & Cas. Co., 853 F.2d 21, 23 (1st Cir. 1988). Here, Plaintiff asserts a RICO

14

cause of action against Defendants and all other co-defendants, including SISSO. As such, Plaintiff fails to establish the element of an enterprise and, therefore, fails to state a valid RICO claim.

### b. Pattern of Racketeering Activity

Moreover, Plaintiff also fails to establish a pattern of racketeering activity. Civil liability under § 1962(c) requires a "pattern of racketeering activity" consisting of two or more related predicate acts of racketeering activity that are committed over an extended period of time. Schultz v. Rhode Island Hosp. Trist Nat'l Bank, N.A., 94 F.3d 721, 731-732 (1st Cir. 1996). Thus, this element has two prerequisites: (1) two predicate acts of racketeering, and (2) continuity of those acts.

The RICO Act provides a list of what activities constitute "racketeering activity," which includes acts indictable under 18 U.S.C. § 1341, the mail fraud statute. 18 U.S.C. § 1961(1)(B). Plaintiff alleges in the Complaint, and further in its opposition, that Defendants acted together "with a common goal to defraud or attempt to defraud [Plaintiff] … of [its] contractual and property rights." Compl. p. 47. According to Plaintiff, MMC and SISSO effectively merged to become one operating entity ("MMC/SISSO") when MMC acquired SISSO and became the new administrator of the Hospital. Plaintiff alleged that MMC/SISSO, acting under Defendants' control, contracted with the federal government under false pretenses, misleading the government to believe SISSO was the valid administrator of the Hospital (which was previously authorized by the Sublease). This was allegedly done to exploit Plaintiff's license, which SISSO had formerly operated under, in order to receive Medicare funds. Compl. p. 52. Allegedly, MMC/SISSO continuously submitted invoices via mail and/or interstate wire to Medicare and other heath insurance companies, and received payments (in SISSO's name) via interstate mail or wire for alleged medical services. Plaintiff argues that these alleged acts of fraud, although committed by MMC/SISSO, were the result of

15

the Mayor's influence and control over MMC/SISSO.

These general allegations of fraud, however, do not meet the pleading requirements under Rule 9(b) in order to constitute a claim for mail or wire fraud. Even though Plaintiff states the general contents of the communications (i.e., invoices and payments), Plaintiff does not state the time nor place of the alleged mail and wire communication perpetrating that fraud. Given the lack of specificity in Plaintiff's complaint, Plaintiff cannot be said to have sufficiently pled mail or interstate wire fraud under Rule 9(b). As such, Plaintiff has failed to allege that Defendants committed any predicate acts under the RICO Act.

Furthermore, even if Plaintiff had pled mail and wire fraud with the required specificity, Plaintiff would have still failed to state a claim upon which relief could be granted. Mail and interstate wire fraud requires proof that (1) defendants knowingly devised or participated in a scheme to defraud, (2) to obtain money or property by means of false or fraudulent pretenses, representations and promises, and (3) that the mails or interstate wire facilities were used in carrying out the scheme. Neder v. United States, 527 U.S. 1, 20 (1999). The use of the mails or wires need not be essential to the scheme to defraud, or even done by a defendant, so long as the mailing or wire is a closely related and reasonably foreseeable incident of the scheme. United States v. Morrow, 39 F.3d 1228, 1236-123 (1st Cir. 1994).

Because an essential element of the federal fraud statute is the use of interstate communication lines, Plaintiff is required to allege that the wire communications took place across state lines. Here, Plaintiff did not allege that the wire communications between MMC/SISSO and the federal agencies went outside of Puerto Rico. Thus, the Court can assume that the fraudulent communications between the parties occurred within Puerto Rico. Because Plaintiff has only pled the use of *intrastate* communications as wire fraud, Plaintiff has failed to plead RICO predicate acts as required by 18 U.S.C. §§

16

1961(1), 1962(c).

Even on the supposition that two related predicate acts could somehow been established from the vague language contained in the Complaint, Plaintiff runs up against another insurmountable obstacle of establishing the requirement of "continuity". This element is satisfied by alleging: (1) a series of related predicates extending over a substantial period of time that amount to a threat of continued criminal activity ("the closed-ended approach") or (2) that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future ("the open-ended approach"). H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 242 (1989). Here, Plaintiff does not allege either type of continuous racketeering activity, and completely fails to specify any sort of "pattern" (which is defined as two or more acts) of fraudulent communications. Thus, Plaintiff fails to state a claim under RICO.

**ii.   Conspiracy to Violate RICO Claim**

Our conclusion that Plaintiff has failed to adequately plead a substantive violation of RICO makes it unnecessary for us to consider Plaintiff's conspiracy claim. A conspiracy claim under § 1962(d) may survive a fact finder's conclusion that there is insufficient evidence to prove a RICO violation, Howard v. Am. Online, Inc., 208 F.3d 741, 751 (9th Cir. 2000), cert. denied, 121 S. Ct. 77 (2000), but if the pleadings do not state a substantive RICO claim upon which relief may be granted, then the conspiracy claim also fails, id.; see also Salinas v. United States, 522 U.S. 52, 65 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense...."). As such, Defendant's motion to dismiss Plaintiff's claim alleging conspiracy to violate RICO is GRANTED.

**D. Jurisdiction of the State Law Claims**

Defendants also argue that the Court does not have proper jurisdiction over Plaintiff's following state law claims: (1) breach of contract; (2) fraud; (3)

17

damages incidental to contract and/or tort; (4) damages incidental to tortious interference with contractual relations; (5) loss of opportunities and reputation; (6) loss of business opportunity; and (7) damages to other sub-lessors.  Defendants aver that these claims should be dismissed based on lack of supplemental jurisdiction.  This argument is based on Defendants' position that no valid federal claim exists against them because, according to Defendants motion, Plaintiff's Section 1983 and RICO claims should both be dismissed. Although this Court dismisses Plaintiff's RICO cause of action, we disagree with Defendants and hold that a valid federal claim exists because Plaintiff has sufficiently stated a Section 1983 claim against the Mayor.

The jurisdiction of the bankruptcy court, like that of any other federal court, is limited by statute.  Section 1334(b) of Title 28 provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or 'related to' cases under title 11."  The district courts may, in turn, refer "any or all proceedings arising under title 11 or arising in or 'related to' a case under title 11 … to the bankruptcy judges for the district."  At its essence, bankruptcy court jurisdiction exists in cases "under" the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* and those cases "arising under," "arising in," and "related to" title 11. 28 U.S.C. § 1334(b); 28 U.S.C. § 157(a).  These types of proceedings are further delineated as "core" or "non-core."  Because of the constitutional limits imposed upon bankruptcy court jurisdiction, distinguishing between core and non-core proceedings is vital to the exercise of jurisdiction by a bankruptcy court.  A bankruptcy court may hear and finally determine all core bankruptcy proceedings; the parties' agreement is not needed. 28 U.S.C. § 157(b).  In non-core "related to" proceedings, however, only the district court may enter final orders absent consent of the parties.  28 U.S.C. § 157(c).

    **i.**    **"Related To"**

18

Bankruptcy courts may exercise subject matter jurisdiction over core claims that "arise under" or "arise in" a bankruptcy case.  A bankruptcy court will also have subject matter jurisdiction over those non-core proceedings that "relate to" a bankruptcy case.  In re Middlesex Power Equip. & Marine Inc., 292 F.3d 61, 68 (1st Cir. 2002).  A civil proceeding is "related to" a bankruptcy case, for jurisdictional purposes, when the action between the parties affects how much property is available for distribution to creditors of the bankruptcy estate or allocation of property among such creditors, or if the outcome could alter the debtor's rights or liabilities.  Id. at 68.  By its very definition, "related-to" jurisdiction only applies in non-core matters as an alternative basis of jurisdiction.  It assumes that the matter does not 'arise in' the case at hand and therefore it requires some other nexus vis-à-vis the estate involved.

Whether the claims are sufficiently "related to" a bankruptcy case is a question of whether they are "sufficiently connected" to the debtor's reorganization.  The Third Circuit has established a much-cited standard for determining whether a proceeding is "related."  In Pacor, Inc. v. Higgins, 743 F.2d 984 (3rd Cir. 1984), the court described the test as whether "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."  The First Circuit has recognized this standard. See In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991).  In addition, numerous First Circuit district and bankruptcy courts have accepted and applied this test. See, e.g., In re Santa Clara Cnty Child Care Consortium, 223 B.R. 40, 45 (B.A.P. 1st Cir. 1998) (providing a lengthy list of First Circuit district and bankruptcy courts adopting the Pacor test).  Simply stated, if the determination of the controversy could have an effect on the bankruptcy estate, the controversy is a "related matter."  28 U.S.C.A. § 157(a).

Here, Plaintiff's complaint is clear that Defendants' alleged interference of the Lease and lack of payment from SISSO was the direct cause of the bankruptcy filing.  The funding of the plan would come in large part from the

19

final determination of the amounts owed to Plaintiff.  Thus, there exists a sufficient nexus between the determination of this controversy and the administration of the estate to find that this Court has jurisdiction over this matter.

**ii.   Core v. Non-Core**

Once this Court's jurisdiction is established, the Court determines whether a civil proceeding is categorized as either a "core proceeding" or a "non-core proceeding."  The Judicial Code differentiates between core proceedings and non-core proceedings and includes a non-exhaustive list of core proceedings.  See 28 U.S.C. § 157(b)(2).  Section 157 does not provide the bankruptcy courts with the full authority over all matters as to which a district court may exercise jurisdiction under Section 1334.  Pursuant to 28 U.S.C. §157(b)(1), a bankruptcy judge "may hear and determine all…core proceedings arising under title 11…and may enter appropriate orders and judgments, subject to review [under 28 U.S.C. § 158]."  A core proceeding, for bankruptcy jurisdictional purposes, is an action that has as its foundation the creation, recognition, or adjudication of rights that would not exist independent of a bankruptcy environment.

Section 157(c) effectively creates three categories of proceedings: (1) a core proceeding, in which a bankruptcy court may hear the proceeding and make final determinations; (2) a non-core, related proceeding, in which a bankruptcy court may hear the proceeding, but cannot make final determinations absent consent; and (3) proceedings that are non-core and not "related to" a case under title 11, wherein a bankruptcy court may not hear the proceeding.  The Supreme Court decided upon the power of bankruptcy judges to decide core and non-core proceedings in the seminal case of N. Pipeline Constr. Co. v. Marathon Pipeline Co., 458 U.S. 50 (1982).  This case involved an adversary proceeding brought by a debtor-in-possession seeking damages for an alleged pre-petition breach of contract.  The Supreme Court held that the proceeding could not be finally

adjudicated by the bankruptcy court.   The Court explained that while the restructuring of debtor-creditor relationships is at the core of the federal bankruptcy power, the adjudication of state-created private rights is not.  <u>Id.</u> at 71.

The First Circuit defines non-core proceedings as "claims concerned only with state law issues that did not arise in the core bankruptcy function of adjudicating debtor-creditor rights, referring to them as 'Marathon-type suits.'" <u>In re Arnold Print Works, Inc.</u>, 815 F.2d at 167 (quoting 130 Cong. Rec. H1848 (daily ed. March 21, 1984) (statement of Representative Kindness)).   In this case, the court ruled that bankruptcy courts were empowered to finally determine suits filed by an estate representative to collect debts arising after the commencement of the bankruptcy case, but not empowered to finally determine suits relating to debts arising before commencement of the case.   <u>In re Arnold Print Works</u>, 815 F.2d at 168.  While the former was deemed to be core, the latter was deemed non-core.  <u>Id.</u>  The court based its decision on <u>Marathon</u> stating that, "[n]on-core proceedings, those that the statute calls 'related to' bankruptcy cases, concern aspects of the bankruptcy case that <u>Marathon</u> barred non-Article III judges from determining on their own."  <u>Id.</u> at 167.

The present adversary proceeding relates to a pre-petition action for a breach of contract (the termination of the Lease) that commenced outside the bankruptcy court.   The Court in <u>In re Mec Steel Bldgs., Inc.</u> held that, "[i]f an action survive[s] outside of bankruptcy, and in the absence of bankruptcy would have been initiated in a state or district court, then it clearly involves non-core matter."  136 B.R. 606 (Bankr. D. Puerto Rico 1992).  Here, Plaintiff's action could survive outside of bankruptcy and in the absence of bankruptcy, would have been resolved in local court.  Plaintiff's action relates to pre-petition claims arising under local law, which is deemed non-core under cited case law and specifically pursuant to the Supreme Court's decision in <u>Marathon</u>. Cases where courts find that there is "related to" jurisdiction are deemed non-

21

core.  By definition, these actions are non-core related proceedings because they existed prior to the filing of the bankruptcy petition.  Applying the case law and statutes to the facts of the case before us, this Court concludes that Plaintiff's auxiliary claims are non-core proceedings "related to" a case under title 11.  Pursuant to 11 U.S.C. § 157(c)(1) and (c)(2), this Court may only submit proposed findings of facts and conclusions of law. Any final judgment must be entered by an Article III judge, absent consent of all parties. Thus, this Court has proper jurisdiction to hear Plaintiff's state law claims against Defendants and DENIES Defendants' request to dismiss these claims.

### iii.  Abstention

Our analysis now turns to whether this Court should consider abstaining from this proceeding altogether, even though jurisdiction has been established over the controversy. 28 U.S.C. § 1334(c) provides for two types of abstention, mandatory and discretionary (sometimes referred to as permissive). Mandatory abstention under §1334(c)(2) provides that "upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, "related to" a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated in a State forum of appropriate jurisdiction." The key factors for discretionary abstention under 28 U.S.C. § 1334 (c)(1) implicate: (1) the interest of justice; (2) the interest of comity with state courts; or (3) respect for state law.

### a.    Mandatory Abstention

Therefore, in order for mandatory abstention to apply, the proceeding must: 1) be based on a state law claim or cause of action, 2) lack a federal jurisdictional basis absent the bankruptcy, 3) be commenced in a state forum of

22

appropriate jurisdiction, 4) be capable of timely adjudication, and 5) be a non-core proceeding. 28 U.S.C. Sec. 1334(c)(2). "Pursuant to section 1334(c)(2), the 'district court must abstain from hearing a purely state law claim where there is no other basis for federal jurisdiction other than its relatedness to a bankruptcy proceeding (including one where the debtor is a party) and where the claim can be timely adjudicated in state court.'" In re Interamericas Turnkey Development Co., Inc., 94 B.R. 9, 13 (D. Puerto Rico 1988), citing Matter of Candelero Sand & Gravel, Inc., 66 B.R. 903, 908 (D. Puerto Rico 1986)(quoting State Bank of Lombard v. Chart House, 46 B.R. 468, 472 (N.D. Ill. 1985)); see also Goya Foods v. Unanue-Casal (In re Unanue-Casal), 164 B.R. 216, 222-23 (D. Puerto Rico 1993)(discussing requirements for mandatory abstention), aff'd., 32 F.3rd. 561 (1st Cir. 1994).  The language of the statute is clear that one of the prerequisites for mandatory abstention is that an action must have been initiated in a state forum with jurisdiction. See, Juan Flores Rivera v. Telemundo Group, 133 B.R. 674 (D. Puerto Rico 1991); In re Mec Steel Bldgs., Inc., 136 B.R. at 610.  Applying these factors to the present case, it is clear that all factors can be satisfied except for, arguably, factor four where the timeliness of the resolution in state court could be questioned; and factor three, which requires that a state court case be pending. As there is no state litigation pending in this case, and in view of the facts that not all of the required elements for mandatory abstention are met, abstention in this form is deemed inapplicable.

>        **b.   Discretionary Abstention**

Even though mandatory abstention does not apply, § 1334(c)(1) provides for discretionary or permissive abstention. Section 1334(c)(1) states that "[n]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or 'related to' a nor difficult, or the matters involved do not have an impact on

23

state policy. <u>Telemundo,</u> 133 B.R. at 675.

In <u>Telemundo</u>, The District Court of Puerto Rico listed the factors to consider upon reaching a determination as to discretionary abstention:

(1) the effect or lack thereof on the efficient administration of the estate if a court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other non bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted core proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy's court] docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to jury trial, and (12) the presence in the proceeding of non-debtor parties.

<u>Telemundo, 133 B.R. at 677</u>. This case involves a collection of monies action and breach of contract which requires the application of well established state law. The fact that the case involves issues of state law alone is not sufficient to warrant abstention. In fact, upon considering core matters this court must interpret state law routinely. For example, when deciding which creditor has a better claim, the court must look at the validity of the lien according to state law. See, <u>In re Arnold Print Works, 815 F.2d at 169.</u> As to the interest of justice, an abstention with respect to the Plaintiff's dispute would not advance judicial economy or the administration of this bankruptcy case. The non-core related proceeding could result in the payment of the substantial amounts claimed to be owed. This fact should be determined in the context of this bankruptcy case and should not be delayed as the result of requiring Plaintiff to commence another case in the state court. See, <u>In re Earle Industries, Inc., 72 B.R. 131, 134 (Bankr. E.D. Pa. 1987)</u>; <u>In re Climate Control Engineers, Inc., 51 B.R. 359, 363 (Bankr. M.D. Fla. 1985)</u> ("Because there is no action commenced in state court covering the same subject matter ... and because the power to

24

abstain should be exercised sparingly"). In regard to the interest of comity with state courts, there is no action pending in state court covering the same subject matter. As to the requirement regarding the respect for state law, the action for breach of contract or fraud does not involve unsettled issues of state law or matters of substantial public importance. Telemundo, 133 B.R. at 675. Therefore, discretionary abstention with regard to Plaintiff's claims, in either its mandatory or discretionary form, is inapplicable to this proceeding.

### iv.   The _Stern v. Marshall_ Case

A thorough analysis of this court's jurisdiction over the state law claims presently before us would not be complete without discussing the recent ruling by the Supreme Court. In Stern v. Marshall, ____U.S. ____ , 131 S. Ct. 2594 (2011), the U.S. Supreme Court, in a 5-4 decision, held that the bankruptcy court could not, as a constitutional matter, enter a final judgment on a counterclaim that did not arise under title 11 or in a case under title 11, even though 28 U.S.C. § 157(b)(2)(C) expressly permits it to do so. The Court affirmed a 2010 ruling of the Ninth Circuit Court of Appeals and held that a bankruptcy court, as a non-Article III court, did not have the constitutional authority to decide a state law claim brought by a debtor against a creditor, even though the matter was part of the "core" statutory jurisdiction of the bankruptcy court. This significant decision limits the power of bankruptcy courts and may have wide-ranging implications, requiring certain types of claims to be decided in a non-bankruptcy forum, even where they are central to a debtor's bankruptcy case. In a dispute concerning the estate of the late J. Howard Marshall II, Pierce Marshall filed a complaint in Vickie Lynn Marshall's bankruptcy case alleging that V.L. Marshall defamed him and that such defamation claim was not dischargeable. V.L. Marshall counterclaimed for tortious interference with a gift expected from her late husband J. Howard. The bankruptcy court granted V.L. Marshall summary judgment on Pierce Marshall's

25

claim for defamation and awarded V.L. Marshall more than $400 million on her
counterclaim against Pierce Marshall.

Justice Roberts began his majority opinion by examining 28 U.S.C. § 157,
which "divide[s] bankruptcy proceedings into three categories: those that
'arise[s] under title 11'; those that 'aris[e] in a title 11 case'; and those
that are 'related to a case under title 11.'" "Bankruptcy judges may hear and
enter final judgment in 'all core proceedings arising under title 11, or arising
in a case under title 11." 11 U.S.C. § 157(b)(2)(C) details 16 types of core
proceedings, including counterclaims by a debtor against a claimant. The majority
found that V.L. Marshall's counterclaim against Pierce Marshall for tortious
interference constituted a "core proceeding" under the plain text of the statute.
The majority held that as a statutory matter, the Bankruptcy Court had authority
to enter a final judgment on the debtor's counterclaim for tortious interference.
However, the analysis did not end there. Despite finding that 28 U.S.C. § 157
permitted the Bankruptcy Court to enter a final order in the matter, the majority
agreed with Pierce Marshall that Article III of the Constitution rendered this
statutory provision unconstitutional and held that the Bankruptcy Court could not
enter a final order on the state law counter-claim.

With a stern lecture to Congress not to hand off the work of judges to
others, even if those others might have the title "judge," a divided Supreme
Court  took out of the reach of specialized federal bankruptcy courts the
authority to decide a small, but potentially significant, group of debtors'
claims.  Striking down a part of a 1984 law designed to satisfy an earlier
Supreme Court decision limiting bankruptcy judges' powers, the Court ruled that
specialized judges who do not have life tenure and other guarantees of
independence cannot decide in a final way a debtors' claim that is based upon
state law with no link whatever to federal law or regulations. For the
specialized bankruptcy courts, the decision was as momentous a constitutional

26

ruling on those courts' authority as was the Justices' decision in the 1982 case of Northern Pipeline Construction v. Marathon Pipe Line, *supra*, nullifying an earlier congressional law against those courts' powers. Congress, in 1984, passed a new law to salvage the bankruptcy courts' authority by changing the way their judges were named, and the way those courts' rulings were reviewed in higher federal courts. But the decision found that Congress had violated Article III in giving bankruptcy courts final authority to decide one kind of claim that debtors assert in those cases. That claim, the new decision made clear, is one that is based solely on state law, and that characteristic puts it — because of Article III — beyond the reach of a bankruptcy judge. Under the 1984 law, Congress gave the regional federal appeals courts the authority to name bankruptcy judges and limited such judges to 14-year terms. By contrast, federal judges named under Article III are appointed by the President, subject to Senate confirmation, and serve for life unless removed by impeachment. The new ruling specifies that a non-Article III judge of a bankruptcy court cannot constitutionally be given the authority to decide a debtor's claim that is exclusively based upon some legal right assured by state law.

While Stern v. Marshall is probably the Supreme Court's most significant ruling on bankruptcy jurisdiction in recent years, the impact is not yet clear. Moreover, the opinion may be restricted by its facts to counterclaims with little or no relation to the underlying bankruptcy claim. Despite our analysis of this seminal opinion, this Court finds that at this stage in our proceedings its applicability to the matters at hand is non conclusory. Our jurisdictional conclusion remains the same. The safe interpretation as to the limitations upon this court due to the effect of the Stern case is that this Court may only submit proposed findings of facts and conclusions of law regarding the state law claims against Defendant. Any final judgment will be entered by an Article

27

III judge, absent consent of all parties.

#### IV.   CONCLUSION

WHEREFORE, in view of the above, IT IS ORDERED that the following claims be dismissed for failure to state a claim pursuant to FRCP, Rule 12(b)(6):

(a) Plaintiff's Section 1983 claim against Mrs. Gonzalez and the conjugal partnership

(b) Plaintiff's RICO claims against Defendants

IT IS FURTHER ORDERED that the following claims be sustained:

(a)   Plaintiff's Section 1983 claim against the Mayor

(b)   Plaintiff's state law claims against Defendants: (1) breach of contract; (2) fraud; (3) damages incidental to contract; (4) tortious interference with contractual relations; (5) loss of opportunities and reputation; (6) loss of business opportunity; and (7) damages to other sub-lessors.

IT IS SO ORDERED.

San Juan, Puerto Rico this 02 day of September, 2011.

Brian K. Tester
U.S. Bankruptcy Judge

CC:   ALL CREDITORS

28